1  Steve W. Berman (*pro hac vice* pending)
   Mark S. Carlson (*pro hac vice* pending)
2  HAGENS BERMAN SOBOL SHAPIRO LLP
   1918 Eighth Avenue, Suite 3300
3  Seattle, WA  98101
   Telephone:  (206) 623-7292
4  Facsimile:   (206) 623-0594
   steve@hbsslaw.com
5  markc@hbsslaw.com

6  Rio S. Pierce, CBA No. 298297
   HAGENS BERMAN SOBOL SHAPIRO LLP
7  715 Hearst Avenue, Suite 202
   Berkeley, CA 94710
8  Telephone:  (510) 725-3000
   Facsimile:   (510) 725-3001
9  riop@hbsslaw.com

10 *Attorneys for Plaintiff*
   Rearden LLC and Rearden Mova LLC
11

12                UNITED STATES DISTRICT COURT

13               NORTHERN DISTRICT OF CALIFORNIA

14                  SAN FRANCISCO DIVISION

15

| REARDEN LLC, REARDEN MOVA LLC, California limited liability companies,<br><br>                                   Plaintiffs,<br><br>        v.<br><br>TWENTIETH CENTURY FOX FILM CORPORATION, a Delaware corporation, TWENTIETH CENTURY FOX HOME ENTERTAINMENT LLC, a Delaware limited liability company,<br><br>                                   Defendants. | No. ___<br><br>**COMPLAINT FOR COPYRIGHT AND TRADEMARK INFRINGEMENT**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |
| --- | --- |

COMPLAINT
Case No.:

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................1

II.   THE PARTIES ..................................................................................................4

III.  JURISDICTION AND VENUE ........................................................................4

IV.   FACTUAL ALLEGATIONS .............................................................................5

      A.    The MOVA Contour systems and methods..............................................5

      B.    The MOVA Contour intellectual property .............................................32

      C.    Rearden's authorized use of the MOVA Contour system, methods, and Contour Program and output in fifteen major motion pictures, and industry acclaim ...........34

      D.    Transfer of the MOVA Assets to OnLive, Inc., OL2, Inc., and Rearden Mova .......36

      E.    Shenzhenshi's transparently false ownership claims ............................37

      F.    Defendants' unauthorized use of the MOVA Contour system, methods, and Contour Program and output .................................................................................39

            1.    *Night at the Museum: Secret of the Tomb* ................................40

            2.    *Fantastic Four* ...........................................................................42

            3.    *Deadpool* ...................................................................................45

FIRST CAUSE OF ACTION: COPYRIGHT INFRINGEMENT ................................50

SECOND CAUSE OF ACTION: TRADEMARK INFRINGEMENT ...........................54

PRAYER FOR RELIEF .......................................................................................57

DEMAND FOR JURY TRIAL ..............................................................................58

Plaintiffs Rearden LLC and Rearden Mova LLC (collectively, "Plaintiffs"), through their attorneys and for their claims against defendant Twentieth Century Fox Film Corporation ( "Fox"), allege as follows.

## I.    INTRODUCTION

1.    Twentieth Century Fox's *Deadpool* opened on February 12, 2016, grossing $132 million in North America and $265 million globally.  It was the top film opening of all time for an R-rated film, both domestically *and* internationally.  And it is now highest grossing R-rated film of all time, earning over $363 million domestically and $783 million worldwide.[1] *Deadpool* is by far the highest grossing of any of Fox's ten X-Men franchise movies.[2]

2.    Colossus is a well-known X-Men franchise character that has a metallic body and face. In prior X-Men movies, Colossus was played by an actor whose face was made metallic-looking using conventional Visual Effects ("VFX") techniques, resulting in a character that was no taller or larger than the actor. But *Deadpool* director Tim Miller wanted Colossus to appear as he did in the original X-Men comic books: "…in the comics he's this seven- or eight-foot tall [expletive] behemoth of a character and that's why he's so cool…"[3] As a result, Miller needed to create an entirely CG (computer graphics) Colossus. X-Men movie fans had come to expect a Colossus with a real human face, so Miller turned to a unique Oscar-winning VFX technology called MOVA Contour Reality Capture, which transferred every human subtlety of the Colossus actor's facial performance through to the CG metallic face of the Colossus character. The result was a behemoth-sized entirely CG Colossus that was faithful to the original X-Men comic books, but whose CG face had completely photorealistic human motion, consistent with the Colossus of prior X-Men movies.

3.    Annemarie Griggs, *Deadpool* Visual Effects Producer, described how two actor's faces were used to create the Colossus CG face, one for initial shape of the face, and one to provide facial motion throughout the *Deadpool* movie:

---

[1] http://www.boxofficemojo.com/movies/?id=deadpool2016.htm

[2] http://www.boxofficemojo.com/franchises/chart/?id=xmen.htm

[3] "From Comics to Screen…to Screen: MAGIC!" featurette on *Deadpool* DVD, Blu-ray and digital video with bonus features.The deleted expletive has the meaning of "extraordinary" in this context.

"…we had one actor whose face was used as the original face model for the look of his face. Then we had another actor whose facial movements were used when Colossus speaks."[4]

Pauline Duvall, Visual Effects Supervisor of Miller's VFX company, Blur Studio, described how the facial performance was captured with the extraordinary precision required to preserve and transfer the subtleties of the facial actor's performance:

"Digital Domain has a great system called 'MOVA' which is a facial capture system. You paint on the face and it creates thousands and thousands of little tracking markers. At that point you get a piece of geometry that captures movement and acting of the actor."[5]

4.    But neither Ms. Griggs, Ms. Duvall, nor defendant Fox ever mentioned that the acclaimed cutting-edge digital MOVA Contour technology that made the photorealistic face of the CG Colossus possible was stolen from its inventor and developer, Rearden LLC, and its owner Rearden Mova LLC.  Nor is it ever mentioned that although Fox had previously contracted with Rearden LLC and its controlled entities on a previous film, *Percy Jackson & The Olympians: The Lightning Thief*, Fox nonetheless secretly contracted with the thieves to use the stolen MOVA Contour facial performance capture technology.

5.    Nor was it ever disclosed that *Deadpool* Director Tim Miller and his VFX company, Blur Studio, had a long relationship with Rearden LLC and its controlled entities, contracting for motion and facial capture work and collaborating on projects. Mr. Miller and Blur Studio had previously created an all-CG photorealistic superhero short animated film, entitled *Batman: Arkham City*[6], utilizing MOVA Contour facial performance capture systems and methods, and the Contour Program output authorized by Rearden LLC and its controlled companies. Also, Mr. Miller and Blur Studio were hired by Rearden LLC as contractors to do marker-based facial animation tests during MOVA Contour's development.[7] Mr. Miller has known Mr. Perlman personally for over a decade,

---

[4] "From Comics to Screen…to Screen: MAGIC!" , op. cit.

[5] "From Comics to Screen…to Screen: MAGIC!", op. cit.

[6] "Batman: Arkham City - Behind The Scenes Of The Cinematic Trailer", October 23, 2011, shows how MOVA Contour was used by Blur Studio. https://youtu.be/oPYM4TG0oXM

[7] "Steve Perlman at Columbia Engineering School", June 4, 2011. "Marker-based Woman Pirate face test animation" by Blur Studio, directed by Tim Miller, under contract by Rearden. Starts at 14 minutes, 24 seconds. https://youtu.be/1QxrQnJCXKo?t=14m24s

COMPLAINT
Case No.:

2

frequently shared with Mr. Perlman projects he was working on, and sought business and financial advice from Mr. Perlman related to movie production.

6.      And, nowhere is it mentioned that *after* Rearden and Rearden Mova were in widely-reported litigation against the MOVA Contour thieves, Fox and Miller secretly engaged the thieves to provide MOVA Contour facial performance capture in *Deadpool* during the litigation.

7.      But throughout this entire time, Fox never bothered to contact its longtime MOVA Contour service provider Rearden LLC to ask any questions or to verify authorization to use the MOVA Contour system, methods, trade secrets, or trademarks that Fox knew Rearden owned. Nor did Mr. Miller ever bother to call Mr. Perlman, his longtime business associate and friend, to verify authorization to use MOVA Contour.

8.      And this was not the first time that Fox contracted with MOVA Contour's thieves. Fox contracted with them previously to use MOVA Contour in another film, *Night at the Museum: Secret of the Tomb*, which was also highly successful. MOVA Contour was used to capture a facial performance (from the same actor used in *Deadpool*), to bring the CG face of a Roman bust of Augustus Caesar to life.[8] Fox also contracted with the same thieves previously to use MOVA Contour in another film, *Fantastic Four*. It used MOVA Contour to capture a facial performance of actor Jamie Bell as an animation reference for the Thing character. [9]

9.      Fox used the stolen MOVA Contour systems and methods and Contour Program output, made derivative works, and with Fox Home Entertainment, reproduced and distributed, and authorized performance and display of *Deadpool, Night at the Museum: Secret of the Tomb* and *Fantastic Four* in knowing or willfully blind violation of Rearden Mova LLC's intellectual property. This case seeks all just and equitable copyright and trademark remedies on behalf of the inventors and owners of the MOVA Contour systems and methods, and Contour Program and output, plaintiffs Rearden LLC and Rearden Mova LLC.

---

[8] https://youtu.be/0pZZlj3KVrk?t=1m18s

[9] Failes, Ian, "Fantastic Five", fxguide, August 9, 2015. https://www.fxguide.com/quicktakes/fantastic-five/

## II.    THE PARTIES

10.    Plaintiff Rearden LLC ("Rearden") is a California limited liability company having its principal place of business at 355 Bryant Street, Suite 110, San Francisco, California 94107.

11.    Plaintiff Rearden Mova LLC ("Rearden Mova") is a California limited liability company having its principal place of business at 355 Bryant Street, Suite 110, San Francisco, California 94107.  Rearden MOVA is wholly owned by Rearden.

12.    Defendant Twentieth Century Fox Film Corporation ("Fox") is a Delaware corporation having its principal place of business at 10201 W. Pico Blvd., Los Angeles, California 90064.

13.    Defendant Twentieth Century Fox Home Entertainment LLC ("Fox Home Entertainment") is a Delaware limited liability company, having its principal place of business at PO Box 900, Beverly Hills, California, 90213.  Fox Home Entertainment is wholly-owned and controlled by Fox.

## III.    JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), and § 1338 (trademark and copyright jurisdiction).

15.    This Court has personal jurisdiction over Fox and Fox Home Entertainment.  It has general personal jurisdiction over Fox and Fox Home Entertainment because their principal places of business are in the State of California and they have the capacity to sue and be sued in the State of California.  And this Court has specific personal jurisdiction over Fox and Fox Home Entertainment because they have committed acts in the State of California that give rise to all claims of infringement asserted herein.

16.    Venue is proper for plaintiffs' copyright and trademark infringement claims under 28 U.S.C. § 1400(a) and 1391 (b), (c) and (d).  Fox used plaintiffs' MOVA service mark, made derivative works, and with Fox Home Entertainment, reproduced, distributed, and authorized the performance and display of *Deadpool, Night at the Museum: Secret of the Tomb* and *Fantastic Four* throughout this judicial district.

