Steve W. Berman (*pro hac vice*)
Mark S. Carlson (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594
steve@hbsslaw.com
markc@hbsslaw.com

Rio S. Pierce, CBA No. 298297
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone:  (510) 725-3000
Facsimile:   (510) 725-3001
riop@hbsslaw.com

*Attorneys for Plaintiff*
Rearden LLC and Rearden Mova LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| REARDEN LLC, REARDEN MOVA LLC, California limited liability companies, <br><br> Plaintiffs, <br><br> v. <br><br> TWENTIETH CENTURY FOX FILM CORPORATION, a Delaware corporation, TWENTIETH CENTURY FOX HOME ENTERTAINMENT LLC, a Delaware limited liability company, <br><br> Defendants. | No. 3:17-CV-04191-JST <br><br> **FIRST AMENDED COMPLAINT FOR COPYRIGHT AND TRADEMARK INFRINGEMENT** <br><br> **DEMAND FOR JURY TRIAL** |

1

**TABLE OF CONTENTS**

**Page**

2   I.   INTRODUCTION ...................................................................................1

3   II.   THE PARTIES ......................................................................................4

4   III.   JURISDICTION AND VENUE ............................................................4

5   IV.   FACTUAL ALLEGATIONS ................................................................5

6        A.   The Contour program, systems, and methods ............................5

7        B.   The Contour intellectual property ...........................................34

8        C.   Rearden's use of the Contour program, system, and methods in fifteen major motion pictures and one videogame cinematic trailer, and industry acclaim ......................36

9
10       D.   Transfer of the Contour Assets to OnLive, Inc., OL2, Inc., and Rearden Mova.......38

11       E.   Shenzhenshi's transparently false ownership claims .................39

12       F.   Defendants' unauthorized use of the Contour Assets.............41

13            1.   *Night at the Museum: Secret of the Tomb* ...................42

14            2.   *Fantastic Four* .........................................................43

15            3.   *Deadpool* ................................................................46

16   FIRST CAUSE OF ACTION: VICARIOUS AND CONTRIBUTORY COPYRIGHT INFRINGEMENT ...................................................................53

17   SECOND CAUSE OF ACTION: TRADEMARK INFRINGEMENT ...........................................58

18   PRAYER FOR RELIEF..........................................................61

19   DEMAND FOR JURY TRIAL .........................................................62

20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs Rearden LLC and Rearden Mova LLC (collectively, "Plaintiffs"), through their attorneys and for their claims against defendant Twentieth Century Fox Film Corporation ( "Fox"), allege as follows.

## I.      INTRODUCTION

1.      Twentieth Century Fox's *Deadpool* opened on February 12, 2016, grossing $132 million in North America and $265 million globally.  It was the top film opening of all time for an R-rated film, both domestically *and* internationally.  And it is now the highest grossing R-rated film of all time, earning over $363 million domestically and $783 million worldwide.[1] *Deadpool* is by far the highest grossing of any of Fox's ten X-Men franchise movies.[2]

2.      Colossus is a well-known X-Men franchise character that has a metallic body and face. In prior X-Men movies, Colossus was played by an actor whose face was made metallic-looking using conventional Visual Effects ("VFX") techniques, resulting in a character that was no taller or larger than the actor. But *Deadpool* director Tim Miller wanted Colossus to appear as he did in the original X-Men comic books: "…in the comics he's this seven- or eight-foot tall [expletive] behemoth of a character and that's why he's so cool…"[3] As a result, Miller needed to create an entirely CG (computer graphics) Colossus. X-Men movie fans had come to expect a Colossus with a real human face, so Miller turned to a unique Oscar-winning VFX technology called Contour Reality Capture, which transferred every human subtlety of the Colossus actor's facial performance through to the CG metallic face of the Colossus character. The result was a behemoth-sized entirely CG Colossus that was faithful to the original X-Men comic books, but whose CG face had completely photorealistic human motion, consistent with the Colossus of prior X-Men movies.

---

[1] http://www.boxofficemojo.com/movies/?id=deadpool2016.htm

[2] http://www.boxofficemojo.com/franchises/chart/?id=xmen.htm

[3] "From Comics to Screen…to Screen: MAGIC!" featurette on *Deadpool* DVD, Blu-ray and digital video with bonus features. The deleted expletive has the meaning of "extraordinary" in this context.

3.      Annemarie Griggs, *Deadpool* Visual Effects Producer, described how two actor's faces were used to create the Colossus CG face, one for initial shape of the face, and one to provide facial motion throughout the *Deadpool* movie:

> "…we had one actor whose face was used as the original face model for the look of his face. Then we had another actor whose facial movements were used when Colossus speaks." [4]

Pauline Duvall, Visual Effects Supervisor of Miller's VFX company, Blur Studio, described how the facial performance was captured with the extraordinary precision required to preserve and transfer the subtleties of the facial actor's performance:

> "Digital Domain has a great system called 'MOVA' which is a facial capture system. You paint on the face and it creates thousands and thousands of little tracking markers. At that point you get a piece of geometry that captures movement and acting of the actor." [5]

4.      But neither Ms. Griggs, Ms. Duvall, nor defendant Fox ever mentioned that the acclaimed cutting-edge digital Contour technology that made the photorealistic face of the CG Colossus possible was stolen from its inventor and author, Rearden LLC, and its owner Rearden Mova LLC.  Nor is it ever mentioned that although Fox had previously contracted with Rearden LLC and its controlled entities on a previous film, *Percy Jackson & The Olympians: The Lightning Thief*, Fox nonetheless secretly contracted with the thieves to use the stolen Contour facial performance capture technology.

5.      Nor was it ever disclosed that *Deadpool* Director Tim Miller and his VFX company, Blur Studio, had a long relationship with Rearden LLC and its controlled entities, contracting for motion and facial capture work and collaborating on projects. Mr. Miller and Blur Studio had previously created an all-CG photorealistic superhero short animated film, entitled *Batman: Arkham City*[6], utilizing Contour facial performance capture systems and methods, and the Contour program authorized by Rearden LLC and its controlled companies. Also, Mr. Miller and Blur Studio were

---

[4] "From Comics to Screen…to Screen: MAGIC!" , op. cit.

[5] "From Comics to Screen…to Screen: MAGIC!", op. cit.

[6] "Batman: Arkham City - Behind The Scenes Of The Cinematic Trailer", October 23, 2011, shows how Contour was used by Blur Studio. https://youtu.be/oPYM4TG0oXM

hired by Rearden LLC as contractors to do marker-based facial animation tests during Contour's development.[7] Mr. Miller has known Mr. Perlman personally for over a decade, frequently shared with Mr. Perlman projects he was working on, and sought business and financial advice from Mr. Perlman related to movie production.

6.      And, nowhere is it mentioned that *after* Rearden and Rearden Mova were in widely-reported litigation against the Contour thieves, Fox and Miller secretly engaged the thieves to provide Contour facial performance capture in *Deadpool* during the litigation.

7.      But throughout this entire time, Fox never bothered to contact its longtime Contour service provider Rearden LLC to ask any questions or to verify authorization to use the Contour program, system, methods, trade secrets, or trademarks that Fox knew Rearden owned. Nor did Mr. Miller ever bother to call Mr. Perlman, his longtime business associate and friend, to verify authorization to use Contour.

8.      And this was not the first time that Fox contracted with Contour's thieves.  Fox contracted with them previously to use Contour in another film, *Night at the Museum: Secret of the Tomb*, which was also highly successful. Contour was used to capture a facial performance (from the same actor used in *Deadpool*), to bring the CG face of a Roman bust of Augustus Caesar to life.[8] Fox also contracted with the same thieves previously to use Contour in another film, *Fantastic Four*. It used Contour to capture a facial performance of actor Jamie Bell as an animation reference for the CG Thing character.[9]

9.      Fox used the stolen Contour systems and methods and Contour program, and with Fox Home Entertainment, reproduced and distributed, and authorized performance and display of *Deadpool, Night at the Museum: Secret of the Tomb* and *Fantastic Four* in knowing or willfully blind violation of Rearden Mova LLC's intellectual property.  This case seeks all just and equitable

---

[7] "Steve Perlman at Columbia Engineering School", June 4, 2011. "Marker-based Woman Pirate face test animation" by Blur Studio, directed by Tim Miller, under contract by Rearden. Starts at 14 minutes, 24 seconds. https://youtu.be/1QxrQnJCXKo?t=14m24s

[8] https://youtu.be/0pZZlj3KVrk?t=1m18s

[9] Failes, Ian, "Fantastic Five", fxguide, August 9, 2015. https://www.fxguide.com/quicktakes/fantastic-five/

copyright and trademark remedies on behalf of the inventors and owners of the Contour program, systems, and methods, plaintiffs Rearden LLC and Rearden Mova LLC.

## II.     THE PARTIES

10.     Plaintiff Rearden LLC ("Rearden") is a California limited liability company having its principal place of business at 355 Bryant Street, Suite 110, San Francisco, California 94107.

11.     Plaintiff Rearden Mova LLC ("Rearden Mova") is a California limited liability company having its principal place of business at 355 Bryant Street, Suite 110, San Francisco, California 94107.  Rearden Mova is wholly owned by Rearden.

12.     Defendant Twentieth Century Fox Film Corporation ("Fox") is a Delaware corporation having its principal place of business at 10201 W. Pico Blvd., Los Angeles, California 90064.

13.     Defendant Twentieth Century Fox Home Entertainment LLC ("Fox Home Entertainment") is a Delaware limited liability company, having its principal place of business at PO Box 900, Beverly Hills, California, 90213.  Fox Home Entertainment is wholly-owned and controlled by Fox.

## III.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), and § 1338 (trademark and copyright jurisdiction).

15.     This Court has personal jurisdiction over Fox and Fox Home Entertainment.  It has general personal jurisdiction over Fox and Fox Home Entertainment because their principal places of business are in the State of California and they have the capacity to sue and be sued in the State of California.  And this Court has specific personal jurisdiction over Fox and Fox Home Entertainment because they have committed acts in the State of California that give rise to all claims of infringement asserted herein.

16.     Venue is proper for plaintiffs' copyright and trademark infringement claims under 28 U.S.C. § 1400(a) and 1391 (b), (c) and (d).  Fox used plaintiffs' MOVA trademark, and with Fox Home Entertainment, reproduced, distributed, and authorized the performance and display of

1    *Deadpool, Night at the Museum: Secret of the Tomb*, and *Fantastic Four* throughout this judicial

2    district.

3    ## IV.   FACTUAL ALLEGATIONS

4    **A.   The Contour program, systems, and methods**

5    17.   The technology at the core of this case includes Contour Reality Capture ("Contour")

6    technology that was conceived, developed, and authored by plaintiff Rearden and is currently owned

7    by plaintiff Rearden Mova.