COMPLAINT
Case No.:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### IV.    FACTUAL ALLEGATIONS

**A.    The MOVA Contour systems and methods**

17.    The technology at the core of this case includes MOVA Contour Reality Capture ("Contour" or "MOVA Contour") technology that was conceived and developed by plaintiff Rearden and is currently owned by Rearden MOVA, which is wholly owned by Rearden.

18.    MOVA Contour (http://www.rearden.com/mova.html) is one of many technologies incubated and offered by Rearden (www.rearden.com), a San Francisco Bay Area company founded in 1999 by Steve Perlman as an incubator for fundamental technology, creative works, and their interplay.

19.    MOVA Contour is the fourth performance motion capture technology that Rearden has used in film and videogame production since its founding 18 years ago.  Facial performance motion capture, as both a technology and a tool for motion picture and videogame production, falls squarely within the focus of Rearden's business.  Rearden practices all of its technologies and inventions, either directly or indirectly by spinning off Rearden entities to use its technologies and inventions.  Despite holding a global portfolio of hundreds of its own patents, Rearden has never been in the business of licensing third parties to practice its technologies and inventions, and it has never licensed nor sought to license any of its technologies, inventions, patents, copyrights, or trademarks.  Rearden's intellectual property portfolio exists only to protect Rearden's product and services offerings, and neither Rearden nor any of its controlled entities has ever previously sued any other person or entity for patent or copyright infringement before this matter.

20.    Mr. Perlman previously worked as Principal Scientist at Apple where he developed, among many other technologies, the multimedia underpinnings of the color Macintosh as well as QuickTime. He left Apple for two startups that later went public, and designed and co-founded WebTV, which was later acquired by Microsoft. Microsoft named Perlman President of a new Silicon Valley division focused on television products, which ultimately developed Microsoft's cable, satellite, IPTV and Xbox 360 systems. Perlman left Microsoft in 1999 and self-funded a technology incubator and visual effects production studio in San Francisco called Rearden, Inc. (now Rearden LLC). Rearden focused largely on developing fundamental media-related technologies

whose development times (e.g. 5 to 15 years) are beyond the horizon of venture capital and corporate research and development.  Perlman has operated Rearden continuously through to this day.  He is a prolific inventor.  Perlman is a named inventor on over 500 patents worldwide, and among his many innovations are the following:

- The underlying technology for QuickTime (the video streaming technology for iPhone, iPad, iPod and Mac and much of the multimedia technology for Apple);

- The underlying technology for many of Microsoft's video products;

- OnLive cloud gaming technology;

- MOVA Contour facial capture technology;

- Artemis pCell wireless technology; and

- A wide range of other technologies in other fields, including medical and national defense life-saving technologies, often in cooperation with the U.S. government and U.S. agencies, sometimes not publicly disclosed.

21.    A major technology focus of Rearden is and has been "performance motion capture," a production technology typically used to create a 3D animated character in a film or videogame that moves exactly like a human performer. In 2000, Rearden began offering motion capture services for movies and videogames (through wholly-owned subsidiaries Rearden Studios and then MOVA LLC) using existing commercial "marker-based" motion capture systems that could capture and track body ("skeletal") motion, but there was no known technology at that time that could capture and track the subtleties of human facial motion in a realistic, life-like manner, despite an urgent need:

"The state of the art [before Contour] was … marker-based motion capture…we looked at a number of other films at the time that were using facial marker tracking…as you can see, it gives you a pretty crappy performance… What we realized was that what we needed was the information that was going on between the markers. We needed the subtleties of the skin. We needed to see skin moving over muscle moving over bone. We needed creases and dimples and wrinkles…" [10]

Rearden set out to invent and perfect a photorealistic facial motion capture and tracking system.

---

[10] Ulbrich, Ed, "How Benjamin Button Got His Face" TED Talk, Feb 2009. https://www.ted.com/talks/ed_ulbrich_shows_how_benjamin_button_got_his_face.

22.    Over the next five years, Rearden's technical team tried dozens of different approaches to solve the problem, ultimately leading to the conception and perfection of a solution to the long-felt need—a technology that precisely captures and tracks the 3D shape and motion of a human face to sub-millimeter precision, producing photorealistic results. Rearden branded the technology Contour Reality Capture, and offered it as a service. This innovative technology was recognized in the motion picture industry as revolutionary:

"Contour's promise is enormous," [Director David] Fincher said, "The notion that the human face in all its subtleties could be mapped in real time and such density of surface information opens up so many possibilities for both two- and three-dimensional image makers and story-tellers."

"I live in this environment, and I see stuff every day, so I get a little jaded," said [Digital Domain Senior VP and Executive Producer Ed] Ulbrich… "Other developments have been gradual, more evolutionary than revolutionary. Contour separates the performance from the photography. It's a substantial turning point in the business, and I think it will change how picture are made."[11]

23.    MOVA Contour's technical breakthrough was introduced at the Special Interest Group on Computer Graphics and Interactive Techniques ("SIGGRAPH") Conference on July 31, 2006 to wide acclaim, including photographs of Contour's systems and methods on the front page of the *New York Times*[12], page B1 of the *Wall Street Journal*[13], and *The Hollywood Reporter*, among other publications. Mr. Perlman was invited to present MOVA Contour technologies and their practical applications in movie production to the Directors Guild of America[14]. And he was invited on many occasions to give public presentations on MOVA Contour and the development process that led to its invention, for example in a speech at Columbia University[15].

---

[11] Marlowe, Chris, "Contour mapping intricate detail: Mova revolutionizing motion-capture process with new system," The Hollywood Reporter, July 31, 2006, http://www.rearden.com/press/2006/Contour-HollywoodReporter-060731-2.pdf.

[12] Markoff, John, "Camera System Creates Sophisticated 3-D Effects", New York Times, July 31, 2006. https://nyti.ms/2uAfwGF.

[13] Wingfield, Nick, "Digital Replicas May Change Face of Films", July 31, 2006. http://on.wsj.com/2teIRbO.

[14] "'Facial Performance Capture for Photoreal Digital Characters' Presented by Steve Perlman, Founder & President, Mova", Digital Day 2007: The Future of the Future, Directors Guild of America, July 28, 2007. http://ishindler.com/articles/DGA_Digital_Day_flyer07.pdf.

[15] https://youtu.be/1QxrQnJCXKo.

COMPLAINT
Case No.:

24.    The following photograph[16] from an article in *The Hollywood Reporter* on the day MOVA Contour was unveiled—July 31, 2006—was directed to movie and videogame industry professionals and illustrates several Contour Program output, which are described in further detail later in this complaint:



25.    Also on July 31, 2006, the following photographs appeared in a *New York Times* article directed to a general readership audience, which illustrate an application of the phosphor-based makeup used in MOVA Contour facial motion capture methods:

---

[16] Marlowe, op. cit.

COMPLAINT
Case No.:



Actors must cover themselves with makeup containing phosphorescent powder for Contour, a system that can create 3-D effects. Austin Hice

and stills from three Contour Program output (this photograph appeared on the front page):[17]



An actress goes from live performance, left, to phosphorescence, to a Contour-generated image, right. Mova.com

26.    Also on July 31, 2006, the following photograph appeared in a *Wall Street Journal* article directed to a general readership audience, which illustrates the same three Contour Program output with "non-technical reader" annotations for each image (the web version of the article included a video that showed the three output in motion):[18]

---

[17] Markoff, op. cit.

[18] Wingfield, op. cit.

COMPLAINT
Case No.:



Contour cameras film the movements of an actress wearing glow-in-the-dark makeup

Cameras capture a series of raw 3-D images defined by the makeup

The digital version of the actress is completed with skin and clothing textures

27.     In one embodiment, MOVA Contour uses an array of cameras whose shutters are synchronized to strobing white lights and ultraviolet lights ("black lights") in conjunction with phosphor-based makeup applied to the performer in random patterns, with the entire system controlled by highly-advanced and proprietary MOVA Contour software that operates the Contour system in real time to capture an actor's performance frame-by-frame, and then creates original Contour Program output based on the performance, frame-by-frame.

28.     The Contour system is controlled, and the captured camera images are processed, by several computers running copyrighted software. Some of the software operates prior to a facial capture session to prepare and calibrate the Contour system, some operates in real-time during a live facial capture, and some operates after the facial capture. Collectively, this Contour software is referred to herein as the "Contour Program." The Contour Program produces several types of output, some of which are used by the Contour Program itself for further processing, and others of which are used for driving a CG face in a movie or videogame.

29.     One embodiment of the operation of the MOVA Contour system and methods, and the Contour Program, is described in the following page from a MOVA Contour brochure below, which was distributed at computer graphics and entertainment industry conferences:

COMPLAINT
Case No.:

# HOW IT WORKS

## PREPARATION



Preparation is completed in under an hour. The actor's skin is sponged with an FDA-approved phosphorescent makeup, either alone or mixed with skin-tone base color. Cloth can also be treated with a phosphorescent dye.

## LIGHTS



The Contour capture system is portable, and can be set up on any light-sealed stage. The stage is then lit with custom Kino Flo fluorescent fixtures. Because the lights are flashed on and off at 90 to 120 frames per second (i.e. beyond human perception), the stage appears steadily lit to the eye.

## CAMERAS



**Two sets of cameras are placed around the stage area:**

*Color cameras* capture normally-lit surfaces only when the lights are on. This provides the reference video used for previews.

*Geometry cameras* capture phosphorescent patterns (embedded in the makeup or cloth dye) only when the lights are off.

## ACTION



**Live Performance:** Contour enables true "digital directing." Subjects are able to move freely within the capture volume. Color cameras capture normally-lit surfaces, providing reference video from three or more cameras.



**Capture Process:** Our cameras capture every surface detail where phosphorescent makeup is applied. It's like having millions of invisible markers. Wrinkles, dimples, lips, nostrils—every subtle detail is captured in motion.



**Captured Surface:** The recorded phosphorescent patterns are then correlated to produce a high-resolution surface geometry—100,000+ polygons per scene.



**Tracked Surface:** Contour tracks your optimal number of surface points from frame to frame and shot to shot. Tracked points are specified by the client after the capture session and placed wherever required. Tracked points can be added, moved and retracked, utilizing the same capture data.

**For more information, or to contact us, visit www.mova.com. The MOVA studio is located in San Francisco, CA.**

Copyright MOVA® LLC 2006–2008. MOVA is a registered trademark and Contour is a trademark of MOVA LLC. Patents Pending.

COMPLAINT
Case No.:

30.    **Preparation:** Phosphor-based makeup (various types of phosphor are supported) is applied in a random pattern on the performer's face, neck, etc.—whatever body surfaces are intended to be captured—typically using an airbrush, sponge or cotton swab.

31.    **Lights:** The performer sits or stands in the arc-shaped Contour rig in a light-sealed stage. One part of the Contour Program causes white lights and black lights to be flashed so rapidly that the flashing is beyond human perception and it appears to the performer and observers that the lights are on steadily. Typically fluorescent lamps or LEDs are used.

32.    **Cameras:** One part of the Contour Program causes the shutters on two pluralities of cameras, distributed around the rig, to open and close synchronously with the flashing of the lights such that:

   (a)    a first plurality of cameras open their shutters when the white lights are on, illuminating the natural skin color of the performer; and

   (b)    a second plurality of cameras open their shutters when the white lights are off and the phosphor-based makeup is emitting random patterns of light (typically in green or blue).