8    18.   Contour (http://www.rearden.com/mova.html) is one of many technologies incubated

9    and offered by Rearden (www.rearden.com), a San Francisco Bay Area company founded in 1999 by

10   Steve Perlman as an incubator for fundamental technology, creative works, and their interplay.

11   19.   Contour is the fourth performance motion capture technology that Rearden has used

12   in film and videogame production since its founding 19 years ago.  Facial performance motion

13   capture, as both a technology and a tool for motion picture and videogame production, falls squarely

14   within the focus of Rearden's business.  Rearden practices all of its technologies and inventions,

15   either directly or indirectly by spinning off Rearden entities to use its technologies and inventions.

16   Despite holding a global portfolio of hundreds of its own patents, Rearden has never been in the

17   business of licensing third parties to practice its technologies and inventions, and it has never

18   licensed nor sought to license any of its technologies, inventions, patents, copyrights, or trademarks.

19   Rearden's intellectual property portfolio exists only to protect Rearden's product and services

20   offerings, and neither Rearden nor any of its controlled entities has ever previously sued any other

21   person or entity for patent or copyright infringement.

22   20.   Mr. Perlman previously worked as Principal Scientist at Apple where he developed,

23   among many other technologies, the multimedia underpinnings of the color Macintosh as well as

24   QuickTime. He left Apple for two startups that later went public, and designed and co-founded

25   WebTV, which was later acquired by Microsoft. Microsoft named Perlman President of a new

26   Silicon Valley division focused on television products, which ultimately developed Microsoft's

27   cable, satellite, IPTV and Xbox 360 systems. Perlman left Microsoft in 1999 and self-funded a

28

technology incubator and visual effects production studio in San Francisco called Rearden, Inc. (now

Rearden LLC). Rearden focused largely on developing fundamental media-related technologies

whose development times (e.g. 5 to 15 years) are beyond the horizon of venture capital and corporate

research and development.  Perlman has operated Rearden continuously through to this day.  He is a

prolific inventor.  Perlman is a named inventor on over 500 patents worldwide, and among his many

innovations are the following:

- The underlying technology for QuickTime (the video streaming technology for iPhone, iPad, iPod and Mac and much of the multimedia technology for Apple);

- The underlying technology for many of Microsoft's video products;

- OnLive cloud gaming technology;

- Contour facial capture technology;

- Artemis pCell wireless technology; and

- A wide range of other technologies in other fields, including medical and national defense life-saving technologies, often in cooperation with the U.S. government and U.S. agencies, sometimes not publicly disclosed.

21.    A major technology focus of Rearden from its 1999 founding to this day is

"performance motion capture," a production technology typically used to create a 3D animated

character in a movie or a videogame that moves exactly like a human performer. In 2000, Rearden

began offering motion capture services for movies and videogames (through wholly-owned

subsidiaries Rearden Studios and then MOVA LLC) using existing commercial "marker-based"

motion capture systems that could capture and track body ("skeletal") motion, but there was no

known technology at that time that could capture and track the subtleties of human facial motion in a

realistic, life-like manner, despite an urgent need:

"The state of the art [before Contour] was … marker-based motion capture…we looked at a number of other films at the time that were using facial marker tracking…as you can see, it gives you a pretty crappy performance… What we realized was that what we needed was the information that was going on between the markers. We needed the

subtleties of the skin. We needed to see skin moving over muscle moving over bone. We needed creases and dimples and wrinkles…" [10]

Rearden set out to invent and perfect a photorealistic facial motion capture and tracking system.

22.    Over the next five years, Rearden's technical team—including brilliant, talented, and highly creative engineers, programmers, and visual effects artists—tried dozens of different approaches to solve the problem.  Years of experimenting, testing, trials, failures, sweat of the brow, expenditure of millions of dollars, and finally stunning breakthroughs, ultimately led to the conception and perfection of a solution to the long-felt need—a technology that precisely captures and tracks the 3D shape and motion of a human face to sub-millimeter precision, producing photorealistic results. Rearden branded the technology Contour Reality Capture, and offered it to the videogame and motion picture industries. The solution was comprised of a complex apparatus and methods for capturing facial performances, and wholly original software that operated the apparatus and subsequently processed the performance captures into works that could be used by effects studios to animate CG characters.  This innovative technology was recognized in the motion picture industry as revolutionary:

> "Contour's promise is enormous," [Director David] Fincher said, "The notion that the human face in all its subtleties could be mapped in real time and such density of surface information opens up so many possibilities for both two- and three-dimensional image makers and story-tellers."

> "I live in this environment, and I see stuff every day, so I get a little jaded," said [then Digital Domain Senior VP and Executive Producer Ed] Ulbrich… "Other developments have been gradual, more evolutionary than revolutionary. Contour separates the performance from the photography. It's a substantial turning point in the business, and I think it will change how picture are made." [11]

23.    Contour's technical breakthrough was introduced at the Special Interest Group on Computer Graphics and Interactive Techniques ("SIGGRAPH") Conference on July 31, 2006 to wide acclaim, including photographs of Contour's systems and methods on the front page of the *New*

---

[10] Ulbrich, Ed (former Digital Domain CEO), "How Benjamin Button Got His Face" TED Talk, Feb 2009. https://www.ted.com/talks/ed_ulbrich_shows_how_benjamin_button_got_his_face.

[11] Marlowe, Chris, "Contour mapping intricate detail: Mova revolutionizing motion-capture process with new system," The Hollywood Reporter, July 31, 2006, http://www.rearden.com/press/2006/Contour-HollywoodReporter-060731-2.pdf.

*York Times*[12], page B1 of the *Wall Street Journal*[13], and *The Hollywood Reporter*, among other publications. Mr. Perlman was invited to present MOVA Contour technologies and their practical applications in movie production to the Directors Guild of America[14]. And he was invited on many occasions to give public presentations on MOVA Contour and the development process that led to its invention, for example in a speech at Columbia University[15].

24.     The following photograph[16] from an article in *The Hollywood Reporter* on the day Contour was unveiled—July 31, 2006—was directed to movie and videogame industry professionals and illustrates several Contour program output works, which are described in further detail later in subsequent allegations:



---

[12] Markoff, John, "Camera System Creates Sophisticated 3-D Effects", New York Times, July 31, 2006. https://nyti.ms/2uAfwGF.

[13] Wingfield, Nick, "Digital Replicas May Change Face of Films", July 31, 2006. http://on.wsj.com/2teIRbO.

[14] "'Facial Performance Capture for Photoreal Digital Characters' Presented by Steve Perlman, Founder & President, Mova", Digital Day 2007: The Future of the Future, Directors Guild of America, July 28, 2007. http://ishindler.com/articles/DGA_Digital_Day_flyer07.pdf.

[15] https://youtu.be/1QxrQnJCXKo.

[16] Marlowe, op. cit.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

25.     Also on July 31, 2006, the following photographs appeared in a *New York Times* article directed to a general readership audience, which illustrate an application of the phosphor-based makeup used in Contour facial motion capture methods:



Actors must cover themselves with makeup containing phosphorescent powder for Contour, a system that can create 3-D effects. Austin Hice

and three Contour program output works (this photograph appeared on the front page):[17]



An actress goes from live performance, left, to phosphorescence, to a Contour-generated image, right. Mova.com

―――――――――

[17] Markoff, op. cit.

FIRST AMENDED COMPLAINT
Case No.: 3:17-cv-04191-JST

26.     Also on July 31, 2006, the following photograph appeared in a *Wall Street Journal* article directed to a general readership audience, which illustrates the same three Contour program output works with "non-technical reader" annotations for each image (the web version of the article included a video that showed the three output works in motion):[18]



| ① Contour cameras film the movements of an actress wearing glow-in-the-dark makeup | ② Cameras capture a series of raw 3-D images defined by the makeup | ③ The digital version of the actress is completed with skin and clothing textures |

27.     In one embodiment, Contour uses an array of cameras whose shutters are synchronized to strobing white lights and ultraviolet lights in conjunction with phosphor-based makeup applied to the performer in random patterns, with the entire system controlled by highly-advanced, original and proprietary Contour program that operates the Contour system in real time to capture an actor's performance frame-by-frame, and then processes the capture into original Contour program output works based on the captures.

28.     The Contour system is controlled, and the captured camera images are processed, by several computers running the Contour program. Part of the program operates prior to a facial performance capture session to prepare and calibrate the Contour system.  Part operates in real-time during a live facial performance capture.  And part operates after the facial capture to process the

---

[18] Wingfield, op. cit.

FIRST AMENDED COMPLAINT
Case No.: 3:17-cv-04191-JST

10

captures into works that can be used to animate CG characters. The Contour program produces several types of output works, some of which are used by the Contour program itself for further processing, and some are used for animating a CG face in a movie or videogame.

29.     One embodiment of the operation of the Contour program, system, and methods is described in the following page from a Contour brochure below, distributed at computer graphics and entertainment industry conferences:



30.     **Preparation:** Phosphor-based makeup (various types of phosphor are supported) is applied in a random pattern on the performer's face, neck, etc.—whatever body surfaces are intended to be captured—typically using an airbrush, sponge or cotton swab.

31.     **Lights:** The performer sits or stands in the arc-shaped Contour apparatus in a light-sealed stage. One part of the Contour program causes white lights and ultraviolet lights to be flashed so rapidly that the flashing is beyond human perception and it appears to the performer and observers that the white and ultraviolet lights are on steadily.

32.     **Cameras:** One part of the Contour program causes the shutters on two pluralities of cameras, distributed around the apparatus, to open and close synchronously with the flashing of the lights such that:

(a)     a first plurality of cameras open their shutters when the white lights are on, illuminating the natural skin color of the performer; and

(b)     a second plurality of cameras open their shutters when the white lights are off and the phosphor-based makeup is emitting random patterns of light.

33.     **Action:** The performer provides her or his facial performance while one part of the Contour program causes the output of each of the plurality of cameras to be recorded onto storage devices. The output works of the two pluralities of cameras are illustrated in each half of the face in the "Capture Process" section of the brochure reproduced above.

(a)     the output of the first plurality of cameras is called the "**Skin Texture**" and it looks like normal skin and facial features of the performer from multiple angles, largely without visible makeup, and

(b)     the output of the second plurality of cameras is called the "**Makeup Pattern**" and it looks like a random pattern of green or blue largely without showing the skin or other facial features (e.g. eyes or mouth) of the performer.

34.     Part of the Contour program processes the Makeup Pattern output work to create a high-resolution 3D surface that moves in the shape of the skin of the performer with sub-millimeter precision. This output work is called the "**Captured Surface**" and, rendered on a display, it looks

like a 3D bust of the performer's skin in motion. A still frame of a Captured Surface work is shown in the "Captured Surface" section of the brochure reproduced above.