33.    **Action:** The performer provides her or his facial performance while one part of the Contour Program causes the output of each of the plurality of cameras to be recorded onto storage devices. The output of the two pluralities of cameras are illustrated in each half of the face in the "Capture Process" section of the brochure reproduced above.

   (a)    the output of the first plurality of cameras is called herein the "**Skin Texture**" and it looks like normal skin and facial features of the performer from multiple angles, largely without visible makeup, and

   (b)    the output of the second plurality of cameras is called herein the "**Makeup Pattern**" and it looks like a random pattern of green or blue largely without showing the skin or other facial features (e.g. eyes or mouth) of the performer.

34.    The Contour Program uses the Makeup Pattern output to compute a high-resolution 3D surface that moves in the shape of the skin of the performer with sub-millimeter precision. This output is called herein the "**Captured Surface**" and, rendered on a display, it looks like a 3D bust of

the performer's skin in motion. A still frame of a Captured Surface is shown in the "Captured

Surface" section of the brochure reproduced above.

35.    The Contour Program also uses the Makeup Pattern output to compute a high-

resolution 3D mesh that tracks 3D points on the skin of the performer as the skin moves from frame-

to-frame. This output is called herein the "**Tracking Mesh**" and, rendered on a display, it looks like

a 3D mesh that exactly follows the movement, stretching and wrinkling, etc., of the skin as the

performer moves her or his face. A still frame of a Tracking Mesh is shown in the "Tracked Surface"

section of the brochure reproduced above. The Tracking Mesh tracks the subtleties of the

performer's facial motion with sub-millimeter precision. For example, if the performer's expression

causes the cheeks to bulge out from a smile, the 3D points on the mesh tracking the cheek will bulge

out in exactly the same 3D shape. If the forehead furrows into wrinkles, then the 3D points on the

mesh tracking the forehead will furrow into wrinkles in exactly the same 3D shape. The Tracking

Mesh can be configured to be at any resolution, whether thousands or even millions of 3D points,

depending on the level of tracking detail required by the project. An example of a Tracking Mesh

tracking skin deformation from an extreme expression is shown here:



36.     The Contour output specified above can be used for many different applications. Often they are used for "retargeting" the performer's face onto another 3D model of a face, either a real face (e.g. when Rupert Grint (Ron Weasley) transforms into the face of Daniel Radcliffe (Harry Potter) in *Harry Potter and the Deathly Hallows, Part I*), or a fictional face (e.g. Mark Ruffalo's face transforms into the Hulk's superhero face in *The Avengers*, Brad Pitt's 44-year-old face retargeted to an 87 year-old version of his face in *The Curious Case of Benjamin Button*), or Jeff Bridge's face retargeted in *TRON: Legacy* (2010) to his 28 year-younger face as it appeared in *TRON* (1982).

37.     When the retargeting is from a first performer's real face to the real face of a second performer, then each performer's face is captured by the Contour system, with output created by the Contour Program for each performer. The Captured Surface, Tracking Mesh, and Skin Texture output can be used in the construction of a 3D model of the face of the second performer, and then the Tracking Mesh of the first performer is used to control the 3D model of the second performer's face. The result is a 3D model of the face of the second performer that is controlled by the motion of the first performer's face. For example, the photograph below shows a man (the "second performer") captured by Contour. The 3D model of a CG head (center) was generated from the Contour Program output, including the Makeup Pattern (left) and Tracking Mesh (right):



COMPLAINT
Case No.:

14

38.     The photograph below shows the performance of the woman (the "first performer") in the brochure reproduced above (showing her Skin Texture (left) and Tracking Mesh (right) Contour output) retargeted to the man's CG head in the above photo by retargeting the 3D points on her Tracking Mesh to the 3D model of the man's CG head. As you can see in her Live Performance (showing the Skin Texture output, below left), her facial expression causes the man's CG head to track her facial expression. Contour's Tracking Mesh is so precise that a high degree of realism is maintained, even though the man's CG face and head have a very different shape and size than hers, and he is male and she is female. In fact, Contour output capture the woman's performance with such fidelity that observers of the animation have commented that despite the fact that the man's CG face clearly has a male *shape*, the *motion* appears to be that of a female face. The video of this and other Contour examples is available on Rearden's home page (www.rearden.com, click on the MOVA logo and click on the video), or directly (www.rearden.com/mova.php or https://vimeo.com/86130623):



39.     A similar retargeting process can be performed with a fictional head. For example, the two photographs below are of a performer whose face was captured in the Contour system showing the Skin Texture output on the left and how she appeared to the naked eye (or a conventional camera), showing the Makeup Pattern combined with Skin Texture on the right:



40.     The photograph below shows several views of a CG model of the head of a videogame character that was created by an artist:



Although the head looks almost photoreal when in a neutral pose and immobile, if the face were animated—whether by hand-drawn animation or prior motion capture techniques—any photorealism would be lost because the human eye and brain are precisely attuned to notice any unnatural imperfection in facial motion. But, by using the Contour system and methods and the Contour Program, every subtle motion of the human face is captured with sub-millimeter precision, producing output that retain that precision and that can be retargeted to any CG head, bringing it to life.

COMPLAINT
Case No.:

16

41.    The photographs below show the above videogame character's head in two expressions retargeted from the Tracking Mesh generated by the Contour Program from the Contour facial capture of the above actress. Although the photorealism of the motion cannot be seen in static photographs, the motion is realistic and life-like, despite the fact that the performer's face is a very different shape than that of the CG head. Even in a static image, however, one can see how the expressionless CG model tracked the good-natured expression of the actress:





42.    A 3D "wireframe" (a mesh of 3D points) of the retargeted CG Character's head is shown below separately, overlaid upon the rendered image, and then the final rendered image:

1
2
3
4
5
6
7
8
9



10
11
12
13
14
15
16
17
18



19
20
21
22
23
24
25
26
27



28

43.     In summary, the MOVA Contour Program does substantially all of the work in the process of precisely transforming the facial performance of a live performer, capturing the most subtle of facial motions with sub-millimeter precision to drive with realism the life-like motion of faces of CG characters that appear in a finished movie, videogame, or other production, or utilized for other applications. The process begins by airbrushing or otherwise applying a random pattern of phosphor-based makeup on a performer, having the performer sit or stand in the arc-shaped Contour rig surrounded by an array of white lights and black lights and two pluralities of cameras, with the lights flashed rapidly and synchronized with the camera shutters as Skin Textures and Makeup Patterns are captured by the Contour Program. The Contour Program then processes the Makeup Pattern to capture thousands or even millions of 3D points as the performer's face moves, producing precise Captured Surface and Tracking Mesh files. Thus, the Contour Program produces output that includes the following:

- **Skin Texture**, showing the normal skin and facial features of the performer from multiple angles, largely without visible makeup

- **Makeup pattern**, showing the random pattern of makeup on the performer from multiple angles, largely without visible skin or facial features

- **Captured Surface**, a high-resolution moving 3D surface in the shape of the performer's skin as the performer's face moves

- **Tracking Mesh**, a high-resolution 3D mesh that exactly tracks the movement, stretching, wrinkling, etc. as the performer moves their face.

The Tracking Mesh can then be retargeted to a CG face, driving that CG face with photorealistic and natural motion, thereby precisely preserving every subtlety of human expression by the performer in the final movie, videogame, or other production.

44.     Within days after the Mova Contour Program, system and methods were unveiled at SIGGRAPH in 2006, tests and production began on one of the first movies utilizing MOVA Contour, *The Curious Case of Benjamin Button.* The movie was released in 2008. The photorealistic reverse-aging of Brad Pitt's face from an 87-year-old man backwards to his then-age of 44, and then

COMPLAINT
Case No.:

further backwards to a younger age, was widely lauded as a visual effects ("VFX") milestone, the first ever photorealistic CG face, winning an Academy Award for Best Visual Effects for the team at the VFX production company, Digital Domain, which had hired Rearden to operate the MOVA Contour system to capture Brad Pitt's face and generate Contour Program output for the film.

45.    In a widely-viewed TED (Technology, Entertainment, Design) Talk entitled, "How Benjamin Button Got His Face," Ed Ulbrich, Digital Domain's Senior VP and Executive Producer (subsequently the CEO of successor Digital Domain 3.0, Inc.), confirmed that *The Curious Case of Benjamin Button* would have been "impossible" to make but for MOVA Contour's system and methods and the unprecedented facial capture precision and subtlety of the MOVA Contour Program's output. Ulbrich stated in the talk:

> "We first got involved in *The* [*Curious Case of Benjamin Button*] project in the early 90s.... We took a lot of meetings and we seriously considered it. But at the time, we had to throw in the towel. **It was deemed impossible. It was beyond the technology of the day to depict a man aging backward**... The project came back to us a decade later.... **we came across a remarkable technology called Contour**... creating a surface capture as opposed to a marker capture...**This was when we had our 'Aha!' This was the breakthrough**...we could put Brad [Pitt] in this [Contour] device, and use this Contour process, and we could stipple on this phosphorescent makeup and put him under the black lights, and we could, in fact, scan him in real time... effectively, we ended up with a [Contour Program output] 3D database of everything Brad Pitt's face is capable of doing...we could transpose the [Contour Program output] data of Brad at [then-aged] 44 onto [a 3D model of] Brad at 87. So now, we had a 3D database of everything Brad Pitt's face can do at age 87, in his 70s and in his 60s."[19]

---

[19] Ulbrich, op. cit. (emphasis added).

COMPLAINT
Case No.:

1     46.     In the TED Talk, Ulbrich showed details of the MOVA Contour system and methods,

2     Contour Program output, and how the CG face of Benjamin Button in the final movie was derived

3     from the Contour Program output. The following paragraphs describe still frames from the TED talk

4     (labeled by "Minutes:Seconds" from the start of the video).