35.     The same part of the Contour program processes the Makeup Pattern output work to create a high-resolution 3D mesh that tracks points on the skin of the performer in 3D as the skin moves from frame-to-frame. This output work is called the "**Tracking Mesh**" and, rendered on a display, it looks like a 3D mesh that exactly follows the movement, stretching and wrinkling, etc., of the skin as the performer moves her or his face. A still frame of a Tracking Mesh work is shown in the "Tracked Surface" section of the brochure reproduced above. The Tracking Mesh work tracks the subtleties of the performer's facial motion with sub-millimeter precision. For example, if the performer's expression causes the cheeks to bulge out from a smile, the points on the 3D mesh tracking the cheek will bulge out in exactly the same 3D shape. If the forehead furrows into wrinkles, then the points on the 3D mesh tracking the forehead will furrow into wrinkles in exactly the same 3D shape. The Tracking Mesh work can be configured to be at any resolution, whether thousands or even millions of points, depending on the level of tracking detail required by the project. An example of a Tracking Mesh work tracking skin deformation from an extreme expression is shown here:



36.     The Contour program's output works specified above can be used for many different applications. Often they are used for "retargeting" the performer's face onto another 3D model of a face, either a real face (e.g. when Rupert Grint (Ron Weasley) transforms into the face of Daniel Radcliffe (Harry Potter) in *Harry Potter and the Deathly Hallows, Part I*), or a fictional face (e.g. Mark Ruffalo's face transforms into the Hulk's face in *The Avengers*, Brad Pitt's 44-year-old face retargeted to an 87 year-old version of his face in *The Curious Case of Benjamin Button*), or Jeff Bridge's face retargeted in *TRON: Legacy* (2010) to his 28 year-younger face as it appeared in *TRON* (1982).

37.     When the retargeting is from a first performer's real face to the real face of a second performer, then each performer's face is captured by the Contour system, with output works created by the Contour program for each performer. The Captured Surface, Tracking Mesh, Makeup Pattern, and Skin Texture output works can be used in the construction of a 3D model of the face of the second performer, and then the Tracking Mesh work of the first performer is used to animate the 3D model of the second performer's face. The result is a 3D model of the face of the second performer that is animated by the motion of the first performer's face. For example, the photograph below shows a man (the "second performer") captured by the Contour program, system, and methods. The 3D model of a CG head (center) was generated from the Contour program output works, including the Makeup Pattern (left) and Tracking Mesh (right) works:



1       38.     The photograph below shows the performance of the woman ("the first performer") in

2  the brochure reproduced above (showing her Skin Texture (left) and Tracking Mesh (right) Contour

3  output works) retargeted to the man's CG head in the above photo by retargeting the points on her

4  Tracking Mesh work to the 3D model of the man's CG head. As you can see in her live performance

5  (showing the Skin Texture output work, below left), her facial expression causes the man's CG head

6  to track her facial expression. Contour's Tracking Mesh work is so precise that a high degree of

7  realism is maintained, even though the man's CG face and head have a very different shape and size

8  than hers, and he is male and she is female. In fact, Contour output works capture the woman's

9  performance with such fidelity that observers of the animation have commented that despite the fact

10  that the man's CG face clearly has a male *shape*, the *motion* appears to be that of a female face. The

11  video of this and other Contour examples is available on Rearden's home page (www.rearden.com,

12  click on the MOVA logo and click on the video), or directly (www.rearden.com/mova.php or

13  https://vimeo.com/86130623):



39.     A similar retargeting process can be performed with a fictional head. For example, the two photographs below are of a performer whose face was captured in the Contour system showing the Skin Texture output work on the left and how she appeared to the naked eye (or a conventional camera), showing the Makeup Pattern work combined with the Skin Texture work on the right:



40.     The photograph below shows several views of a CG model of the head of a videogame character that was created by an artist:



Although the head looks almost photoreal (it was only a test, not a polished CG model) when it is in a neutral pose and immobile, if the face were animated—whether through hand-drawn animation or prior art motion capture techniques—any photorealism would be lost because the human eye and brain are precisely attuned to notice any unnatural imperfection in facial motion. But, by using the Contour system and methods and the Contour program, every subtle motion of the human face is

captured with sub-millimeter precision, producing output works that retain that precision and can be retargeted to any fictional CG head, bringing it to life.

41.     The photographs below show the above videogame character's head in two expressions retargeted from the Tracking Mesh work generated by the Contour program from the Contour facial capture of the above actress. Although the photorealism of the motion cannot be seen in static photographs, the motion is realistic and life-like, despite the fact that the performer's face is a very different shape than that of the CG head. Even in a static image, however, one can see how the expressionless CG model tracked the good-natured expression of the actress:





42.     A 3D "wireframe" (a mesh of 3D points) of the retargeted CG character's head is shown below, separately and overlaid upon the rendered image, and then the final rendered image:





43.     In summary, the Contour program transforms the facial performance of a live performer, capturing the most subtle of facial motions with sub-millimeter precision to animate with realism the life-like motion of faces of CG characters that appear in a finished movie, videogame, or other production. The process begins by airbrushing or otherwise applying a random pattern of phosphor-based makeup on a performer, having the performer sit or stand in the arc-shaped Contour apparatus surrounded by an array of white lights and ultraviolet lights and two pluralities of cameras, with the lights flashed rapidly and synchronized with the camera shutters as Skin Texture and Makeup Pattern works are created by the Contour program. The Contour program then processes the Makeup Pattern work to create thousands or even millions of points in 3D as the performer's face moves, producing precise Captured Surface and Tracking Mesh works. Thus, the Contour program produces output works that include the following:

- **Skin Texture**, showing the normal skin and facial features of the performer from multiple angles, largely without visible makeup, in color
- **Makeup Pattern**, showing the random pattern of makeup on the performer from multiple angles, largely without visible skin or facial features, in grayscale
- **Captured Surface**, a high-resolution moving 3D surface in the shape of the performer's skin as the performer's face moves
- **Tracking Mesh**, a high-resolution 3D mesh that exactly tracks the movement, stretching, wrinkling, etc. as the performer moves their face.

The Tracking Mesh work can then be retargeted to a CG face, animating it with photorealistic and natural motion, thereby precisely preserving every subtlety of human expression by the performer in the final movie, videogame, or other production.

44.     The Contour program includes a security mechanism that automatically affixes notice of Rearden's Contour program copyright to Skin Texture and Makeup Pattern output works, an example of which is shown in the three images below from a *Beauty and the Beast* Contour capture of performer Dan Stevens. The first image and second groups of images below show the first and second frames, respectively, of the 3 color Skin Texture and 22 grayscale Makeup Pattern works.

The first frame contains the copyright notice, year, date, and time of the capture and technical Contour capture information; the second frame (and all subsequent frames) shows the performer's frame-by-frame capture by the Contour program from the angle of each camera in the Contour apparatus.  The third image below is an enlargement of the first frame of one Skin Texture output work, showing the copyright notice which reads, "Copyright 2016 - Rearden LLC", and also includes the date and time of the Contour capture session: "Tue, Jun 14, 2016 - 09:41:16". The date and time stamping notifies any Contour program end-user that the copyright of the Contour program is controlled by Rearden LLC as of the date and time of the Contour capture. Since the end-user would not have access to the copyright notices embedded into the Contour program's source code, the current-year copyright notice serves as *express notification that Rearden LLC is asserting its copyright in the Contour program.* This copyright protection feature affixed copyright notice on every Contour program Skin Texture and Makeup Pattern work from the date of the Contour program theft in early 2013 until this Court's Preliminary Injunction Order[19] went into effect on June 17, 2016, finally halting use of the stolen Contour program. The below Contour capture was time-stamped on June 14, 2016, evidencing that the stolen Contour program was still in use by The Walt Disney Company three days before the Injunction Order in *Shenzhenshi, et al. v. Rearden, et al.*. From its theft in 2013 through the June 17, 2016 Injunction Order, many thousands of Contour program works were created for movies and videogames using the stolen Contour program, each affixed with "Copyright [current date] - Rearden LLC" and the date and time of the capture.

---

[19] *Shenzhenshi, et al. v. Rearden, et al.,* NDCA Case No. 15-797, Dkt. 188

FIRST AMENDED COMPLAINT
Case No.: 3:17-cv-04191-JST



45.     Within days after the Contour program, system, and methods were unveiled at SIGGRAPH in 2006, tests and production began on one of the first movies utilizing Contour, *The Curious Case of Benjamin Button.* The movie was released in 2008. The photorealistic reverse-aging of Brad Pitt's face from an 87-year-old man backwards to his then-age of 44, and then further backwards to a younger age, was widely lauded as a visual effects ("VFX") milestone, the first ever photorealistic CG face, winning an Academy Award for Best Visual Effects for the team at the VFX production company, Digital Domain, which had hired Rearden to operate the Contour system to capture Brad Pitt's face and generate Contour program output works for the film.

46.     In a widely-viewed TED (Technology, Entertainment, Design) Talk entitled, "How Benjamin Button Got His Face," Ed Ulbrich, then Digital Domain's Senior VP and Executive Producer (subsequently the CEO of successor Digital Domain 3.0, Inc.), confirmed that *The Curious Case of Benjamin Button* would have been "impossible" to make but for the Contour system and methods and the unprecedented facial capture precision and subtlety of the Contour program's output works. Ulbrich stated in the talk:

> "We first got involved in *The* [*Curious Case of Benjamin Button*] project in the early 90s.... We took a lot of meetings and we seriously considered it. But at the time, we had to throw in the towel. **It was deemed impossible**. **It was beyond the technology of the day to depict a man aging backward**... The project came back to us a decade later.... **we came across a remarkable technology called Contour**…creating a surface capture as opposed to a marker capture…**This was when we had our 'Aha!' This was the breakthrough**…we could put Brad [Pitt] in this [Contour] device, and use this Contour process, and we could stipple on this phosphorescent makeup and put him under the black lights, and we could, in fact, scan him in real time… effectively, we ended up with a [Contour program output file] 3D database of everything Brad Pitt's face is capable of doing…we could transpose the [Contour program output file] data of Brad at [then-aged] 44 onto [a 3D model of] Brad at 87. So now, we had a 3D database of everything Brad Pitt's face can do at age 87, in his 70s and in his 60s."[20]

47.     In the TED Talk, Ulbrich showed details of the Contour system and methods, Contour program output works, and how the CG face of Benjamin Button in the final movie was derived from

---

[20] Ulbrich, op. cit. (emphasis added).

FIRST AMENDED COMPLAINT
Case No.: 3:17-cv-04191-JST

22

1   the Contour program output works. The following paragraphs describe still frames from the TED

2   talk (labeled by "Minutes:Seconds" from the start of the video).