5     47.     **9:43:** The branded MOVA Contour "rig", a semicircle of two pluralities of cameras

6     with synchronized white lights and black lights surrounding a performer, with MOVA staff operating

7     the Contour system:

8

9

10

11

12

13     

14

15

16

17

18

19

20     48.     **10:11:** On the left, Contour Program **Skin Texture** output, showing the performer's

21     natural skin color and facial features. On the right, a performer with conventional motion capture

22     markers on her face:

23

24

25

26

27

28

COMPLAINT
Case No.:

1
2
3
4
5
6
7
8
9
10
11



12    49.    **10:17:** On the left, Contour Program **Tracking Mesh** output, showing hundreds of

13  thousands of 3D points, the Tracking Mesh resolution is so high that the points can only be seen by

14  zooming in. In contrast, conventional marker-based resolution is shown on the right:

15
16
17
18
19
20
21
22
23
24
25



26    50.    **10:20:** On the left Contour Program **Captured Surface** output, showing high-

27  resolution surface geometry. In contrast, marker-based facial capture surface geometry on the right:

28

COMPLAINT
Case No.:



51.    **10:39:** Contour Program **Makeup Pattern** output, showing random patterns of phosphor-based makeup. Each of the four Contour facial captures of Mr. Pitt was a separate motion facial performance used for a different facial expression of Benjamin Button. The Contour Program created high-resolution **Captured Surface** and **Tracking Mesh** output from each of these:



1   52.   **10:49:** Contour Program **Makeup Pattern** output, showing how many Contour

2   outputs were used. Each of the Contour facial captures was a separate motion facial performance of

3   Mr. Pitt used for a different facial expressions of Benjamin Button. The Contour Program created

4   high-resolution **Captured Surface** and **Tracking Mesh** output from each of these, creating a

5   database of Capture Surface and Tracking Mesh Contour output:



53.   **12:33:** Contour Program **Makeup Pattern** output (left), **Captured Surface** output

(middle), retargeted **Captured Surface** and **Tracking Mesh** output to a derivative fictional aged

head (right), are shown below. The 3D points of the Contour **Tracking Mesh** output of Mr. Pitt's

actual face were retargeted to corresponding 3D points on the fictional "maquette" (i.e. hand-made

3D bust) of Mr. Pitt at age 87. As a simple example, the 3D point on the right corner of Mr. Pitt's

actual mouth could correspond to the 3D point on the right corner of the 3D maquette's mouth. As

Mr. Pitt's smile widens during the Contour capture session, moving the tracked 3D point on the

corner of his mouth outward, the retargeted 3D point on the maquette's mouth would move

proportionately outward causing the 87-year-old smile to widen. As described by Mr. Ulbrich:

"[Left:] This is Brad doing one of the [character expression] poses. [Middle:] And here's the resulting

[**Captured Surface** output] data that comes from that, the model that comes from that. [Right:]

Retargeting is the process of transposing that [**Captured Surface** and **Tracking Mesh** output] data onto another model. And because the life cast, or the bust—the maquette—of Benjamin was made from Brad, we could transpose the [**Captured Surface** and **Tracking Mesh** output] data of Brad at 44 [years] onto Brad at 87[years]. Effectively, we ended up with a [**Captured Surface** and **Tracking Mesh** output] 3D database of everything Brad Pitt's face is capable of doing…we could transpose the [**Captured Surface** and **Tracking Mesh** output] data of Brad at [then-aged] 44 onto [a 3D maquette of] Brad at 87. So now, we had a 3D database of everything Brad Pitt's face can do at age 87, in his 70s and in his 60s":



54.    **17:18:** On the left is 87-year-old fictional head maquette Tracking Mesh retargeted from, and derivative of, a Contour Program **Tracking Mesh** output, with a pair of glasses added in as a prop. The final derivative face is shown on the right after various steps such as texturing and lighting that is applied to the maquette. The resulting derivative face is integrated into the live-action footage of the final scene, producing the final derivative work:

1

2

3

4

5

6

7

8

9

10

11



12      55.    The photorealistic reverse-aging derived from the MOVA Contour system, methods

13  and output received wide acclaim when *The Curious Case of Benjamin Button* was released in

14  December of 2008 and on February 22, 2009 won an Academy Award for Best Visual Effects for the

15  photorealistic face based on Mova Contour output, and shortly thereafter the credibility gained from

16  the Academy Award brought in new MOVA Contour projects from studios. MOVA Contour had

17  been used in one other movie in 2008, *The Incredible Hulk*, which demonstrated how, in addition to

18  transforming an actor's age, the same MOVA Contour output can be used for many other VFX

19  purposes, such as transforming an actor's face into a creature.

20      56.    And in April of 2009, defendant Fox contracted with Rearden-controlled MOVA LLC

21  to use MOVA Contour to capture the face of Steve Coogan, Hades in *Percy Jackson & the*

22  *Olympians: The Lightning Thief*, to transform's Mr. Coogan's face to the flaming creature face of

23  Hades. A still from the resulting animated scene was featured on the home page of MOVA LLC's

24  website, shown in the photograph below:

25

26

27

28

© 2010 Twentieth Century Fox Film Corporation. All rights reserved



mova®

HOME ‹
SERVICES
TECHNOLOGY
GALLERY
ABOUT US
PRESS
CONTACT

contour™
REALITY CAPTURE

Percy Jackson & the Olympians: The Lightning Thief, 20th Century Fox

CONTOUR™ is markerless, high-resolution, photo-real surface capture.
Our clients include Industrial Light & Magic, Electronic Arts, Warner Brothers,
Digital Domain, Double Negative Visual Effects, Twentieth Century Fox,
Marvel Studios, THQ, Moving Picture Company, and Rhythm & Hues.

"CONTOUR's promise is enormous—the notion that the human face, in all its subtleties could be mapped in real time, and with such density of surface information opens up so many possibilities for both two- and three- dimensional image makers and storytellers... I can't wait to get my hands on it."

—David Fincher, director of Panic Room, Fight Club, The Game, Se7en, Alien³, Zodiac, and The Curious Case of Benjamin Button



**Introducing Geni4**
QuickTime (1.3 Mbps)
Windows Media (2.2 Mbps)



**Introduction**
Meet Founder and President
Steve Perlman



**How It Works**
Flash 8 required

HOME ‹    SERVICES    TECHNOLOGY    GALLERY    ABOUT US    PRESS    CONTACT

©2004–2010 Mova LLC    Terms of Use and Privacy Policy  Specifications subject to change without notice. Legal Notices

57.    In 2011, *Deadpool* Director Tim Miller lawfully used MOVA Contour operated by Rearden and Rearden-controlled entities in a CG animation entitled *Batman: Arkham City*.[20] The four photographs below are still frames of Contour Program output or derivative thereof. The subtleties of the facial expressions of the performer were precisely captured with the Contour systems and methods and then retargeted to a CG face, retaining the subtleties of the human performance:

---

[20] "Batman: Arkham City - Behind The Scenes Of The Cinematic Trailer", October 23, 2011, op.cit. https://youtu.be/oPYM4TG0oXM

COMPLAINT
Case No.:

27

Skin Texture Output

Tracking Mesh Output




Captured Surface Output



CG Face from Retargeted MOVA Contour Output



58.     The following four photographs show the arc-shaped Contour rig, two pluralities of synchronized cameras, white light and black light sources, computers running the Contour Programs, and actors wearing the phosphor-based makeup of the MOVA Contour systems and methods, used lawfully by defendants and operated by Rearden and Rearden-controlled entities in *Percy Jackson &*

*the Olympians: The Lightning Thief* (2010) and in *Batman: Arkham City (2011)*(Mr. Perlman appears at the right in the last photograph):



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



COMPLAINT
Case No.:

1

2

59.    And the following photograph released by Digital Domain shows the stolen MOVA

Contour rig that was operated by the thieves and used unlawfully by Fox in at least *Deadpool,*

*Fantastic Four,* and *Night at the Museum: Secret of the Tomb.* Close inspection of the photo shown

in the left inset shows the thieves neglected to remove a Rearden, Inc. Asset Tag on one of the stolen

cameras (Rearden, Inc. is Rearden LLC's predecessor in interest). Rearden Asset #10393 is a Basler

102f Camera, Serial # 20606024, purchased on October 1, 2006 and stolen in 2013. Also, numerous

tell-tale details specific to Contour's operation are visible in the stolen Contour rig photograph (e.g.

the right inset shows black tape is wrapped around the end of a fluorescent lamp tube to prevent light

spillage from the glowing electrode, a Contour-specific technique taught in Rearden Mova's US

Patent 7,567,293 at 19:66-20:15), confirming that the thieves were using Rearden's stolen system:



60.     The Contour system has no "operating manual." It is a hand-built system, the operation of which is known only by Rearden's MOVA team who invented it and Rearden's MOVA employees and contractors who were trained to use it under strict confidentiality duties. It was not intended to be an end-user system and must be used carefully with knowledge of its operation to function correctly and safely. Fox was able to use the Contour system only because it had engaged, either directly or in concert with entities subject to its supervision and control, former Rearden employees to operate Rearden's Contour system using Rearden trade secrets without authorization.

**B.      The MOVA Contour intellectual property**

61.     The MOVA Contour computer program is the subject of United States Copyright Registration No. TXu001977151, a copy of which is attached hereto as Exhibit 1.  Plaintiff Rearden Mova is the owner of Copyright Registration No. TXu001977151.  The MOVA Contour Program runs on computers that are part of the MOVA Contour physical apparatus.

62.     The MOVA Contour methods and systems are the subject of issued United States Patent Nos. 7,605,861 (the "'861 Patent"), 8,659,668 (the "'668 Patent"), 7,548,272 (the "'272 Patent"), 7,567,293 (the "'293 Patent"), and 8,207,963 (the "'963 Patent") as well as numerous United States pending patent applications, and international patents and patent applications.  Plaintiff Rearden Mova is the exclusive owner of the '861, '668, '272, '293, and '963 patents, as well as all other domestic patent applications and all international patents and patent applications drawn to the MOVA Contour systems and methods.  The Mova Contour physical apparatus and methods are embodiments of the claims of the '861, '668, '272, '293 and '963 patents.

63.     MOVA® and Contour® are the subject of United States Trademark Registration Nos. U.S. Registration No. 3,843,152 and U.S. Registration No. 3,628,974, respectively.  Copies of these registrations are attached hereto as Exhibits 2 and 3.

64.     The MOVA Contour systems and methods include know-how, confidential information that derives independent economic value, both actual and potential, from not being generally known to the public or other persons who can obtain economic value from its disclosure and use.  The MOVA Contour confidential information includes, without limitation:

▪ the source code and object code used in operating the MOVA Contour physical assets;

- many specific functionally-designed mechanisms, such as determining when part of the face is obstructed from the view of certain cameras and seamlessly filling in those parts of the face with views from other cameras;

- certain of the processes used along with the MOVA Contour physical assets, such as the timing configurations for the Mova system;

- sequencing the steps of calibration, aperture adjustment and focus adjustment of the Mova cameras;

- specific phosphor-based makeup formulations;

- techniques for applying makeup to performers being captured;

- specific electrical set up safety measures of the MOVA Contour rig;

- specific electrical modification of fluorescent light ballasts so as to operate safely;

- specific performer medical considerations, such as, in the case of performers receiving Botox treatments for facial wrinkles, scheduling shoots in specific intervals relative to their treatments to maintain natural skin motion;

- specific instructions to performers on how to perform in such a way to keep their faces within the capture volume;

- specific instructions to performers for specialized moves, such as singing, or bending the head downward and upward, with the face going out of and then back into view of the cameras; and

- information regarding MOVA's prior customer relationships and business terms.

65.    Rearden and Rearden Mova have protected this confidential information by, *inter alia*, maintaining email, documents, source and object code, and other software in secure locations; controlling access to these locations; and by including confidentiality terms in its agreements with all employees and contractors who have ever had access to any source code, object code other software, electrical set up, proprietary electrical circuit designs, timing systems, interconnects, makeup formulations, phosphor research, results of proprietary tests, etc. The following confidentiality terms of a Rearden employment agreement (Rearden referenced as "the Company"), for example, are representative of those in all other Rearden employment and contractor agreements:

COMPLAINT
Case No.:

- "At all times, both during my employment by the Company and after its termination, I will keep in confidence and trust and will not use or disclose any Proprietary Information or anything relating to it without the prior written consent of an officer of the Company..."

- "I agree that during my employment by the Company I will not remove any Company Documents and Materials from the business premises of the Company or deliver any Company Documents and Materials to any person or entity outside the Company, except as I am required to do in connection with performing the duties of my employment. I further agree that, immediately upon the termination of my employment by me or by the Company for any reason ... I will return all Company Documents and Materials, apparatus, equipment and other physical property, or any reproduction of such property ..."