3       48.    **9:43:** The branded Contour apparatus, a semicircle of two pluralities of cameras with

4   synchronized white and ultraviolet lights surrounding a performer, with Rearden's Mova LLC staff

5   operating the Contour system:



6

7

8

9

10

11

12

13

14

15

16

17       49.    **10:11:** On the left, Contour program **Skin Texture** output work, showing the

18   performer's natural skin color and facial features. On the right, a performer with conventional motion

19   capture markers on her face:

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11



12      50.   **10:17:** On the left, Contour program **Tracking Mesh** output work, showing hundreds

13  of thousands of points in 3D, the Tracking Mesh work's resolution is so high that the points can only

14  be seen by zooming in. In contrast, conventional marker-based resolution is shown on the right:

15
16
17
18
19
20
21
22
23
24



25
26      51.   **10:20:** On the left the Contour program **Captured Surface** work, showing high-

27  resolution surface geometry. In contrast, marker-based facial capture surface geometry on the right:

28

1
2
3
4
5
6
7
8
9
10
11



12       52.   **10:39:** Contour program **Makeup Pattern** work, showing random patterns from

13   glowing phosphor-based makeup. Each of the four Contour facial captures of Mr. Pitt was a separate

14   motion facial performance used for a different facial expression of Benjamin Button. The Contour

15   program created high-resolution **Captured Surface** and **Tracking Mesh** works from each of these:

16
17
18
19
20
21
22
23
24
25
26



27
28

53.    **10:49:** Contour program **Makeup Pattern** works, showing how many Contour output works were used. Each of the Contour facial captures was a separate motion facial performance of Mr. Pitt used for a different facial expression of Benjamin Button. The Contour program created high-resolution **Captured Surface** and **Tracking Mesh** output works from each of these, creating a database of Capture Surface and Tracking Mesh output works:



54.    **12:33:** Contour program **Makeup Pattern** work (left), **Captured Surface** work (middle), retargeted **Captured Surface** and **Tracking Mesh** works to a fictional aged head (right), are shown below. The 3D points of the Contour **Tracking Mesh** work of Mr. Pitt's actual face were retargeted to corresponding points on the 3D fictional "maquette" (i.e. hand-made 3D bust) of Mr. Pitt at age 87. As a simple example, the point on the right corner of Mr. Pitt's actual mouth could correspond to the point on the right corner of the 3D maquette's mouth. As Mr. Pitt's smile widens during the Contour capture session, moving the tracked point on the corner of his mouth outward, the retargeted point on the 3D maquette's mouth would move proportionately outward causing the 87-year-old smile to widen. As described by Mr. Ulbrich: "[Left:] This is Brad doing one of the [character expression] poses. [Middle:] And here's the resulting [**Captured Surface** work] data that comes from that, the model that comes from that. [Right:] Retargeting is the process of transposing

1    that [**Captured Surface** and **Tracking Mesh** work] data onto another model. And because the life

2    cast, or the bust—the maquette—of Benjamin was made from Brad, we could transpose the

3    [**Captured Surface** and **Tracking Mesh** work] data of Brad at 44 [years] onto Brad at 87[years].

4    Effectively, we ended up with a [**Captured Surface** and **Tracking Mesh** work] 3D database of

5    everything Brad Pitt's face is capable of doing…we could transpose the [**Captured Surface** and

6    **Tracking Mesh** work] data of Brad at [then-aged] 44 onto [a 3D maquette of] Brad at 87. So now,

7    we had a 3D database of everything Brad Pitt's face can do at age 87, in his 70s and in his 60s":



19        55.    **17:18:** On the left is 87-year-old fictional head maquette Tracking Mesh work

20   retargeted from a Contour program **Tracking Mesh** work, with a pair of glasses added in as a prop.

21   The final CG face is shown on the right after various steps such as texturing and lighting that is

22   applied to the maquette. The resulting CG face is integrated into the live-action footage of the final

23   scene:

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11



12    56.    The photorealistic reverse-aging derived from the Contour system, methods and

13 output works received wide acclaim when *The Curious Case of Benjamin Button* was released in

14 December of 2008 and on February 22, 2009 won an Academy Award for Best Visual Effects for the

15 photorealistic face based on Contour output works. Shortly thereafter the credibility gained from the

16 Academy Award brought in new Contour projects from studios. Contour had been used in one other

17 movie in 2008, *The Incredible Hulk*, which demonstrated how, in addition to transforming an actor's

18 age, the same Contour output works can be used for many other VFX purposes, such as transforming

19 an actor's face into a creature.

20    57.    And in April of 2009, defendant Fox contracted with Rearden-controlled MOVA LLC

21 to use Contour to capture the face of Steve Coogan, Hades in *Percy Jackson & the Olympians: The*

22 *Lightning Thief*, to transform's Mr. Coogan's face to the flaming creature face of Hades. A still from

23 the resulting animated scene was featured on the home page of MOVA LLC's website, shown in the

24 photograph below:

25
26
27
28

FIRST AMENDED COMPLAINT
Case No.: 3:17-cv-04191-JST                                                    28



© 2010 Twentieth Century Fox Film Corporation. All rights reserved



HOME ‹
SERVICES
TECHNOLOGY
GALLERY
ABOUT US
PRESS
CONTACT

Percy Jackson & the Olympians: The Lightning Thief, 20th Century Fox

CONTOUR™ is markerless, high-resolution, photo-real surface capture.
Our clients include Industrial Light & Magic, Electronic Arts, Warner Brothers,
Digital Domain, Double Negative Visual Effects, Twentieth Century Fox,
Marvel Studios, THQ, Moving Picture Company, and Rhythm & Hues.

"CONTOUR's promise is enormous—the notion that the human face, in all its subtleties could be mapped in real time, and with such density of surface information opens up so many possibilities for both two- and three- dimensional image makers and storytellers... I can't wait to get my hands on it."

—David Fincher, director of Panic Room, Fight Club, The Game, Se7en, Alien³, Zodiac, and The Curious Case of Benjamin Button



Introducing Geni4
QuickTime (1.3 Mbps)
Windows Media (2.2 Mbps)



Introduction
Meet Founder and President
Steve Perlman



How It Works
Flash 8 required

HOME ‹    SERVICES    TECHNOLOGY    GALLERY    ABOUT US    PRESS    CONTACT

©2004–2010 Mova LLC    Terms of Use and Privacy Policy. Specifications subject to change without notice. Legal Notices.

58.    In 2011, *Deadpool* Director Tim Miller lawfully used Contour operated by Rearden and Rearden-controlled entities in a CG animation entitled *Batman: Arkham City*.[21] The four photographs below are still frames of Contour program output works. The subtleties of the facial expressions of the performer were precisely captured with the Contour program, systems and methods and then retargeted to a CG face, retaining the subtleties of the human performance:

---

[21] "Batman: Arkham City - Behind The Scenes Of The Cinematic Trailer", October 23, 2011, op. cit. https://youtu.be/oPYM4TG0oXM

Skin Texture Output                              Tracking Mesh Output

 

Captured Surface Output



CG Face from Retargeted MOVA Contour Output



59.     The following four photographs show the arc-shaped Contour apparatus, two pluralities of synchronized cameras, white light and ultraviolet light sources, computers running the Contour program, and actors wearing the phosphor-based makeup of the Contour systems and methods, used lawfully by defendants and operated by Rearden and its controlled entities in *Percy Jackson & the Olympians: The Lightning Thief* (2010) and in *Batman: Arkham City (2011)*(Mr. Perlman appears at the right in the last photograph):

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





FIRST AMENDED COMPLAINT
Case No.: 3:17-cv-04191-JST

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





1

2     60.    And the following photograph released by Digital Domain shows the stolen Contour

3   apparatus that was operated by the thieves and used unlawfully by Fox in at least *Deadpool,*

4   *Fantastic Four,* and *Night at the Museum: Secret of the Tomb.* Close inspection of the photo shown

5   in the left inset shows the thieves neglected to remove a Rearden asset tag on one of the stolen

6   cameras. Rearden Asset #10393 is a Basler 102f Camera, Serial # 20606024, purchased on October

7   1, 2006 and stolen in 2013 along with the Contour program. Also, numerous tell-tale details specific

8   to Contour's operation are visible in the stolen Contour apparatus photograph (e.g. the right inset

9   shows black tape is wrapped around the end of a fluorescent lamp tube to prevent light spillage from

10  the glowing electrode, a Contour-specific technique taught in Rearden's US Patent 7,567,293 at

11  19:66-20:15), confirming that the thieves used the identical Rearden system and methods:



12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

61.     The Contour system has no "operating manual." It is a hand-built system, the operation of which is known only by Rearden's MOVA team who invented it and Rearden's MOVA employees and contractors who have been trained to use it under strict confidentiality obligations. It was not intended to be an end-user system and must be used carefully with knowledge of its operation for it to function correctly and safely. Fox was able to use the Contour system only because it had contracted with DD3, which had hired the rogue former Rearden employees who orchestrated the theft to operate Rearden's Contour system without authorization.

**B.      The Contour intellectual property**

62.     The Contour computer program is the subject of United States Copyright Registration No. TXu001977151, a copy of which is attached hereto as Exhibit 1.  Plaintiff Rearden Mova is the owner of Copyright Registration No. TXu001977151.  The Contour program runs on computers that are part of the Contour apparatus.

63.     The Contour methods and systems are the subject of issued United States Patent Nos. 7,605,861 (the "'861 Patent), 8,659,668 (the "'668 Patent"), 7,548,272 (the "'272 Patent"), 7,567,293 (the "'293 Patent"), and 8,207,963 (the "'963 Patent"), as well as numerous United States pending patent applications, and international patents and patent applications.  Plaintiff Rearden Mova is the exclusive owner of the '861, '668, '272, '293, and '963 patents, as well as all other domestic patent applications and all international patents and patent applications drawn to the Contour systems and methods.  The Contour apparatus and methods are embodiments of the claims of the '861, '668, '272, '293 and '963 patents.

64.     MOVA® and Contour® are the subject of United States Trademark Registration Nos. U.S. Registration No. 3,843,152 and U.S. Registration No. 3,628,974, respectively.  Copies of these registrations are attached hereto as Exhibits 2 and 3.

65.     The Contour systems and methods include know-how, confidential information that derives independent economic value, both actual and potential, from not being generally known to the public or other persons who can obtain economic value from its disclosure and use.  The Contour confidential information includes, without limitation:

- the source code and object code used in operating the Contour physical assets;
- many specific functionally-designed mechanisms, such as determining when part of the face is obstructed from the view of certain cameras and seamlessly filling in those parts of the face with views from other cameras;
- certain of the processes used along with the Contour physical assets, such as the timing configurations for the Contour system;
- sequencing the steps of calibration, aperture adjustment and focus adjustment of the Mova cameras;
- specific phosphor-based makeup formulations;
- techniques for applying makeup to performers being captured;
- specific electrical set up safety measures of the Contour apparatus;
- specific electrical modification of fluorescent light ballasts so as to operate safely;
- specific performer medical considerations, such as, in the case of performers receiving Botox treatments for facial wrinkles, scheduling shoots in specific intervals relative to their treatments to maintain natural skin motion;
- specific instructions to performers on how to perform in such a way to keep their faces within the capture volume;
- specific instructions to performers for specialized moves, such as singing, or bending the head downward and upward, with the face going out of and then back into view of the cameras; and
- information regarding Rearden's and Rearden's controlled entities' prior customer relationships and business terms.