66.    The MOVA Contour confidential information constitutes trade secrets as that term is defined in the California Uniform Trade Secrets Act ("CUTSA") at sections 3426 to 3426.11 of the California Civil Code, and the Defense of Trade Secrets Act at 18 U.S.C. § 1832(b), *et seq*.

67.    The "MOVA Assets" at issue herein include the MOVA Contour technology, and related hardware and software, source code, domestic and international patents and patent applications, domestic and international trademarks, copyrights, trade secrets, domain names, business records, and various related physical goods (the "MOVA Assets").

**C.    Rearden's authorized use of the MOVA Contour system, methods, and Contour Program and output in fifteen major motion pictures and one videogame cinematic trailer, and industry acclaim**

68.    Rearden and its controlled companies operated the MOVA Contour system for, and authorized used of its system, methods and Contour Program output by Universal Studios in *The Incredible Hulk* (2008) and *Snow White and the Huntsman* (2012).

69.    Rearden and its controlled companies operated the MOVA Contour system for, and authorized used of its system, methods and Contour Program output by Sony Pictures in *The Amazing Spider-Man* (2012).

70.    Rearden and its controlled companies operated the MOVA Contour system for, and authorized used of its system, methods and Contour Program output by Warner Brothers Studios in

COMPLAINT
Case No.:

34

1    *Harry Potter and the Deathly Hallows*, Part 1 (2010) and Part 2 (2011), *Green Lantern* (2011), *Jack*

2    *the Giant Slayer* (2013), and *Gravity* (2013).

3         71.    Rearden and its controlled companies operated the MOVA Contour system for, and

4    authorized used of its system, methods and Contour Program output by Disney Motion Pictures

5    Group in *TRON: Legacy* (2010), *Pirates of the Caribbean: On Stranger Tides* (2011), *John Carter*

6    (2012), and *The Avengers* (2012).

7         72.    Rearden and its controlled companies operated the MOVA Contour system for, and

8    authorized used of its system, methods and Contour Program output by Paramount Pictures for "*The*

9    *Curious Case of Benjamin Button*" (2008) and *Transformers: Dark of the Moon* (2011).

10        73.    Rearden and its controlled companies operated the MOVA Contour system for, and

11   authorized used of its system, methods and Contour Program output by Rocksteady Studios in the

12   videogame cinematic trailer, *Batman: Arkham City* (2011).

13        74.    And Rearden and its controlled companies operated the MOVA Contour system for,

14   and authorized used of its system, methods and Contour Program output by defendant Fox in *Percy*

15   *Jackson and the Olympians: The Lightning Thief* (2010).

16        75.    In each of the above fifteen films and one videogame cinematic trailer, the motion

17   picture and videogame studios performed a routine intellectual property due diligence prior to

18   contracting with Rearden for use of the MOVA Contour systems, methods, and Contour Program, in

19   part to verify that Rearden and Rearden-controlled companies owned the MOVA Contour Assets and

20   technology and was authorized to use them for the benefit of the studios.

21        76.    Rearden and Rearden-controlled companies have built considerable good will in the

22   MOVA Contour Assets and technology.   Rearden and Rearden-controlled companies used the

23   MOVA Contour systems and methods in the fifteen major motion pictures identified above, which

24   collectively grossed roughly $9.5 billion in global box office. Five of these movies are in the top-25

25   highest-grossing films since 2008 (when the first Contour movie was released), including the highest

26   grossing film in each of 2011 and 2012[21].   The MOVA Contour system and methods and the Contour

27   _____

28       [21] www.boxofficemojo.com.

COMPLAINT
Case No.:

Program output have been the subject of numerous film industry press articles in which luminaries like director David Fincher have lauded the MOVA Contour technology:

> "Contour's promise is enormous," Fincher said. "The notion that the human face in all its subtleties could be mapped in real time and with such density of surface information opens up so many possibilities for both two- and three-dimensional image makers and storytellers."[22]

The MOVA Contour system and methods and the Contour Program output have been the subject of an invited presentation by Steve Perlman to the Director's Guild of America[23], and they were identified as a "breakthrough" in the aforementioned TED talk[24]. MOVA Contour facial capture's improvements over prior facial performance capture technologies have been acclaimed by major motion picture actors, producers, directors, and top VFX professionals, including Ed Ulbrich in his TED Talk description of MOVA Contour and how it was essential in the creation of *The Curious Case of Benjamin Button*.[25]  And on February 9, 2015, the Academy of Motion Picture Arts and Sciences awarded the Scientific and Technical Award to the MOVA [Contour] facial performance capture system.[26]

**D.     Transfer of the MOVA Assets to OnLive, Inc., OL2, Inc., and Rearden Mova**

77.     The MOVA Contour systems and methods, along with videogame streaming technology, was spun out of Rearden in 2007 into OnLive, Inc., a corporation controlled by Rearden. OnLive, Inc. thereafter owned all of the MOVA Assets, both Contour and other motion capture technology.

78.     On August 17, 2012, OnLive, Inc. assigned all of its assets, including the MOVA Assets, to OL2, Inc. as part of an assignment for the benefit of creditors ("ABC").  On information and belief, OL2, Inc. was primarily focused on the video gaming unit of OnLive, Inc., and was not interested in offering any MOVA Contour movie production services.

---

[22]Marlowe, July 31, 2006, op. cit.

[23] Directors Guild of America, July 28, 2007, op. cit.

[24] Op. cit.

[25] Ulbrich, Op. cit.

[26] http://oscar.go.com/news/oscar-news/150209-ampas-sci-tech-awards-2015-winners

79.     In October of 2012, Rearden learned that OL2, Inc. was interested in selling the MOVA Assets, and ultimately decided to reacquire them.  Rearden formed a wholly-owned subsidiary, MO2 LLC, as a vehicle to acquire the MOVA Assets from OL2, Inc.

80.     Rearden's CEO Perlman tasked his employee Greg LaSalle with management of MO2 LLC. LaSalle had worked with Rearden from 1999 to 2007, and between 2007 and August 17, 2012 worked for OnLive, Inc. LaSalle was rehired by Rearden LLC on August 20, 2012.

81.     On February 11, 2013, OL2, Inc. transferred the MOVA Assets to MO2 LLC through a Membership Interest and Asset Purchase and Sale Agreement.  MO2 LLC is wholly owned by Rearden.

82.     On April 19, 2013, MO2 LLC transferred the MOVA Assets to another wholly-owned Rearden company, Rearden Mova LLC.

83.     On September 18, 2014, Rearden recorded patent assignments for the MOVA Asset patents, reflecting the assignment from OL2, Inc. LLC to MO2 LLC made in the Membership Interest and Asset Purchase and Sale Agreement.

84.     Rearden also recorded patent assignments for the MOVA Asset patents, reflecting the assignment from MO2 LLC to Rearden Mova on April 19, 2013. However, the execution dates of the online forms were incorrectly filled in with the recordation dates of September 18, 2014 (and in one case, September 8, 2014). As soon as it became aware of the errors, Rearden corrected the erroneous execution dates to the correct date: April 19, 2013.

**E.      Shenzhenshi's transparently false ownership claims**

85.     Unknown to Rearden, starting in October 2012, then-Rearden-employee LaSalle was in negotiation with a company called Digital Domain 3.0, Inc. ("DD3"), a People's Republic of China and India-owned Delaware Corporation doing business in Venice Beach, California under the "DD3" or "Digital Domain" business names. DD3 is a successor company to prior Digital Domain companies that Rearden, OnLive, Inc., and LaSalle (on behalf of Rearden and OnLive, Inc.) had worked with previously in movie productions making authorized use of the MOVA technology identified above. DD3 is currently wholly-owned by Digital Domain Holdings Ltd. ("DDHL"), a Hong Kong exchange-listed Bermuda corporation with its principal place of business in Hong Kong.

86.    On February 20, 2015, Shenzhenshi Haitiecheng Science and Technology Co., Ltd. ("Shenzhenshi"), allegedly another People's Republic of China corporation with its purported principal place of business in Shenzhen, China, filed a declaratory judgment action against Rearden and various other Rearden entities in this judicial district, Case No. 3:15-cv-00797-JST, alleging that it had acquired the MOVA Assets by assignment from MO2 LLC on May 8, 2013.  Shenzhenshi further alleged that it had granted an exclusive license to the MOVA Assets to DD3.

87.    But as set forth above, MO2 LLC did not own the MOVA Assets on May 8, 2013, so it could not have assigned them to Shenzhenshi on that date. Rather, MO2 LLC had previously assigned the MOVA Assets to Rearden Mova LLC on April 19, 2013. Further, on May 8, 2013 LaSalle was not a Rearden employee, and as an employee or not, LaSalle never had authority to sell the MO2 LLC Assets to anyone. Nor could Shenzhenshi have granted a license of the MOVA Assets to Digital Domain because it never owned the MOVA Assets. Shenzhenshi, DD3 and LaSalle knew that the MO2-Shenzhenshi transaction was a ruse. LaSalle wrote to his attorneys, "[DD3] are going to actually acquire the Mova assets through one of their Chinese companies [Shenzhenshi]. I believe this is so it would be nearly impossible for Steve [Perlman] to go after them….They will indemnify me against any claims brought by Rearden and Steve Perlman." [27]

88.    The day after the Court granted Rearden permission to file counterclaims, a company called Virtue Global Holdings, Ltd., a British Virgin Islands corporation, suddenly appeared in the Shenzhenshi case represented by Shenzhenshi's counsel.  Shenzhenshi had absconded from the litigation it instigated, and was found to be in default.  Months later Virtue Global Holdings alleged that Shenzhenshi had assigned the MOVA Assets to Virtue Global Holdings on December 17, 2015. But again, as set forth above, Shenzhenshi never owned the MOVA Assets and therefore could not have assigned them to Virtue Global Holdings.

89.    Rearden asserted counterclaims for declaratory relief against Shenzhenshi and Virtue Global Holdings affirming Rearden's ownership of the MOVA Assets, and for patent, trademark,

---

[27] *Shenzhenshi, et al. v. Rearden, et al.,* NDCA Case No. 15-797, HEYL001594.

COMPLAINT
Case No.:

and copyright infringement, misappropriation of trade secrets, fraudulent transfer, and other causes of action.

90.    The MOVA Asset ownership and fraudulent transfer claims were bifurcated and tried in December, 2016.  A ruling is pending.

**F.    Defendants' unauthorized use of the MOVA Contour system, methods, and Contour Program and output**

91.    Once LaSalle was hired by DD3 in or about May, 2013, DD3 took possession of the MOVA Contour physical apparatus for Shenzhenshi. On information and belief, LaSalle had access to the secure storage facility where the physical MOVA Contour apparatus was kept, and assisted DD3 in taking unauthorized possession of the patented MOVA Contour apparatus and copies of the copyrighted Contour Program.