66.     Rearden and Rearden Mova have protected this confidential information by, *inter alia*, maintaining email, documents, source and object code, and other software in secure locations; controlling access to these locations; and by including confidentiality provisions in its agreements with all of its employees and contractors who have ever had access to any source code, object code, other software, electrical set up, proprietary electrical circuit designs, timing systems, interconnects,

makeup formulations, phosphor research, results of proprietary tests, etc. The following confidentiality provisions of a Rearden employment agreement (Rearden referenced as "the Company"), are representative of those in all other Rearden employment and contractor agreements:

- "At all times, both during my employment by the Company and after its termination, I will keep in confidence and trust and will not use or disclose any Proprietary Information or anything relating to it without the prior written consent of an officer of the Company..."

- "I agree that during my employment by the Company I will not remove any Company Documents and Materials from the business premises of the Company or deliver any Company Documents and Materials to any person or entity outside the Company, except as I am required to do in connection with performing the duties of my employment. I further agree that, immediately upon the termination of my employment by me or by the Company for any reason ... I will return all Company Documents and Materials, apparatus, equipment and other physical property, or any reproduction of such property ..."

67.     The Contour confidential information constitutes trade secrets as that term is defined in the California Uniform Trade Secrets Act ("CUTSA") at sections 3426 to 3426.11 of the California Civil Code, and the Defense of Trade Secrets Act at 18 U.S.C. § 1832(b), *et seq.*

68.     The "Contour Assets" at issue herein include the Contour technology, and related hardware and software, source code, domestic and international patents and patent applications, domestic and international trademarks, copyrights, trade secrets, domain names, business records, and various related physical goods (the "Contour Assets").

**C.     Rearden's use of the Contour program, system, and methods in fifteen major motion pictures and one videogame cinematic trailer, and industry acclaim**

69.     Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by Universal Studios in *The Incredible Hulk* (2008) and *Snow White and the Huntsman* (2012).

70.     Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by Sony Pictures in *The Amazing Spider-Man* (2012).

71.     Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by Warner Brothers Studios in *Harry Potter and the Deathly Hallows*, Part 1 (2010) and Part 2 (2011), *Green Lantern* (2011), *Jack the Giant Slayer* (2013), and *Gravity* (2013).

72.     Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by Disney Motion Pictures Group in *TRON: Legacy* (2010)*, Pirates of the Caribbean: On Stranger Tides* (2011), *John Carter* (2012), and *The Avengers* (2012).

73.     Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by Paramount Pictures for "*The Curious Case of Benjamin Button*" (2008) and *Transformers: Dark of the Moon* (2011).

74.     Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by Rocksteady Studios in the videogame cinematic trailer, *Batman: Arkham City* (2011).

75.     And Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by defendant Fox in *Percy Jackson and the Olympians: The Lightning Thief* (2010).

76.     In each of the above fifteen films and one videogame cinematic trailer, the motion picture and videogame studios performed a routine intellectual property due diligence prior to contracting with Rearden for use of the Contour program, systems, and methods, in part to verify that Rearden and/or Rearden-controlled affiliates owned the Contour Assets and technology and had the right to use them for the benefit of the studios.

77.     Rearden and/or Rearden-controlled affiliates have built considerable good will in the Contour Assets and technology.   Rearden and/or Rearden-controlled affiliates used the Contour systems and methods in the fifteen major motion pictures identified above, which collectively grossed roughly $9.5 billion in global box office. Five of these movies are in the top-25 highest-grossing movies since 2008 (when the first Contour movie was released), including the number one

highest grossing movie in each of 2011 and 2012[22].  The Contour system and methods and the Contour program have been the subject of numerous motion picture industry press articles in which movie industry luminaries like director David Fincher have lauded the Contour technology:

> "Contour's promise is enormous," Fincher said. "The notion that the human face in all its subtleties could be mapped in real time and with such density of surface information opens up so many possibilities for both two- and three-dimensional image makers and storytellers."[23]

The Contour system and methods and the Contour program have been the subject of an invited presentation by Steve Perlman to the Director's Guild of America[24], and they were identified as a "breakthrough" in the aforementioned TED talk[25]. Contour's improvements over prior facial performance capture technologies have been acclaimed by major motion picture actors, producers, directors, and top VFX professionals, including Ed Ulbrich in his TED Talk description of Contour and how it was essential in the creation of *The Curious Case of Benjamin Button*.[26]  And on February 9, 2015, the Academy of Motion Picture Arts and Sciences awarded the Scientific and Technical Award to the MOVA [Contour] facial performance capture system.[27]

**D.      Transfer of the Contour Assets to OnLive, Inc., OL2, Inc., and Rearden Mova**

78.      Rearden's Contour assets and apparatus (called the "Contour Assets" herein) as well as Rearden's other motion capture assets, along with videogame streaming technology, was spun out of Rearden in 2007 into OnLive, Inc., a corporation controlled by Rearden.  OnLive, Inc. thereafter owned all of the Contour Assets, both Contour and other motion capture technology.

79.      On August 17, 2012, OnLive, Inc. assigned all of its assets, including the Contour Assets, to OL2, Inc. as part of an assignment for the benefit of creditors ("ABC").  On information and belief, OL2, Inc. was primarily focused on the video gaming unit of OnLive, Inc., and was not interested in offering any Contour movie production services.

---

[22] www.boxofficemojo.com.

[23]Marlowe, July 31, 2006, op. cit.

[24] Directors Guild of America, July 28, 2007, op. cit.

[25] Op. cit.

[26] Ulbrich, Op. cit.

[27] http://oscar.go.com/news/oscar-news/150209-ampas-sci-tech-awards-2015-winners

80.     In October of 2012, Rearden learned that OL2, Inc. was interested in selling the Contour Assets and apparatus, and Rearden ultimately decided to reacquire them.  Rearden formed a wholly-owned subsidiary, MO2 LLC, as a vehicle to acquire the Contour Assets from OL2, Inc.

81.     Rearden's CEO Perlman tasked his employee Greg LaSalle with management of MO2 LLC. LaSalle had worked with Rearden from 1999 to 2007, and between 2007 and August 17, 2012 worked for OnLive, Inc. LaSalle was rehired by Rearden LLC on August 20, 2012.

82.     On February 11, 2013, OL2, Inc. transferred the Contour Assets to MO2 LLC through a Membership Interest and Asset Purchase and Sale Agreement.  MO2 LLC is wholly owned by Rearden.

83.     On April 19, 2013, MO2 LLC transferred the Contour Assets to another wholly-owned Rearden company, plaintiff Rearden Mova LLC.

84.     On September 18, 2014, Rearden recorded patent assignments for the Contour Asset patents, reflecting the assignment from OL2, Inc. to MO2 LLC made in the Membership Interest and Asset Purchase and Sale Agreement.

85.     Rearden also recorded patent assignments for the Contour Asset patents, reflecting the assignment from MO2 LLC to Rearden Mova on April 19, 2013. However, the execution dates of the online forms were incorrectly filled in with the recordation dates of September18, 2014 (and in one case, September 8, 2014). As soon as it became aware of the errors, Rearden corrected the erroneous execution dates to the correct date: April 19, 2013.

**E.      Shenzhenshi's transparently false ownership claims**

86.     Unknown to Rearden, starting in October 2012, rogue Rearden-employee LaSalle was in negotiation with a company called Digital Domain 3.0, Inc. ("DD3"), then a People's Republic of China and India-owned Delaware Corporation doing business in Venice Beach, California under "DD3" or "Digital Domain" business names. DD3 is a successor company to prior Digital Domain companies that Rearden, OnLive, Inc., and LaSalle (on behalf of Rearden and OnLive, Inc.) had worked with previously in movie productions making authorized use of the Contour technology

1    identified above. DD3 is currently wholly-owned by Digital Domain Holdings Ltd. ("DDHL"), a

2    Hong Kong exchange-listed Bermuda corporation with its principal place of business in Hong Kong.

3        87.    On February 20, 2015, Shenzhenshi Haitiecheng Science and Technology Co., Ltd.

4    ("Shenzhenshi"), allegedly another People's Republic of China corporation with its purported

5    principal place of business in Shenzhen, China, filed a declaratory judgment action against Rearden

6    and various other Rearden entities in this judicial district, Case No. 3:15-cv-00797-JST, alleging that

7    it had acquired the Contour Assets by assignment from MO2 LLC on May 8, 2013.  Shenzhenshi

8    further alleged that it had granted an exclusive license to the Contour Assets to DD3.

9        88.    But as set forth above, MO2 LLC did not own the Contour Assets on May 8, 2013, so

10   it could not have assigned them to Shenzhenshi on that date. Rather, MO2 LLC had previously

11   assigned the Contour Assets to Rearden Mova LLC on April 19, 2013. Further, on May 8, 2013

12   LaSalle was not a Rearden employee, and as an employee or not, LaSalle never had authority to sell

13   the MO2 LLC Assets to anyone. Nor could Shenzhenshi have granted a license of the Contour

14   Assets to Digital Domain because it never owned the Contour Assets. Shenzhenshi, DD3 and LaSalle

15   knew that the MO2-Shenzhenshi transaction was a ruse. LaSalle wrote to his attorneys, "[DD3] are

16   going to actually acquire the Contour Assets through one of their Chinese companies [Shenzhenshi].

17   I believe this is so it would be nearly impossible for Steve [Perlman] to go after them….They will

18   indemnify me against any claims brought by Rearden and Steve Perlman." [28]

19       89.    The day after the Court granted Rearden permission to file counterclaims, a company

20   called Virtue Global Holdings, Ltd., a British Virgin Islands corporation, suddenly appeared in the

21   Shenzhenshi case represented by Shenzhenshi's counsel.  Shenzhenshi absconded from the litigation.

22   Months later Virtue Global Holdings alleged that Shenzhenshi had assigned the Contour Assets to

23   Virtue Global Holdings on December 17, 2015.  But again, as set forth above, Shenzhenshi never

24   owned the Contour Assets and therefore could not have assigned them to Virtue Global Holdings.

25       90.    Rearden asserted counterclaims for declaratory relief against Shenzhenshi and Virtue

26   Global Holdings affirming Rearden's ownership of the Contour Assets, and for patent, trademark,

27

28       [28] *Shenzhenshi, et al. v. Rearden, et al.,* NDCA Case No. 15-797, HEYL001594.

FIRST AMENDED COMPLAINT
Case No.: 3:17-cv-04191-JST

and copyright infringement, misappropriation of trade secrets, fraudulent transfer, and other causes of action, against Shenzhenshi and Virtue Global Holdings.

91.     The Contour Asset ownership and fraudulent transfer claims were bifurcated and tried in December, 2016.  On August 11, 2017, the Court entered a statement of decision in Rearden's favor.  It found that Rearden had at all material times been the owner of the Contour Assets, apparatus and program.

**F.     Defendants' unauthorized use of the Contour Assets**

92.     Once LaSalle was hired by DD3 in or about May, 2013, DD3 took possession of the patented Contour Assets for Shenzhenshi. On information and belief, LaSalle had access to the secure storage facility where the Contour Assets were kept, and assisted DD3 in taking unauthorized possession of the patented Contour apparatus and copies of the copyrighted Contour program.