92.    Thereafter, DD3 began secretly offering MOVA Contour facial performance capture services and Contour Program output to motion picture studios and production companies, including defendants.  The system used by DD3 is the very *same system* developed and constructed by Rearden and stolen from the secure storage facility, which includes commercial embodiments of the system claims in the MOVA patents.  And the statements by *Deadpool* Visual Effects Supervisor Annemarie Griggs and Tim Miller's Blur Studio Visual Effects Supervisor Pauline Duvall and the associated video[28] confirm that DD3 performed the very *same methods* that are commercial embodiments of the method claims of the MOVA patents.

93.    Despite the fact that defendant Fox and Director Miller had previously made films based on authorized use of MOVA Contour from Rearden and Rearden-controlled companies, despite the fact that Miller had extensive business dealings with Rearden and Rearden-controlled companies both during MOVA Contour's development and after its commercial release and knew Mr. Perlman personally, and despite the fact that *Deadpool* used MOVA Contour technology while Rearden was in the well-publicized *Shenzhenshi* litigation regarding MOVA Contour's ownership, Fox nonetheless secretly contracted, either directly or in concert with entities subject to its supervision and control, for use of the MOVA Contour system, methods, and Contour Program and

---

[28] "From Comics to Screen…to Screen: MAGIC!", op. cit.

output in at least *three major motion pictures* without ever contacting Rearden or Mr. Perlman to confirm that it was authorized to do so.

### 1. *Night at the Museum: Secret of the Tomb*

94.    *Night at the Museum: Secret of the Tomb* is a film distributed by defendant Fox and produced by Fox either directly or in concert with entities subject to Fox's supervision and control.

95.    On information and belief, between February, 2013 and December, 2014, Fox, either directly or in concert with an entity subject to its supervision and control, contracted with DD3 to provide facial performance capture services using the copyrighted Contour Program and output, including at least the performance of the talking CG Roman bust of Augustus Caesar in *Night at the Museum: Secret of the Tomb*.  DD3 provided facial performance capture services subject to the terms of its contract and subject to the supervision and control of defendant Fox.  Fox incorporated the output of the copyrighted Contour Program into derivative works that were reproduced, distributed, displayed and performed in *Night at the Museum: Secret of the Tomb* without authorization.

96.    A video of the talking CG Augustus Caesar Roman bust that is derivative of MOVA Contour Program output is here: https://youtu.be/0pZZlj3KVrk?t=1m18s Following is a still:



97.     Defendant Fox knew or should have known that the copyrighted MOVA Contour Program and output were owned by Rearden and other Rearden-controlled entities due to several factors:

- Fox had previously contracted with Rearden and its controlled entities to provide authorized MOVA Contour facial performance capture services and Contour Program output for use in *Percy Jackson & The Olympians: The Lightning Thief*.

- Fox had previously conducted due diligence to confirm Rearden and its controlled entities' ownership of the MOVA Contour system, methods, and Contour Program. Fox either conducted, or should have conducted, due diligence to determine whether DD3 was authorized to offer the MOVA Contour system, methods, Contour Program and output.

98.     Neither Rearden nor Rearden Mova were aware of—let alone authorized use of—the copyrighted Contour Program and output by DD3, Fox, or Fox Home Entertainment in *Night at the Museum: Secret of the Tomb*. Nor did Rearden or Rearden Mova authorize any reproduction, distribution, performance, or display of the copyrighted Contour Program's output or the creation of any derivative works based upon the Contour Program output by DD3, Fox, or Fox Home Entertainment in *Night at the Museum: Secret of the Tomb*. At no time did DD3, Fox, or Fox Home Entertainment negotiate or come to an agreement on financial terms in which plaintiffs would authorize MOVA Contour system, methods, Contour Program and output to be used in *Night at the Museum: Secret of the Tomb*.

99.     Defendant Fox released *Night at the Museum: Secret of the Tomb* in domestic theaters on December 11, 2014. To date, the film has grossed over $113 million at the box office in the United States and $363 million globally.[29]

100.     Defendant Fox Home Entertainment released *Night at the Museum: Secret of the Tomb* on DVD and Blu-ray, and via digital distribution such as download and streaming services in the United States on or about March 10, 2015. DVD and Blu-ray sales in the United States exceeded

---

[29] http://www.boxofficemojo.com/movies/?id=nightatthemuseum3.htm

COMPLAINT
Case No.:
41

$27 million.[30] Fox Home Entertainment also authorized reproduction, distribution, performance, and display of *Night at the Museum: Secret of the Tomb* across a wide range of other distribution means, such as on airplanes, in hotels, through cable and satellite television services, *etc*.

### 2. *Fantastic Four*

101.    *Fantastic Four* is a motion picture distributed by defendant Fox, and produced either directly by Fox or in concert with entities subject to Fox's supervision and control.

102.    On information and belief, between February 2013 and August 2014, Fox, either directly or in concert with an entity subject to its supervision and control, contracted with DD3 to provide facial performance capture services using the copyrighted Contour Program and output, including, at least the performance of actor Jamie Bell as the Thing character.  DD3 provided such facial performance capture services and Contour Program output subject to the terms of its contract and the supervision and control of defendant Fox.  Fox incorporated the copyrighted Contour Program output into derivative works that were reproduced, distributed, displayed, and performed in *Fantastic Four* without authorization.

103.    The CG facial animation of The Thing character used MOVA Contour output. *Fantastic Four* was described by Visual Effects Supervisor Patrick Ledda as follows:

> "For facial animation [of The Thing] we did a MOVA session...with our rigging team creating different facial poses out of that."[31]

*Fantastic Four* Visual Effects Production Supervisor Adam LaGattuta described the "MOVA session" in the "*Powering up: Superpowers of the Fantastic Four*" featurette showing Contour Program Facial Texture output on the *Fantastic Four* Blu-ray:

> "...so they capture all these different shapes that everyone makes with their face when they say different words, when they are happy, when they're sad. So, they go through a whole range of emotions and words and syllables and things and we capture all of that with about 35 cameras or so that are placed on a big wall around him as he makes all these expressions."[32]

---

[30] http://www.the-numbers.com/movie/Night-at-the-Museum-Secret-of-the-Tomb#tab=summary

[31] Failes, Ian, op. cit.

[32] "Powering up: Superpowers of the Fantastic Four", featurette on *Fantastic Four* Blu-ray and digital video with Special Features.

1      104.    The following photograph is a still image from the Blu-ray featurette Contour

2  Program Facial Texture output, including the "MOVA" trademark and trade dress.



17      105.    The following promotional photo of the Thing was provided by defendant Fox,

18  showing the CG face derivative of the Contour Program output used for the Thing's facial poses:

1
2
3
4
5
6
7
8
9
10
11
12



13    106.    Defendant Fox knew or should have known that the copyrighted Contour Program

14  and output were owned by Rearden and other Rearden-controlled entities because:

15  ▪   Fox had previously contracted with Rearden and its controlled entities to provide authorized

16      facial performance capture services and Contour Program output for use in *Percy Jackson &*

17      *The Olympians: The Lightning Thief.*

18  ▪   Fox had previously conducted due diligence to confirm Rearden and its controlled entities'

19      ownership of the MOVA Contour systems, methods, and Contour Program and output.  Fox

20      conducted, or should have conducted, due diligence to verify that DD3 was authorized to

21      offer the MOVA Contour systems, methods, and Contour Program and output.

22    107.    Neither Rearden nor Rearden Mova were aware of—let alone authorized use of—the

23  copyrighted MOVA Contour Program and output by DD3, Fox, or Fox Home Entertainment in

24  *Fantastic Four.*  Nor did Rearden or Rearden Mova authorize any reproduction, distribution,

25  performance or display of the copyrighted Contour Program's output or the creation of derivative

26  works based upon its output by DD3, Fox, or Fox Home Entertainment in *Fantastic Four.* At no time

27

28

1   did DD3, Fox, or Fox Home Entertainment negotiate or come to agreement on financial terms in

2   which Rearden would authorize MOVA Contour output to be used in *Fantastic Four*.

3       108.    Defendant Fox released *Fantastic Four* in domestic theaters on or about August 7,

4   2015.  The film has grossed over $56 million at the box office in the United States, and over $167

5   million globally[33].

6       109.    Defendant Fox Home Entertainment released *Fantastic Four* on DVD and Blu-ray,

7   and via digital distribution such as download and streaming services on or about December 15, 2015.

8   Fox Home Entertainment has earned over $13 million on DVD, Blu-ray, and digital distribution as of

9   the date of this complaint. Fox Home Entertainment also distributed *Fantastic Four* across a wide

10  range of other distribution means, such as on airplanes, in hotels, through cable and satellite

11  television services, *etc*.

12          **3.    *Deadpool***

13      110.    *Deadpool* is a motion picture distributed by defendant Fox, and produced directly by

14  Fox or in concert with entity subject to Fox's supervision and control.

15      111.    On information and belief, between February 2013 and February 12, 2016, Fox, either

16  directly or in concert with an entity subject to its supervision and control, contracted with DD3 to

17  provide facial performance capture services using the copyrighted Contour Program and output,

18  including, at least the performance of an actor for the face of the Colossus character.  DD3 provided

19  such facial performance capture services and Contour Program output subject to the terms of its

20  contract and the supervision and control of defendant Fox.  Fox incorporated the Contour Program

21  output of the copyrighted Contour Program into derivative works that were reproduced, distributed,

22  displayed and performed in *Deadpool,* without authorization.

23      112.    Annemarie Griggs, *Deadpool* Visual Effects Producer, described how two actor's

24  faces were used to create the Colossus CG face, one for the initial shape of the face, and one to

25  provide facial motion throughout the *Deadpool* movie:

26

27

28   [33] http://www.boxofficemojo.com/movies/?id=fantasticfour15.htm

COMPLAINT
Case No.:

"…we had one actor whose face was used as the original face model for the look of his face. Then we had another actor whose facial movements were used when Colossus speaks."[34]

Pauline Duvall, Visual Effects Supervisor of Miller's VFX company, Blur Studio, described how the actor's facial performance was captured with extraordinary precision by the MOVA Contour copyrighted program and output:

"Digital Domain has a great system called 'MOVA' which is a facial capture system. You paint on the face and it creates thousands and thousands of little tracking markers. At that point you get a piece of geometry that captures movement and acting of the actor."[35]

113.    The top two photographs below are stills from MOVA Contour systems and methods Contour Program output from the actor's facial performance used to create the derivative Colossus face.[36] The first photograph contains a still image from Contour Program Skin Texture output, showing the actual skin color of the performer, and including the "MOVA" trademark and trade dress. The second photograph shows a still image from a corresponding Contour Program Makeup Pattern output, showing the glow of the random pattern of phosphor-based makeup. The bottom photograph shows a still of a CG face of the Colossus character in the *Deadpool* movie that is retargeted from the Contour Program output, resulting in a different facial shape than the facial performer, maintains the human subtleties of the facial performance. The CG face of the Colossus character is derivative of the Contour Program output.

---

[34] "From Comics to Screen…to Screen: MAGIC!", op. cit.

[35] "From Comics to Screen…to Screen: MAGIC!", op. cit.

[36] "From Comics to Screen…to Screen: MAGIC!", op. cit.