93.     Thereafter, DD3 began secretly offering Contour facial performance capture services and Contour program output works to motion picture studios and production companies, including defendants.  The system used by DD3 is the *system* developed and constructed by Rearden and stolen from the secure storage facility, which includes commercial embodiments of the system claims in the Contour patents.  And the statements by *Deadpool* Visual Effects Supervisor Annemarie Griggs and Tim Miller's Blur Studio Visual Effects Supervisor Pauline Duvall and the associated video[29] confirm that DD3 performed the *methods* that are commercial embodiments of the method claims of the Contour patents.

94.     Despite the fact that defendant Fox and Director Miller had previously made movies based on authorized use of Contour from Rearden and Rearden-controlled companies, and despite the fact that Miller had extensive business dealings with Rearden and Rearden-controlled companies both during Contour's development and after its commercial release and knew Mr. Perlman personally, and despite the fact that *Deadpool* used Contour technology while Rearden was in the well-publicized *Shenzhenshi* litigation regarding Contour's ownership, Fox nonetheless contracted, either directly or in concert with entities subject to its supervision and control, for use of the Contour

---

[29] "From Comics to Screen…to Screen: MAGIC!", op. cit.

1    program, system, and methods in at least *three major motion pictures* without ever contacting

2    Rearden or Mr. Perlman to confirm that it was authorized to do so.

3              **1.    *Night at the Museum: Secret of the Tomb***

4        95.    *Night at the Museum: Secret of the Tomb* is a film distributed by defendant Fox and

5    produced by Fox either directly or in concert with entities subject to Fox's supervision and control.

6        96.    On information and belief, between February, 2013 and December, 2014, Fox, either

7    directly or in concert with an entity subject to its supervision and control, contracted with DD3 to

8    provide facial performance capture services and output works using the copyrighted Contour

9    program, including at least the performance of the talking CG Roman bust of Augustus Caesar in

10    *Night at the Museum: Secret of the Tomb*.  DD3 used the Contour program subject to the terms of its

11    contract and subject to the supervision and control of defendant Fox.  Fox incorporated the Contour

12    program's output works into a CG character that was reproduced, distributed, displayed, and

13    performed in *Night at the Museum: Secret of the Tomb*.



14
15
16
17
18
19
20
21
22
23    97.    A video of the talking CG Augustus Caesar Roman bust based on the Contour

24    program output works is here: https://youtu.be/0pZZlj3KVrk?t=1m18s Following is a still:

25

26    98.    Defendant Fox knew or should have known that the copyrighted Contour program

27    was owned by Rearden and other Rearden-controlled entities because:

28

1    ▪   Fox, through its employees and agents, reviewed color and grayscale Contour output works

2        that were consistently and extensively marked with Rearden's Contour copyright notice.

3    ▪   Fox had previously contracted with Rearden and its controlled entities to provide authorized

4        Contour facial performance capture services and Contour program output works for use in

5        *Percy Jackson & The Olympians: The Lightning Thief.*

6    ▪   On information and belief, Fox likewise conducted due diligence to determine whether DD3

7        was authorized to offer the Contour system, methods, and Contour program.

8    99.    Neither Rearden nor Rearden Mova authorized use of the copyrighted Contour

9    program by DD3, Fox, or Fox Home Entertainment in *Night at the Museum: Secret of the Tomb*.

10   100.    Defendant Fox released *Night at the Museum: Secret of the Tomb* in domestic theaters

11   on December 11, 2014.  To date, the film has grossed over $113 million at the box office in the

12   United States and $363 million globally.[30]

13   101.    Defendant Fox Home Entertainment released *Night at the Museum: Secret of the*

14   *Tomb* on DVD and Blu-ray, and via digital distribution such as download and streaming services in

15   the United States on or about March 10, 2015.  DVD and Blu-ray sales in the United States exceeded

16   $27 million.[31] Fox Home Entertainment also authorized reproduction, distribution, performance, and

17   display of *Night at the Museum: Secret of the Tomb* across a wide range of other distribution means,

18   such as on airplanes, in hotels, through cable and satellite television services.

19   **2.    *Fantastic Four***

20   102.    *Fantastic Four* is a motion picture distributed by defendant Fox, and produced either

21   directly by Fox or in concert with entities subject to Fox's supervision and control.

22   103.    On information and belief, between February 2013 and August 2014, Fox, either

23   directly or in concert with an entity subject to its supervision and control, contracted with DD3 to

24   provide facial performance capture services and output works using the copyrighted Contour

25   program, including at least the performance of actor Jamie Bell as the Thing character.  DD3 used

26

27   [30] http://www.boxofficemojo.com/movies/?id=nightatthemuseum3.htm

28   [31] http://www.the-numbers.com/movie/Night-at-the-Museum-Secret-of-the-Tomb#tab=summary

1    the Contour program subject to the terms of its contract and subject to the supervision and control of

2    defendant Fox.  Fox incorporated the Contour program's output works into a CG character that was

3    reproduced, distributed, displayed, and performed in *Fantastic Four* without authorization.

4            104.    The CG facial animation of The Thing character used Contour output works.

5    *Fantastic Four* was described by Visual Effects Supervisor Patrick Ledda as follows:

6            "For facial animation [of The Thing] we did a MOVA session...with
our rigging team creating different facial poses out of that."[32]

7    *Fantastic Four* Visual Effects Production Supervisor Adam LaGattuta described the "MOVA

8    session" in the "*Powering up: Superpowers of the Fantastic Four*" featurette showing Contour

9
10    program Facial Texture output on the *Fantastic Four* Blu-ray:

11           "...so they capture all these different shapes that everyone makes with their
face when they say different words, when they are happy, when they're sad.
So, they go through a whole range of emotions and words and syllables and

12           things and we capture all of that with about 35 cameras or so that are placed
on a big wall around him as he makes all these expressions."[33]

13
14
15            105.    The following photograph is a still image from the Blu-ray featurette Contour Facial

16    Texture output work, including the "MOVA" trademark and trade dress.

17
18
19
20
21
22
23
24
25
26

---

[32] Failes, Ian, op. cit.

[33] "Powering up: Superpowers of the Fantastic Four", featurette on *Fantastic Four* Blu-ray and digital video with Special Features.

1
2
3
4
5
6
7
8
9
10
11
12
13



14       106.    The following promotional photo of the Thing was provided by defendant Fox,

15   showing the CG face derivative of the Contour program output used for the Thing's facial poses:

16
17
18
19
20
21
22
23
24
25
26
27
28



107.    Defendant Fox knew or should have known that the copyrighted Contour program was owned by Rearden and other Rearden-controlled entities because:

- Fox, through its employees and agents, reviewed color and grayscale Contour output works that were consistently and extensively marked with Rearden's Contour copyright notice.

- Fox had previously contracted with Rearden and its controlled entities to provide authorized Contour facial performance capture services and Contour program output works for use in *Percy Jackson & The Olympians: The Lightning Thief*.

- On information and belief, Fox likewise conducted due diligence to determine whether DD3 was authorized to offer the Contour system, methods, and Contour program.

108.    Neither Rearden nor Rearden Mova authorized use of the copyrighted Contour program by DD3, Fox, or Fox Home Entertainment in *Fantastic Four*.

109.    Defendant Fox released *Fantastic Four* in domestic theaters on or about August 7, 2015.  The film has grossed over $56 million at the box office in the United States, and over $167 million globally[34].

110.    Defendant Fox Home Entertainment released *Fantastic Four* on DVD and Blu-ray, and via digital distribution such as download and streaming services on or about December 15, 2015. Fox Home Entertainment has earned over $13 million on DVD, Blu-ray, and digital distribution as of the date of this complaint. Fox Home Entertainment also distributed *Fantastic Four* across a wide range of other distribution means, such as on airplanes, in hotels, through cable and satellite television services, *etc*.

### 3.    *Deadpool*

111.    *Deadpool* is a motion picture distributed by defendant Fox, and produced directly by Fox or in concert with entity subject to Fox's supervision and control.

112.    On information and belief, between February 2013 and February 12, 2016, Fox, either directly or in concert with an entity subject to its supervision and control, contracted with DD3 to provide facial performance capture services and output works using the copyrighted Contour

---

[34] http://www.boxofficemojo.com/movies/?id=fantasticfour15.htm

program, including at least the performance of an actor for the face of the Colossus character.  DD3 used the Contour program subject to the terms of its contract and subject to the supervision and control of defendant Fox.  Fox incorporated the Contour program's output works into a CG character that was reproduced, distributed, displayed, and performed in *Deadpool.*

113.    Annemarie Griggs, *Deadpool* Visual Effects Producer, described how two actor's faces were used to create the Colossus CG face, one for the initial shape of the face, and one to provide facial motion throughout the *Deadpool* movie:

> "…we had one actor whose face was used as the original face model for the look of his face. Then we had another actor whose facial movements were used when Colossus speaks."[35]

Pauline Duvall, Visual Effects Supervisor of Miller's VFX company, Blur Studio, described how the actor's facial performance was captured with extraordinary precision by the Contour program and output works:

> "Digital Domain has a great system called 'MOVA' which is a facial capture system. You paint on the face and it creates thousands and thousands of little tracking markers. At that point you get a piece of geometry that captures movement and acting of the actor."[36]

114.    The top two photographs below are stills from Contour program output works from the actor's facial performance used to animate the Colossus face that were released by Fox in a *Deadpool* featurette released on Blu-ray and through other media, such as streaming services.[37] The first photograph, with the "MOVA" trademark and trade dress and dated "2015-11-24" contains a still image from three Contour program Skin Texture output works, each from a different angle, showing the actual skin color of the performer, Although the performer is illuminated by rapidly flashing white and ultraviolet lights, the Contour program precisely synchronizes the camera shutters to only open when the white lights are on and the ultraviolet lights are off, and thus the cameras primarily capture the performer's skin color, not the glowing random pattern of phosphor-based makeup. To a human observer, however, the white and ultraviolet lights flash so rapidly that the

---

[35] "From Comics to Screen…to Screen: MAGIC!", op. cit.

[36] "From Comics to Screen…to Screen: MAGIC!", op. cit.

[37] "From Comics to Screen…to Screen: MAGIC!", op. cit.

human eye cannot detect them flashing at all, and the performer appears to be illuminated by a blend of white light showing actual skin color, and ultraviolet light showing the blue glow of the random pattern of phosphor-based makeup. The second photograph shows a still, blended white-and-ultraviolet-light-illuminated image that a human observer sees. . The bottom photograph shows a still of a CG face of the Colossus character in the *Deadpool* movie that is retargeted from the Contour program output works, resulting in a different facial shape than the facial performer and maintaining the human subtleties of the facial performance:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







FIRST AMENDED COMPLAINT
Case No.: 3:17-cv-04191-JST

115.    The top photograph below shows the front and side views of the Contour program Skin Texture output work interleaved with front and side views of the CG face of Colossus resulting from a retargeting of the Contour program output work. The bottom photograph below shows the fully rendered Colossus character with its retargeted CG face[38]. Both were released by Fox.