COMPLAINT
Case No.:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

114.    The top photograph below shows the front and side views of the Contour Program Skin Texture output interleaved with front and side views of the CG face of Colossus resulting from a retargeting of the Contour Program output. The bottom photograph below shows the fully rendered Colossus character with its Contour Program output retargeted CG face[37]:





_____

[37] Frei, Vincent, "Deadpool: Alex Wang—VFX Supervisor—Digital Domain," February 16, 2016. Art of VFX. http://www.artofvfx.com/deadpool-alex-wang-vfx-supervisor-digital-domain/

COMPLAINT
Case No.:

115.    Defendant Fox knew or should have known that the copyrighted Contour Program and output were owned by Rearden and other Rearden-controlled entities because:

- Fox had previously contracted with Rearden and its controlled entities to provide authorized facial performance capture services and Contour Program output for use in *Percy Jackson & The Olympians: The Lightning Thief*, a high-value movie.

- Fox had previously conducted due diligence to confirm Rearden and its controlled entities' ownership of MOVA Contour technology. Fox conducted, or should have conducted, due diligence to verify that DD3 was authorized to offer the MOVA Contour facial performance capture services and Contour Program output.

- Director Tim Miller's VFX company, Blur Studio, had previously contracted with Rearden and its controlled entities both during Rearden's development of MOVA Contour and after its release, and worked on an authorized CG animation project using MOVA Contour entitled, *Batman: Arkham City*.[38]

- Mr. Miller knew Mr. Perlman personally and professionally and had previously notified Mr. Perlman of movie and VFX projects he had been working on.

116.    Neither Rearden nor Rearden Mova were aware of—let alone authorized use of—the copyrighted MOVA Contour Program and output by DD3 or defendant Fox in *Deadpool*.  Nor did Rearden or Rearden Mova authorize any reproduction, distribution, performance, or display of the copyrighted Contour Program's output or the creation of derivative works based upon those output by DD3 or defendant Fox in *Deadpool*. At no time did DD3, Mr. Miller, Blur Studio or defendant Fox negotiate or come to agreement on financial terms in which Rearden would authorize MOVA Contour facial performance capture services and Contour Program output to be used in *Deadpool*.

117.    Defendant Fox released *Deadpool* in domestic theaters on or about February 16, 2016. It is now highest grossing R-rated film of all time, earning over $363 million domestically and $783 million worldwide.

---

[38] "Batman: Arkham City - Behind The Scenes Of The Cinematic Trailer", October 23, 2011, op.cit.

COMPLAINT
Case No.:

118.    Defendant Fox Home Entertainment released *Deadpool* on DVD and Blu-ray, and via digital distribution such as download and streaming services on or about May 10, 2016.  Fox Home Entertainment has earned over $94 million on DVD, Blu-ray, and digital distribution as of the date of this complaint. Fox Home Entertainment also distributed *Deadpool* across a wide range of other distribution means, such as on airplanes, in hotels, through cable and satellite television services, *etc*.

**FIRST CAUSE OF ACTION:**
**COPYRIGHT INFRINGEMENT**

119.    Plaintiffs reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

120.    At all material times, plaintiff Rearden Mova was and is the owner of United States Copyright Registration No. TXu001977151for the MOVA Contour computer program ("Contour Program").

121.    The authors of the Contour Program created programming that performs several operations. Some of the Contour Program controls the Contour apparatus, including processing images from the two pluralities of Contour cameras. Some of the Contour Program operates prior to a facial capture session to prepare and calibrate the Contour system, some of the Contour Program operates in real-time during a live facial capture, and some of the Contour Program operates after the facial capture. The Contour Program produces several types of output, some of which are used by the Contour Program itself for further processing, and some of which are used for driving a CG face in a movie or videogame. The Contour Program output includes:

(a) the output of the first plurality of cameras called herein the "**Skin Texture**". Displayed, this output looks like normal skin and facial features of the performer from multiple angles, largely without visible makeup.

(b) the output of the second plurality of cameras called herein the "**Makeup Pattern**". Displayed, this output looks like a random pattern of green or blue largely without showing the performer's skin or other facial features (e.g. eyes or mouth).

(c) the Contour Program uses the Makeup Pattern output to compute a high-resolution 3D surface that moves in the shape of the performer's skin with sub-millimeter precision.

This output is called herein the "**Captured Surface**" and, rendered on a display, it looks like a 3D bust of the performer's skin in motion.

(d) the Contour Program uses the Makeup Pattern output to compute a high-resolution 3D mesh that tracks 3D points on the skin of the performer, as the skin moves from frame-to-frame. This output is called herein the "**Tracking Mesh**" and, rendered on a display, it looks like a 3D mesh that exactly follows the movement, stretching and wrinkling the skin as the performer moves their face. The Tracking Mesh tracks the subtleties of the performer's facial motion with sub-millimeter precision.

(e) the Contour Program produces other output associated with the facial motion capture session, for example, timing files that can be used to synchronize an audio recording of the performer with facial capture of the performer.

122.   All of Contour Program output, including Skin Texture, Makeup Pattern, Captured Surface, and Tracking Mesh output, were fixed in a tangible medium of expression when their embodiments were stored in non-volatile computer memory and/or media such as CD, CD-R, DVD or Blu-ray disks from which they may be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.

123.   The Contour Program performs substantially all of the operations required to produce the Contour Program output, including Skin Texture, Makeup Pattern, Captured Surface, and Tracking Mesh output.  Given identical facial motion capture inputs, the Contour Program will produce identical output.  Accordingly, the authors of the Contour Program are the authors of the Contour Program output, and the Contour Program output is subject to the copyright in the Contour Program owned by Rearden Mova.

124.   It follows that at all material times plaintiff Rearden Mova owned the exclusive right to reproduce, distribute copies of, perform, and display the Contour Program output including Skin Texture, Makeup Pattern, Captured Surface, and Tracking Mesh output; to make derivative works based upon Contour Program Skin Texture, Makeup Pattern, Captured Surface and Tracking Mesh output; and to reproduce, distribute, perform, and display the derivative works.

125.   At all material times, defendant Fox had the right and ability to supervise and control the infringing conduct alleged herein, including but not limited to all infringing acts of DD3 and other entities subject to Fox's supervision and control, and had an obvious and direct financial interest in the exploitation of Rearden Mova's copyrighted works.

126.   Defendant Fox, either directly or in concert with an entity subject to its supervision and control, contracted with DD3 to produce Contour Program output including Skin Texture, Makeup Pattern, Captured Surface and Tracking Mesh output, using the MOVA Contour Program for Fox's financial benefit in the production of the feature films *Night at the Museum: Secret of the Tomb*, *Fantastic Four*, and *Deadpool*.

127.   Defendant Fox, either directly or in concert with an entity subject to its supervision and control, prepared at least one CG character whose face was derived from some or all of the Contour Program output including the Skin Texture, Makeup Pattern, Captured Surface, and Tracking Mesh output, for insertion into its motion pictures, including but not limited to the characters of the Augustus Caesar bust in *Night at the Museum: Secret of the Tomb*, the Thing in *Fantastic Four*, and Colossus in *Deadpool*.  These CG characters were and are original "audiovisual works" within the meaning of 17 U.S.C. § 101, which were fixed in a tangible medium of expression when their embodiments were stored in non-volatile computer memory and/or media such as CD, CD-R, DVD or Blu-ray disks from which they may be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.  These CG characters incorporate some or all of the Contour Program output including Skin Texture, Makeup Pattern, Captured Surface, and Tracking Mesh output in their entireties, and the Contour Program output are wholly and indivisibly merged in the derivative CG characters.

128.   Consequently, the CG characters prepared by Fox, either directly or in concert with an entity subject to its supervision and control, which were derivative of Contour Program output including some or all of the Skin Texture, Makeup Pattern, Captured Surface, and Tracking Mesh output, constitute "derivative works" as that term is defined in 17 U.S.C. § 101 prepared in violation of Rearden Mova's exclusive rights under 17 U.S.C. § 106 (2).

129.    On information and belief, while preparing derivative works based on some or all of the Contour Program output including Skin Texture, Makeup Pattern, Captured Surface, and Tracking Mesh output, for the feature films *Night at the Museum: Secret of the Tomb*, *Fantastic Four*, and *Deadpool,* Fox, either directly or in concert with an entity subject to its supervision and control, reproduced, distributed, performed, and/or displayed copies of some or all of the Contour Program output including Skin Texture, Makeup Pattern, Captured Surface, and Tracking Mesh output, in violation of Rearden Mova's exclusive rights under 17 U.S.C. § 106 (1), (3), (4) and (5).

130.    Fox reproduced the finished *Night at the Museum: Secret of the Tomb*, *Fantastic Four*, and *Deadpool* films containing CG character derivative works prepared based on some or all of the Contour Program output including Skin Texture, Makeup Pattern, Captured Surface, and Tracking Mesh output, and distributed the films on hard drives, by digital satellite transmission, and/or via other media and authorized their performance and display in motion picture theaters throughout the United States in violation of Rearden Mova's exclusive rights under 17 U.S.C. § 106(1), (3), (4) and (5).

131.    Fox Home Entertainment, either directly or in concert with entities subject to its supervision and control, reproduced the finished *Night at the Museum: Secret of the Tomb*, *Fantastic Four*, and *Deadpool* films containing derivative works prepared based on some or all of the Contour Program output including Skin Texture, Makeup Pattern, Captured Surface, and Tracking Mesh output, distributed the films on DVDs and Blu-rays, digital download and streaming, and other media, and authorized their performance and display by consumers throughout the United States in violation of Rearden Mova's exclusive rights under 17 U.S.C. § 106(1), (3), (4) and (5).

132.    Neither Fox nor Fox Home Entertainment, nor any other entities with which Fox and Fox Home Entertainment acted in concert and subject to their supervision and control, including but not limited to DD3, sought or received authorization from plaintiffs to use the copyrighted Contour Program and output including Skin Texture, Makeup Pattern, Captured Surface and Tracking Mesh output, to prepare derivative works to be used in the feature films *Night at the Museum: Secret of the Tomb*, *Fantastic Four*, and *Deadpool*, or to reproduce, distribute, perform or display such derivative works.

133.    The acts of infringement by Fox and Fox Home Entertainment, either directly or in concert with an entity subject to its supervision and control, were and are willful, intentional, purposeful and knowing, in that Fox and Fox Home Entertainment, either directly or in concert with entities subject to their supervision and control, at all material times had actual knowledge that the copyright in the Contour Program and output has been and is owned by Rearden Mova as successor-in-interest to its original author and claimant, or was in reckless disregard of or willful blindness to Rearden Mova's copyright.  Fox and Fox Home Entertainment, either directly or in concert with entities subject to their supervision and control, have acted and continue to act in knowing disregard of and indifference to the rights of Rearden Mova.

134.    Fox and Fox Home Entertainment are liable for each act of direct and actively induced copyright infringement alleged above because they had actual knowledge of the acts of infringement, personally and actively directed and participated in such acts of infringement, and financially benefitted from such acts of infringement.

135.    Plaintiffs have been harmed as the direct and proximate result of the foregoing acts of copyright infringement, including both financial and irreparable harm that has no adequate remedy at law.  Plaintiffs are entitled to injunctive relief, actual damages, profits of the infringer, and all such other remedies as may be available under the Copyright Act.

**SECOND CAUSE OF ACTION:**
**TRADEMARK INFRINGEMENT**

136.    Plaintiffs reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

137.    At all material times, plaintiff Rearden Mova was the owner of U.S. Registration No. 3,843,152 for the MOVA service mark.