---

[38] Frei, Vincent, "Deadpool: Alex Wang—VFX Supervisor—Digital Domain," February 16, 2016. Art of VFX. http://www.artofvfx.com/deadpool-alex-wang-vfx-supervisor-digital-domain/

116.   As can be seen in the lower right-hand corner of the above images and enlarged here:



© 2016 TWENTIETH CENTURY FOX FILM CORPORATION. ALL RIGHTS RESERVED.

not only was Fox thorough in *affixing* its own copyright notices to Rearden's Contour program

output works, Fox was even more thorough in *erasing* Rearden's copyright notices from Rearden's

Contour program output works. As can be seen in the photo with the MOVA trademark and trade

dress two pages above, the Contour capture session identified in these photos occurred on "2015-11-

24" (November 24, 2015). *Every* Skin Texture and Makeup Pattern work output from the Contour

program that day was affixed with a Rearden LLC copyright notice dated "Nov 24, 2015" with the

time of the capture. For example, below is a frame from a Contour program Skin Texture output

work from that day affixed with "Copyright 2015 - Rearden LLC" "Nov 24, 2015 16:45:29", and a

frame from a Contour program Makeup Pattern output that day affixed with "Copyright 2015 -

Rearden LLC" "Nov 24, 2015 16:32:21". Both copyright notices were deliberately erased by Fox,

and then Fox falsely designated the Contour output works—and the Contour service offering that

created them—as originating from Fox and its agent DD3, while using Rearden Mova's trademark,

"MOVA". Fox and its agents distributed these copyright notice-stripped and falsely-attributed

Contour program output works to dozens of publications[39], harming Rearden and Rearden Mova.

.



Frame from Contour Program Skin Texture output work

Rearden Copyright notice affixed to Contour Skin Texture output work

```
Copyright 2015 - Rearden, LLC

SMPTE TC: 16:44:56.08
Captured: Tue Nov 24, 2015 - 16:45:29
Filename: c:\capture\2015-11-24_02\0021\LitCam2.raw
Format  : 1388x616, color
Camera  : A102fc
Serial #: 0X003053-20605905
Firmware: 101972-06; mk2c6_A102fc v1.15.34.0; f13 2.0.34.0; SI13eb
B/G/S   : 10/200/181
AOI     : 0,212 - 1388x616
```

---

[39] E.g., BusinessInsider, iDigitalTimes, fxguide.com, arofvfx.com, indiewire.com, mediamikes.com, Examiner.com, ComicBook.com, Comicsverse.com, etc.

FIRST AMENDED COMPLAINT
Case No.: 3:17-cv-04191-JST

51

Frame from Contour Program Makeup Pattern output work

Rearden Copyright notice affixed to Contour Makeup Pattern output work

```
Copyright 2015 - Rearden, LLC

SMPTE TC: 16:33:27.19
Captured: Tue Nov 24, 2015 - 16:32:21
Filename: c:\capture\2015-11-24_02\0018\Cam14.raw
Format  : 1388x616, grayscale
Camera  : A102f
Serial #: 0x003053-20607958
Firmware: 102021-06; mk2c6_A102f v1.28.46.0; f12 1.3.46.0; SI0d01
B/G/S   : 0/200/181
AOI     : 2,212 - 1388x616
```

117.    Defendant Fox knew or should have known that the copyrighted Contour program was owned by Rearden and other Rearden-controlled entities because:

- Fox, through its employees and agents, reviewed color and grayscale Contour output works that were consistently and extensively marked with Rearden's Contour copyright notice.

- Fox had previously contracted with Rearden and its controlled entities to provide authorized Contour facial performance capture services and Contour program output works for use in *Percy Jackson & The Olympians: The Lightning Thief*.

- On information and belief, Fox likewise conducted due diligence to determine whether DD3 was authorized to offer the Contour system, methods, and Contour program.

- Director Tim Miller's VFX company, Blur Studio, had previously contracted with Rearden and its controlled entities both during Rearden's development of Contour and after its release, and worked on an authorized CG animation project using Contour entitled, *Batman: Arkham City*.[40]

- Mr. Miller knew Mr. Perlman personally and professionally and had previously notified Mr. Perlman of movie and VFX projects he had been working on.

118.    Neither Rearden nor Rearden Mova authorized use of the copyrighted Contour program by DD3 or defendant Fox in *Deadpool*.

---

[40] "Batman: Arkham City - Behind The Scenes Of The Cinematic Trailer", October 23, 2011, op. cit.

119.     Defendant Fox released *Deadpool* in domestic theaters on or about February 16, 2016. It is now highest grossing R-rated film of all time, earning over $363 million domestically and $783 million worldwide.

120.     Defendant Fox Home Entertainment released *Deadpool* on DVD and Blu-ray, and via digital distribution such as download and streaming services on or about May 10, 2016.  Fox Home Entertainment has earned over $94 million on DVD, Blu-ray, and digital distribution as of the date of this complaint. Fox Home Entertainment also distributed *Deadpool* across a wide range of other distribution means, such as on airplanes, in hotels, through cable and satellite television services, *etc*.

## FIRST CAUSE OF ACTION:
## VICARIOUS AND CONTRIBUTORY COPYRIGHT INFRINGEMENT

121.     Plaintiffs reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if they were fully set forth here.

### *Rearden's Copyright in the Contour Program.*

122.     The Contour program is an original literary work of authorship by Rearden-employed programmers.

123.     The Contour program was fixed in a tangible medium of expression when it was stored in non-volatile computer memory and/or media such as computer hard drives, CD, CD-R, DVD, or Blu-ray disks from which it may be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.  Accordingly, the Contour program is a proper subject of copyright protection.

124.     Rearden's programmers duly assigned their copyrights in the Contour program to Rearden.  At all material times, Plaintiff Rearden Mova was and is the owner of United States Copyright Registration No. TXu001977151 for the Contour program.

### *DD3's Direct Infringement of Rearden's Copyright.*

125.     Each time that DD3 operated the Contour apparatus, whether for facial performance capture or for processing captures into output works, the computers made an unauthorized copy of the Contour program in their central processing unit's ("CPU") random access memory ("RAM"). Each such copy is a violation of Rearden's exclusive right to authorize copies of its Contour program

1    under 17 U.S.C. § 106 (1), and therefore each copy is an act of direct copyright infringement by

2    DD3.

3           **_Defendants' Vicarious Liability for DD3's Infringement_**

4           126.    Defendants, either directly or through entities subject to their direction and control,

5    contracted with DD3 for facial performance capture services and output works using the Contour

6    program for defendants' films _Night of the Museum: Secret of the Tomb_, _Fantastic Four_, and

7    _Deadpool_.  At all material times during DD3's performance of the facial performance capture

8    contract with defendants, defendants were in a position to police DD3 and/or had the right and ability

9    to supervise and control DD3's performance.

10          127.    Defendants, either directly or through entities subject to their direction and control,

11   initiated and scheduled each facial performance capture session with DD3 using the Contour

12   program.

13          128.    For each session, defendants, either directly or through entities subject to their

14   direction and control, supplied performers to provide facial performances for capture by DD3 using

15   the Contour program.

16          129.    For each session, defendants, either directly or through entities subject to their

17   direction and control, supplied a director to control and direct the actions of DD3 in providing facial

18   performance capture using the Contour program.  Acting as defendants' supervising agent, the

19   director controlled and directed DD3's use of the Contour program by starting and terminating each

20   session, starting and stopping each take, ordering DD3 to provide additional takes, and choosing

21   "Selects" (the Contour capture takes which were deemed "good takes" by the director) for further

22   Contour program processing to create Captured Surface and Tracking Mesh output works, all using

23   the Contour program.  So extensive is defendants' directors' supervision and control over the facial

24   motion capture sessions performed by DD3, that defendants contend that the directors' contribution

25   "is substantial and performs 'the lion's share of the creativity' in the facial motion capture," and that

26   consequently the directors are the authors of the results of the facial motion capture. [41]

27   _____

28          [41] _See, e.g.,_ Dkt. 36 at 8:16-18; 6:13-16.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

130.    For each session, defendants, either directly or through entities subject to their direction and control, provided various film crew to support and facilitate DD3's facial performance capture using the Contour program.  Defendants relied on the presence of a clapperboard operated by defendants' film crew in images in the original complaint to show that the facial performance sessions were superintended and directed by persons provided by Disney MPG, either directly or through entities subject to its direction and control.[42]

131.    Defendants, either directly or through entities subject to their direction and control, received from DD3 and reviewed numerous Contour program output works bearing the Rearden Contour copyright notice.

132.    After reviewing the Contour program output works from Contour capture takes, defendants, or entities subject to their direction and control, chose specific Contour program output works and designated them as "Selects," and caused DD3 to use the Contour program to further process the Selects to create new output works that were used to animate CG characters in *Night at the Museum: Secret of the Tomb, Fantastic Four,* and *Deadpool.*

133.    On information and belief, the contract between DD3 and defendants, or entities subject to their direction and control, grants the unrestricted right to cancel "any portion of the Services" provided by DD3, subject only to the duty to pay for costs and services performed before cancellation.  Accordingly, defendants, either directly or through entities subject to their direction and control, were in a position to police DD3's infringing acts.  They had the authority and practical ability to observe and evaluate services provided by DD3 and—if defendants deemed those services inadequate, improper, or unlawful—require DD3 to remedy the services or cancel DD3's provision of services.

134.    Defendants had an obvious and direct financial interest in exploitation of Rearden's copyright in the Contour program to use the Contour output works to animate CG characters in *Night at the Museum: Secret of the Tomb*, *Fantastic Four*, and *Deadpool*.  Defendants believed that

---

[42] *Id.* at 8:4-15.

1   Contour facial performance motion capture would make the CG characters more believable and

2   compelling, which would in turn draw a wider audience to their films.

3        135.   Accordingly, defendants induced each of DD3's direct infringements of Rearden's

4   copyright in the Contour program during the *Night at the Museum: Secret of the Tomb*, *Fantastic*

5   *Four*, and *Deadpool* facial performance capture contracts, and are vicariously liable to Rearden for

6   each of DD3's direct infringements.

7        ***Defendants' Contributory Copyright Infringement***

8        136.   Defendants had actual knowledge of DD3's specific acts of infringement, and

9   induced, caused, and materially contributed to DD3's infringement.

10        137.   Defendants, either directly or through entities subject to their direction and control,

11   contracted with DD3 for facial performance capture services and output works using the Contour

12   program for defendants' films *Night at the Museum: Secret of the Tomb*, *Fantastic Four*, and

13   *Deadpool*.

14        138.   Defendants, either directly or through entities subject to their direction and control,

15   initiated and scheduled each facial performance capture session with DD3 using the Contour

16   program.

17        139.   Each of the requests for facial performance captures caused DD3 to use the Contour

18   program, which created an infringing copy of the program for non-transitory duration in the RAM of

19   Contour system computers.

20        140.   For each session, defendants, either directly or through entities subject to their

21   direction and control, supplied performers to provide facial performances for capture by DD3 using

22   the Contour program.