138.    MOVA is an arbitrary or at least fanciful mark that is inherently distinctive.

139.    Since at least 2006, Rearden Mova and its predecessors-in-interest have used the MOVA service mark in connection with the marketing, promotion, and sales of facial performance capture services and output to the motion picture and videogame industry, including major motion picture studios and VFX studios.

COMPLAINT
Case No.:

54

140.    Through the marketing, promotion, and sales efforts of Rearden Mova and its predecessors-in-interest from 2005 through the present, and through the widespread publicity of and industry acclaim for the MOVA Contour facial performance capture technology and services offered by Rearden, Rearden Mova's MOVA service mark has acquired secondary meaning indicating that Rearden is the exclusive origin of the MOVA Contour facial performance capture technology and services.

141.    Without authorization, Fox and Fox Home Entertainment used Rearden Mova's MOVA service mark in commerce in the credits of *Deadpool*, listing in the Digital Domain end credit section "MOVA Artist for Colossus" and "MOVA Artists" as shown in the below photograph (red ellipse added):



142.    Without authorization, Fox and Fox Home Entertainment, acting either directly or in concert with entities subject to their supervision and control, used Rearden's MOVA service mark in commerce in connection with commercial advertising and promotion of their *Fantastic Four* film, including at least the Blu-ray featurette.

143.    Fox and Fox Home Entertainment's unauthorized use of Rearden Mova's MOVA service mark on the credits and in the promotional Blu-ray featurette for their *Deadpool* film, and in the promotional Blu-ray featurette for its *Fantastic Four* film, is a use of a word or term that is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Fox and

1   Fox Home Entertainment with Rearden, and/or as to the origin, sponsorship, or approval of the facial

2   motion capture services used in the *Deadpool* and *Fantastic Four* films by Rearden because the

3   MOVA service mark is exclusively associated with Rearden and its MOVA Contour facial motion

4   capture services.

5       144.    Fox and Fox Home Entertainment's unauthorized use of Rearden Mova's MOVA

6   service mark on the credits and in the promotional Blu-ray featurette for their *Deadpool* film and in

7   the promotional Blu-ray featurette for their *Fantastic Four* film is a misleading description or

8   representation of fact that is likely to cause confusion, mistake, or deception as to the affiliation,

9   connection, or association of Fox and Fox Home Entertainment with Rearden, and/or as to the origin,

10  sponsorship, or approval of the facial motion capture services used in the *Deadpool* and *Fantastic*

11  *Four* films by Rearden because the MOVA service mark is exclusively associated with Rearden and

12  its MOVA Contour facial motion capture services.

13      145.    Unauthorized use in commerce of Rearden Mova's MOVA service mark by Fox and

14  Fox Home Entertainment, acting either directly or in concert with entities subject to its supervision

15  and control, in connection with commercial advertising and promotion of its *Deadpool* and *Fantastic*

16  *Four* films, including press releases, press conferences, and other advertising and promotional

17  activities, constitutes a use of a word or term and a misleading description or representation of fact

18  that is likely to cause confusion, mistake or deception as to the characteristics and qualities of the

19  facial motion capture services in the films because the MOVA service mark is exclusively associated

20  with Rearden and its MOVA Contour facial motion capture services.

21      146.    Rearden Mova is, and is likely to continue to be, damaged by Fox and Fox Home

22  Entertainment's unauthorized use of its Rearden MOVA service mark.

23      147.    Fox and Fox Home Entertainment's unauthorized use of Rearden Mova's MOVA

24  service mark in commerce was with actual knowledge or willful disregard of Rearden Mova's

25  service mark, with intent to cause confusion, mistake or deception.

26      148.    Fox and Fox Home Entertainment are liable to Plaintiffs for each and every act of

27  trademark infringement alleged herein.

28

COMPLAINT
Case No.:

149.    Plaintiffs are entitled to an award of their actual damages, disgorgement of defendant Fox's profits, and costs and attorney's fees.

150.    Furthermore, Plaintiffs have suffered irreparable harm that is not compensable by monetary damages, and is therefore entitled to injunctive and other equitable relief.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs request the following relief:

A.    Enter preliminary and/or permanent injunctions as follows:

1.    Pursuant to 17 U.S.C. § 502, enter an injunction prohibiting Fox and Fox Home Entertainment from reproducing, distributing, performing or displaying, or authorizing the same, the *Night at the Museum: Secret of the Tomb*, *Fantastic Four*, and *Deadpool* motion pictures in any medium without authorization of Plaintiffs.

2.    Pursuant to 15 U.S.C. § 1116, enter an injunction prohibiting Fox and Fox Home Entertainment from using any of Plaintiffs' trademarks and service marks, and prohibiting distribution of the *Night at the Museum: Secret of the Tomb*, *Fantastic Four*, and *Deadpool* motion pictures in any medium bearing any of Plaintiffs' trademarks and service marks without authorization of Plaintiffs.

B.    Pursuant to 17 U.S.C. § 503 and 15 U.S.C. § 1118, order the impoundment and destruction of all infringing copies of *Night at the Museum: Secret of the Tomb*, *Fantastic Four*, and *Deadpool* motion pictures in any medium.

C.    Award financial damages compensation as follows:

1.    Pursuant to 17 U.S.C. § 504, award Plaintiffs (a) actual damages; and (b) any additional profits of Fox and Fox Home Entertainment that are attributable to the copyright infringements alleged herein and are not taken into account in computing the actual damages.

2.    Pursuant to 17 U.S.C. § 1117, award Plaintiffs (a) defendant Fox and Fox Home Entertainment's profits; (b) damages sustained by Plaintiffs in an amount to be proved at trial; and (c) the costs of this action.

D.    Willful Infringement.

COMPLAINT
Case No.:

1        Pursuant to 17 U.S.C. § 1117, enter a finding that Fox and Fox Home Entertainment's

2  trademark infringements as alleged herein were willful, in reckless disregard, or in willful

3  blindness to Plaintiffs' trademark rights, and order enhanced damages, costs, and attorney's

4  fees.

5      E.    Award Plaintiffs their costs and attorney's fees as follows:

6         1.    Pursuant to 17 U.S.C. § 505, award full costs and a reasonable attorney's fee

7  to Plaintiffs.

8         2.    Pursuant to 15 U.S.C. § 1117, enter a finding that defendant Fox's trademark

9  infringements as alleged herein present an exceptional case, and award Plaintiffs their costs

10  and attorney's fees.

11      F.    Grant such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

13      Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands trial by jury of all issues so triable under

14  the law.

15  DATED: July 24, 2017         HAGENS BERMAN SOBOL SHAPIRO LLP

16                        By */s/ Rio S. Pierce*

17                          Rio S. Pierce

18                      Steve W. Berman (*pro hac vice* pending)
                          Mark S. Carlson (*pro hac vice* pending)

19                      HAGENS BERMAN SOBOL SHAPIRO LLP
                          1918 Eighth Avenue, Suite 3300

20                      Seattle, WA 98101
                          Telephone:  (206) 623-7292

21                      Facsimile:   (206) 623-0594
                          steve@hbsslaw.com

22                      markc@hbsslaw.com

23                      Rio S. Pierce, CBA No. 298297
                          HAGENS BERMAN SOBOL SHAPIRO LLP

24                      715 Hearst Avenue, Suite 202
                          Berkeley, CA 94710

25                      Telephone:  (510) 725-3000
                          Facsimile:   (510) 725-3001

26                      riop@hbsslaw.com

27                      *Attorneys for Plaintiffs*
                      Rearden LLC and Rearden Mova LLC

28

COMPLAINT
Case No.:

# Exhibit 1

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Maria A. Pallante*

United States Register of Copyrights and Director

**Registration Number**

## TXu 1-977-151

**Effective Date of Registration:**
February 11, 2016

---

## Title

**Title of Work:** MOVA Contour

## Completion/Publication

**Year of Completion:** 2009

## Author

- **Author:** OnLive, Inc.
  **Author Created:** computer program
  **Work made for hire:** Yes
  **Citizen of:** United States

## Copyright Claimant

**Copyright Claimant:** Rearden Mova LLC
355 Bryant Street, Suite 110, San Francisco, CA, 94107, United States
**Transfer statement:** By written agreement

## Rights and Permissions

**Organization Name:** Law Offices of Jonathan Kirsch
**Name:** Jonathan Kirsch
**Email:** jk@jonathankirsch.com
**Telephone:** (310)785-1200
**Address:** 1880 Century Park East
Suite 515
Los Angeles, CA 90067 United States

## Certification

**Name:** Jonathan Kirsch
**Date:** February 11, 2016
**Applicant's Tracking Number:** 2347.3.4

**Correspondence:**   Yes

*0000TXU0019771510202*

**Exhibit 2**



# MOVA

**Reg. No. 3,843,152**
    MOVA, LLC (CALIFORNIA LIMITED LIABILITY COMPANY)
    181 LYTTON AVENUE
**Registered Aug. 31, 2010**  PALO ALTO, CA 94301

**Int. Cl.: 42**
    FOR: RENTAL OF COMPUTER HARDWARE AND SOFTWARE FOR USE IN THE FIELD
    OF ENTERTAINMENT, IN CLASS 42 (U.S. CLS. 100 AND 101).

**SERVICE MARK**
    FIRST USE 9-1-2009; IN COMMERCE 9-1-2009.

**PRINCIPAL REGISTER**
    THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-
    TICULAR FONT, STYLE, SIZE, OR COLOR.

    THE FOREIGN WORDING IN THE MARK TRANSLATES INTO ENGLISH AS IT MOVES.

    SN 78-599,227, FILED 3-31-2005.

    LANA PHAM, EXAMINING ATTORNEY



Director of the United States Patent and Trademark Office

# Exhibit 3

**Int. Cl.: 41**

**Prior U.S. Cls.: 100, 101, and 107**

**Reg. No. 3,628,974**

**United States Patent and Trademark Office**    Registered May 26, 2009

## SERVICE MARK
### PRINCIPAL REGISTER

# CONTOUR

MOVA, LLC (CALIFORNIA LIMITED LIABILITY
    COMPANY)
181 LYTTON STREET
PALO ALTO, CA 94301

    FOR: VISUAL EFFECTS AND MOTION PICTURE
PRODUCTION SERVICES, ALL IN THE FIELD OF
ENTERTAINMENT; ENTERTAINMENT SERVICES,
NAMELY, SPECIAL EFFECTS, VISUAL EFFECTS
AND ANIMATION SERVICES FEATURING MO-
TION CAPTURE FOR TRANSLATING MOVEMENT
OF A REAL SUBJECT AND MAPPING SUCH MOVE-
MENT ONTO A 3-DIMENSIONAL COMPUTER-
GENERATED MODEL OR AS A COMPUTER-GEN-

ERATED SUBJECT, IN CLASS 41 (U.S. CLS. 100, 101
AND 107).

    FIRST USE 8-1-2006; IN COMMERCE 7-25-2007.

    THE MARK CONSISTS OF STANDARD CHAR-
ACTERS WITHOUT CLAIM TO ANY PARTICULAR
FONT, STYLE, SIZE, OR COLOR.

    SN 78-981,021, FILED 5-4-2006.

DANIEL CAPSHAW, EXAMINING ATTORNEY