23        141.   For each session, defendants, either directly or through entities subject to their

24   direction and control, supplied a director to control and direct the actions of DD3 in providing facial

25   performance capture using the Contour program.  Acting as defendants' supervising agent, the

26   director controlled and directed DD3's use of the Contour program by starting and terminating each

27   session, starting and stopping each take, ordering DD3 to provide additional takes, and choosing

28

"Selects" (the Contour capture takes which were deemed "good takes" by the director) for further Contour program processing to create Captured Surface and Tracking Mesh output works, all using the Contour program. So extensive is defendants' directors' supervision and control over the facial motion capture sessions performed by DD3 using the Contour program, that defendants contend that the directors' contribution "is substantial and performs 'the lion's share of the creativity' in the facial motion capture," and that consequently the directors are the authors of the results of the facial motion capture. [43]

142.    For each session, defendants, either directly or through entities subject to their direction and control, provided various film crew to support and facilitate DD3's facial performance capture using the Contour program.  Defendants relied on the presence of a clapperboard operated by defendants' film crew in images in the original complaint to show that the facial performance sessions were superintended and directed by persons provided by defendants, either directly or through entities subject to their direction and control.[44]

143.    Defendants, either directly or through entities subject to their direction and control, received from DD3 and reviewed numerous Contour program output works bearing the Rearden Contour copyright notice.

144.    After reviewing the Contour program output works from the Contour capture takes, defendants, either directly or through entities subject to their direction and control, chose specific Contour works and designated them as "Selects," and caused DD3 to use the Contour program to further process the Selects to create new output works that were used to animate CG characters in *Night at the Museum: Secret of the Tomb*, *Fantastic Four*, and *Deadpool.*

145.    Each of defendants' requests for further processing of their selected Contour output works caused DD3 to use the Contour program, which created an infringing copy of the program for non-transitory duration in the RAM of Contour system computers.

---

[43] *See, e.g.,* Dkt. 36 at 8:16-18; 6:13-16.

[44] *Id.* at 8:4-15.

146.    On information and belief, the contract between DD3 and defendants, or entities subject to their direction and control, grants the unrestricted right to cancel "any portion of the Services" provided by DD3, subject only to the duty to pay for costs and services performed before cancellation.  Accordingly, defendants were in a position to police DD3's infringing acts.  They had the authority and practical ability to observe and evaluate services provided by DD3 and—if defendants deemed those services inadequate, improper, or unlawful—require DD3 to remedy the services or cancel DD3's provision of services to defendants but declined to exercise that right.

147.    Accordingly, defendants are contributory infringers of Rearden's copyright in the Contour program, and are liable to Rearden for each of DD3's direct infringements.

148.    The acts of vicarious and/or contributory copyright infringement by defendants were, and are, willful, intentional, purposeful, and knowing, in that defendants at all material times had actual knowledge that the copyright in the Contour program has been, and is, owned by Rearden, or were in reckless disregard of or willfully blind to Rearden's copyright, and have acted in knowing disregard of and indifference to the rights of Rearden.

149.    Rearden has been harmed as the direct and proximate result of the foregoing acts of copyright infringement.  Plaintiffs are entitled to actual damages, profits of the infringers, and all such other remedies as may be available under the Copyright Act.

**SECOND CAUSE OF ACTION:
TRADEMARK INFRINGEMENT**

150.    Plaintiffs reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if they were fully set forth here.

151.    At all material times, plaintiff Rearden Mova was the owner of U.S. Registration No. 3,843,152 for the MOVA trademark.

152.    MOVA is an arbitrary or at least fanciful mark that is inherently distinctive.

153.    Since at least 2006, Rearden Mova and its predecessors-in-interest have used the MOVA trademark in connection with the marketing, promotion, and sales of facial performance capture services and output works to the motion picture and videogame industry, including major motion picture studios and VFX studios.

154.   Through the marketing, promotion, and sales efforts of Rearden Mova and its predecessors-in-interest from 2005 through the present, and through the widespread publicity of and industry acclaim for the Contour facial performance capture technology and services offered by Rearden, Rearden Mova's MOVA trademark has acquired secondary meaning indicating that Rearden is the exclusive source of the Contour facial performance capture technology and services.

155.   Without authorization, Fox and Fox Home Entertainment used Rearden Mova's MOVA trademark in commerce in the credits of *Deadpool*, listing in the Digital Domain end credit section "MOVA Artist for Colossus" and "MOVA Artists" as shown in the below photograph (red ellipse added):



156.   Without authorization, Fox and Fox Home Entertainment, acting either directly or in concert with entities subject to their supervision and control, used Rearden's MOVA trademark in commerce in connection with commercial advertising and promotion of their *Fantastic Four* film, including at least the Blu-ray featurette.

157.   Fox and Fox Home Entertainment's unauthorized use of Rearden Mova's MOVA trademark on the credits and in the promotional Blu-ray featurette for their *Deadpool* film, and in the promotional Blu-ray featurette for its *Fantastic Four* film, is a use of a word or term that is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Fox and Fox Home Entertainment with Rearden, and/or as to the origin, sponsorship, or approval of the facial motion capture services used in the *Deadpool* and *Fantastic Four* films by Rearden because the

MOVA trademark is exclusively associated with Rearden and its Contour facial motion capture services.

158.    Fox and Fox Home Entertainment's unauthorized use of Rearden Mova's MOVA trademark on the credits and in the promotional Blu-ray featurette for their *Deadpool* film and in the promotional Blu-ray featurette for their *Fantastic Four* film is a misleading description or representation of fact that is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Fox and Fox Home Entertainment with Rearden, and/or as to the origin, sponsorship, or approval of the facial motion capture services used in the *Deadpool* and *Fantastic Four* films by Rearden because the MOVA trademark is exclusively associated with Rearden and its Contour facial motion capture services.

159.    Unauthorized use in commerce of Rearden Mova's MOVA trademark by Fox and Fox Home Entertainment, acting either directly or in concert with entities subject to its supervision and control, in connection with commercial advertising and promotion of its *Deadpool* and *Fantastic Four* films, including press releases, press conferences, and other advertising and promotional activities, constitutes a use of a word or term and a misleading description or representation of fact that is likely to cause confusion, mistake or deception as to the characteristics and qualities of the facial motion capture services in the films because the MOVA trademark is exclusively associated with Rearden and its Contour facial motion capture services.

160.    Rearden Mova is, and is likely to continue to be, damaged by Fox and Fox Home Entertainment's unauthorized use of its Rearden Mova trademark.

161.    Fox and Fox Home Entertainment's unauthorized use of Rearden Mova's MOVA trademark in commerce was with actual knowledge or willful disregard of Rearden Mova's trademark, with intent to cause confusion, mistake or deception.

162.    Fox and Fox Home Entertainment are liable to Plaintiffs for each and every act of trademark infringement alleged herein.

163.    Plaintiffs are entitled to an award of their actual damages, disgorgement of defendant Fox's profits, and costs and attorney's fees.

1    164.    Furthermore, Plaintiffs have suffered irreparable harm that is not compensable by

2    monetary damages, and is therefore entitled to injunctive and other equitable relief.

3                                    **PRAYER FOR RELIEF**

4    Wherefore, Plaintiffs request the following relief:

5    **A.    Preliminary and/or permanent injunctions:**

6        1.    Pursuant to 17 U.S.C. § 502, enter an injunction prohibiting Fox and Fox

7    Home Entertainment from reproducing, distributing, performing or displaying, or authorizing

8    the same, the *Night at the Museum: Secret of the Tomb*, *Fantastic Four*, and *Deadpool*

9    motion pictures in any medium without authorization of Plaintiffs.

10       2.    Pursuant to 15 U.S.C. § 1116, enter an injunction prohibiting Fox and Fox

11   Home Entertainment from using any of Plaintiffs' trademarks and trademarks, and

12   prohibiting distribution of the *Night at the Museum: Secret of the Tomb*, *Fantastic Four*, and

13   *Deadpool* motion pictures in any medium bearing any of Plaintiffs' trademarks and

14   trademarks without authorization of Plaintiffs.

15   **B.    Impoundment and Destruction of Infringing Copies**

16   Pursuant to 17 U.S.C. § 503 and 15 U.S.C. § 1118, order the impoundment and destruction of

17   all infringing copies of *Night at the Museum: Secret of the Tomb*, *Fantastic Four*, and *Deadpool*

18   motion pictures in any medium.

19   **C.    Damages**

20       1.    Pursuant to 17 U.S.C. § 504, award Plaintiffs (a) actual damages; and (b) any

21   additional profits of Fox and Fox Home Entertainment that are attributable to the copyright

22   infringements alleged herein and are not taken into account in computing the actual damages.

23       2.    Pursuant to 15 U.S.C. § 1117, award Plaintiffs (a) defendant Fox and Fox

24   Home Entertainment's profits; (b) damages sustained by Plaintiffs in an amount to be proved

25   at trial; and (c) the costs of this action.

26

27

28

**D.      Willful Infringement**

Pursuant to 15 U.S.C. § 1117, enter a finding that Fox and Fox Home Entertainment's trademark infringements as alleged herein were willful, in reckless disregard, or in willful blindness to Plaintiffs' trademark rights, and order enhanced damages, costs, and attorney's fees.

**E.      Costs and attorney's fees**

1.      Pursuant to 17 U.S.C. § 505, award full costs and a reasonable attorney's fee to Plaintiffs.

2.      Pursuant to 15 U.S.C. § 1117, enter a finding that defendant Fox's trademark infringements as alleged herein present an exceptional case, and award Plaintiffs their costs and attorney's fees.

**F.      Other and Further Relief**

Grant such other and further relief as the Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands trial by jury of all issues so triable under the law.

FIRST AMENDED COMPLAINT
Case No.: 3:17-cv-04191-JST

62

1    DATED:  March 6, 2018              HAGENS BERMAN SOBOL SHAPIRO LLP

2                                       By */s/ Steve Berman*
                                            Steve Berman
3

4                                       Steve W. Berman (*pro hac vice*)
                                        Mark S. Carlson (*pro hac vice*)
5                                       HAGENS BERMAN SOBOL SHAPIRO LLP
                                        1918 Eighth Avenue, Suite 3300
6                                       Seattle, WA 98101
                                        Telephone:  (206) 623-7292
7                                       Facsimile:   (206) 623-0594
                                        steve@hbsslaw.com
8                                       markc@hbsslaw.com

9                                       Rio S. Pierce, CBA No. 298297
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
10                                       715 Hearst Avenue, Suite 202
                                        Berkeley, CA 94710
11                                       Telephone:  (510) 725-3000
                                        Facsimile:   (510) 725-3001
12                                       riop@hbsslaw.com

13                                       *Attorneys for Plaintiffs*
                                        Rearden LLC and Rearden Mova LLC
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT
Case No.: 3:17-cv-04191-JST                         63