# EXHIBIT 2 TO DECLARATION OF MARK S. CARLSON ISO MSJ OPPOSITION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

REARDEN LLC, REARDEN MOVA LLC,
California limited liability
companies,
     Plaintiffs,

  vs.            Case Nos.
               4:17-cv-04006-JST
THE WALT DISNEY COMPANY, a    4:17-cv-04191-JST
Delaware corporation, WALT
DISNEY MOTION PICTURES GROUP,
INC., a California corporation,
BUENA VISTA HOME ENTERTAINMENT,
INC., a California corporation,
MARVEL STUDIOS, LLC, a Delaware
limited liability company,
MANDEVILLE FILMS, INC., a
California corporation,
     Defendants.
_____
AND CONSOLIDATED CASE
_____

\* \* \* CONFIDENTIAL \* \* \*

DEPOSITION OF DAVID HOBERMAN

March 4, 2020

10:07 a.m.

350 South Grand Avenue, 50th Floor

Los Angeles, California

REPORTED BY:

Jean F. Holliday

CSR No. 4535, RPR, CRR

Page 10

```
 1  BY MR. CARLSON:
 2      Q.  And in the story he can break the enchantment
 3  only by finding someone who will love him
 4  notwithstanding his beast form?
 5      A.  Yes.
 6      Q.  In other words, he has to find someone who
 7  loves him for his inner beauty?
 8      A.  Yes.
 9      Q.  So as the producer of "Beauty and the Beast"
10  did you view how you were going to render the Beast
11  character in this live action film as a challenge?
12      A.  Yes.
13      Q.  And outwardly the Beast had to appear
14  believably beastly and at times even a little scary;
15  isn't that right?
16      A.  Yes.
17      Q.  Then at other times the Beast has to be able to
18  believably express his inner humanity and his human
19  feelings and his growing love for Belle; right?
20      A.  Yes.
21      Q.  And it was important that the audience be able
22  to empathize with the Beast character in "Beauty and the
23  Beast"?
24      A.  Yes.
25      Q.  And it was ultimately important for the
```

Page 11

```
 1  audience to be able to believe that Belle could fall in
 2  love with the man inside the Beast?
 3      A.  Yes.
 4      Q.  So in approaching this project you must have
 5  given a lot of thought as to how it would be best to
 6  achieve those objectives when you rendered the Beast in
 7  the film?
 8      A.  Yes.
 9      Q.  So did you -- let me just ask you broadly how
10  did you approach tackling that problem?
11      A.  I didn't personally.  The line producer would
12  be responsible for that.
13      Q.  Okay.  And who was the line producer?
14      A.  Jeffrey Silver.
15      Q.  All right.
16      A.  And his visual effects team.
17      Q.  Okay.  And did Mr. Silver, though, discuss that
18  issue with you either in writing or orally?
19      A.  I don't recall.
20      Q.  Okay.  There were several options I think
21  available to you for how to proceed in rendering the
22  Beast character; is that true?
23      A.  Uh-huh.  Yes.
24      Q.  One of them was to go with, you know, an actor
25  wearing makeup and prosthetics; is that correct?
```

Page 12

```
 1      A.  Yes.
 2      Q.  And one of them would be to go with a fully
 3  computer graphics Beast, a CG Beast; is that right?
 4      A.  I would say another approach would be that.
 5      Q.  Yes.  Okay.  I didn't mean to cabin you in
 6  there.
 7          And another option would be sort of a hybrid of
 8  the two; is that right?  Maybe have an actor in costume
 9  and then have, you know, no face and then put the face
10  in with CG or something like that, a hybrid approach?
11      A.  Yeah.  Yes.
12      Q.  Were there any other options that you
13  considered for rendering the Beast?
14      A.  Well, I'm sure they considered all different
15  methodologies before it would come to me.
16      Q.  Okay.  Were there any others that you recall
17  being brought to you other than the ones that --
18      A.  I don't recall.
19      Q.  Okay.  Did Mr. Silver have a particular point
20  of view or a bias as between the different approaches to
21  rendering the Beast in the film?
22      A.  Yes.
23      Q.  And what was his point of view?
24      A.  CGI.
25      Q.  And why did he prefer CGI?
```

Page 13

```
 1          MS. YOUNG:  Objection.  Calls for speculation.
 2          THE WITNESS:  He just didn't believe that
 3  makeup, hair, effects, prosthetics would work.
 4  BY MR. CARLSON:
 5      Q.  Okay.  You had discussions with him in which he
 6  expressed that view?
 7      A.  Yes.
 8      Q.  And then did -- Mr. Condon had a view on the
 9  matter as well; is that right?
10      A.  Yes.
11      Q.  And Bill Condon was the director of the film?
12      A.  Yes.
13      Q.  What was his view?
14      A.  He wanted to go prosthetics and makeup.
15      Q.  Why did he prefer that?
16      A.  I don't know.
17          MS. YOUNG:  Objection.  Lacks foundation.
18          Go ahead, answer if you know.
19          THE WITNESS:  I don't know.
20  BY MR. CARLSON:
21      Q.  Okay.  Did you ever discuss that issue with
22  him?
23      A.  Yes.
24      Q.  Okay.  Is it you don't recall what was
25  motivating his preference for that issue, or for that
```

David Hoberman - Confidential
March 04, 2020

Page 34

1  Sean to do about coming back with a definitive position?
2      A.  Yes.
3      Q.  And what was that?
4      A.  That they didn't want to go with makeup and
5  effects.
6      Q.  And I guess the idea here was that Mr. Nagenda
7  wanted Sean to take a definitive position to persuade
8  Mr. Condon that you wouldn't go with the makeup effects;
9  is that correct?
10         MS. YOUNG:  Objection.  Calls for speculation.
11  The document speaks for itself.
12         THE WITNESS:  Yes.
13         Are we going through all those?
14  BY MR. CARLSON:
15     Q.  We are, but we're making really good progress,
16  I can tell you.  We're going much faster than I thought
17  we would.
18         (Exhibit 30 marked)
19  BY MR. CARLSON:
20     Q.  You've been handed Exhibit 30 to your
21  deposition, Mr. Hoberman, and this is a three-page
22  document bearing production numbers Mandeville-Rearden
23  0115 through 117, and it's another one of these email
24  strings.
25         Do you see that?

Page 35

1      A.  Yes.
2         MS. YOUNG:  And let me just interject here that
3  I'd like to designate this portion as attorneys' eyes
4  only if you're going to ask him about any of the
5  financial information in here.
6         MR. CARLSON:  And I won't.
7         MS. YOUNG:  Okay.
8         MR. CARLSON:  But feel free to pop in if I step
9  on something.
10         MS. YOUNG:  Okay.
11  BY MR. CARLSON:
12     Q.  I'm really just interested in the most recent
13  of emails which is at the top of the page of 0115.  It's
14  from Mr. Silver to you and it's dated January 7th, 2015,
15  and the subject is "Beauty & the Beast:  Beast
16  Methodology Scenarios and Budgets."
17         Do you see that?
18     A.  Yes.
19     Q.  All I'm interested in here is is that it looks
20  like at this point in time, at the beginning of 2015
21  there were -- the options had narrowed to two.  He lists
22  three options here:  Full prosthetics, full body, no
23  face, and all-CG.  And then he says, "The Full
24  Prosthetics Approach is now moot, now that BC has agreed
25  to go with the Full Body/No Face Version, but it's

Page 36

1  useful for comparison."
2         Do you see that?
3      A.  Yes.
4      Q.  So was there a point in time when Bill Condon
5  had decided to agree not to go down the makeup effects
6  approach and he was siding with the hybrid approach that
7  we talked about earlier, partially CG, partially not?
8      A.  I don't recall that.
9      Q.  Okay.  But certainly by January 2015 the fully
10  prosthetic approach makeup effects approach with the
11  Beast was moot?
12     A.  I don't know dates.  This memo would appear to
13  say that.
14     Q.  I understand.  Okay.
15         (Exhibit 31 marked)
16  BY MR. CARLSON:
17     Q.  Mr. Hoberman, this is Exhibit 31.  It bears the
18  production number Mandeville-Rearden 03 and it's an
19  email from Ms. Kennedy, Rachel Kennedy, to Bill Condon
20  and you and Jeff Silver.  And it's dated March 4, 2015.
21         Do you see that?
22     A.  Yes.
23     Q.  I'm taking this email a little bit out of
24  context just because it's at this point in my notebook
25  but I wanted to ask you about it.

Page 37

1         Who is Rachel Kennedy?
2     A.  She was the publicist for the film.
3     Q.  What does the publicist do?
4     A.  They I guess garner as much media attention to
5  the film as they can.
6     Q.  And I guess what is the point of getting media
7  attention to the film?
8         MS. YOUNG:  Objection.  Calls for speculation.
9  Vague.
10        THE WITNESS:  I mean you always want media to
11  come down to the set and write about the film.
12  BY MR. CARLSON:
13     Q.  So --
14     A.  To put it in people's heads.
15     Q.  To put it in people's head, the film.
16     A.  (No audible response.)
17     Q.  You have to answer orally so she can take it
18  down in the transcript.
19     A.  What didn't I say?
20     Q.  You nodded your head.
21     A.  Oh.  Yes.
22     Q.  So that they'd read about -- people would read
23  about the film and hopefully come and see it; is that
24  right?
25     A.  Yes.

David Hoberman - Confidential
March 04, 2020

Page 50

1  your recollection of a test that had been done using
2  Mova.  Do you recall, you know, similar testing being
3  done with any technology by ILM for facial motion
4  capture?
5       A.  I don't recall.
6       Q.  If I remember correctly, you attended some of
7  the facial -- the Mova facial performance capture
8  sessions with Dan Stevens playing the Beast?
9       A.  Yes.  In London you're referring to?
10      Q.  I don't recall where they were but --
11      A.  Yes.
12      Q.  Yes.  Okay.
13          And you would agree that Mr. Stevens delivered
14 a fine performance as the Beast?
15      A.  Yes.
16      Q.  And did you think it was important to try and
17 capture as much of Mr. Stevens' performance as you could
18 in the CG Beast character for the film?
19      A.  Can you repeat that?
20      Q.  Yes.  Did you think it was important to try to
21 capture as much of Mr. Stevens' performance in the CG
22 Beast as it appeared in the film?
23      A.  That's a vague question for me.
24      Q.  What are you having trouble with and I'll see
25 if I can help you?

Page 51

1       A.  Repeat it again.
2       Q.  Sure.  Did you think that it was important to
3  try to capture as much of Mr. Stevens' performance as
4  the Beast as you could in the CG character as it
5  appeared in the film?
6       A.  That's where I got tripped up, "in the CG
7  character in the film."  The answer to capturing as much
8  of Dan Stevens as possible, yes.
9       Q.  Okay.  And did you think it was important that
10 the CG Beast character as it appeared in the film
11 reflect Mr. Stevens' performance as the Beast?
12      A.  Yes.
13      Q.  Did you believe that Mr. Stevens' performance
14 as the Beast would help audiences to empathize with the
15 CG Beast character?
16      A.  Repeat it, please.
17      Q.  Sure.  Did you believe that Mr. Stevens'
18 performance as the Beast would help audiences to
19 empathize with the CG character?
20      A.  Yes.
21      Q.  Did you think that audiences would want to see
22 his performance?
23      A.  Would what?
24      Q.  Would want to see his performance.
25          MS. YOUNG:  Object to the form.  Calls for

Page 52

1  speculation.
2          THE WITNESS:  I think people wanted to see the
3  movie.
4  BY MR. CARLSON:
5       Q.  I'm going to move on to a different topic.
6          During production were there regular screenings
7  of shots from the film?
8       A.  Yes.
9       Q.  And was it your practice to attend those?
10      A.  No.
11      Q.  Did you attend any?
12      A.  Yes.
13      Q.  How many would you say you attended?
14      A.  I have no idea.
15      Q.  Okay.  There were screenings also for Disney
16 executives where Tendo Nagenda or Sean Bailey or Alan
17 Horn or all three of them would attend; is that correct?
18      A.  Yes.
19      Q.  And they'd have an opportunity to give notes in
20 those screenings?
21      A.  They could.
22      Q.  Did you attend those screenings?
23      A.  No.  I was in London.
24      Q.  And there were screenings for Bob Iger.  Do you
25 recall that?

Page 53

1          MS. YOUNG:  Object to form.
2          THE WITNESS:  I just recall one screening with
3  Bob.
4  BY MR. CARLSON:
5       Q.  Okay.  One screening with Bob Iger?
6       A.  Of the completed film.
7       Q.  Okay.  So the film was completed at the time.
8  And what was the purpose then of screening it at that
9  time for him?
10      A.  He could have given us last minute things that
11 we could do but it was pretty much everybody -- it was
12 pretty much done, and he cried and so...
13      Q.  He was moved?
14      A.  He was moved.
15      Q.  I take it, you know, if a Disney executive in
16 one of these screenings had given a note that they
17 wanted something changed or done differently, that that
18 would be something that would be important to you to
19 address.  Is that correct?
20          MS. YOUNG:  Incomplete hypothetical.  Vague.
21          THE WITNESS:  Yes.
22 BY MR. CARLSON:
23      Q.  Were you involved in the production of the
24 trailer for "Beauty and the Beast"?
25      A.  No.

David Hoberman Confidential
March 04, 2020

Page 54
1   Q.  Who would have been responsible for that?
2   A.  Disney marketing.
3   Q.  Were you shown the trailer before it was
4   released?
5   A.  Yes.
6   Q.  And were you asked to comment on it?
7   A.  Yes.
8   Q.  Okay.  The trailer -- let me ask this:  Studios
9   these days I gather release trailers not only in
10  theaters for theatrical review but also online; is that
11  correct?
12  A.  Yes.
13  Q.  They release them on YouTube and other social
14  platforms?
15          MS. YOUNG:  Objection.  Overbroad.  Vague.
16          THE WITNESS:  Yes.
17  BY MR. CARLSON:
18  Q.  Does Disney track the success of its trailers?
19          MS. YOUNG:  Calls for speculation.
20          THE WITNESS:  What she said.
21  BY MR. CARLSON:
22  Q.  I guess a better question is do you know if --
23  A.  No.
24  Q.  -- Disney tracks -- okay.
25          Did you hear anything about the success of the

Page 55
1   Disney trailer for "Beauty and the Beast"?
2           MS. YOUNG:  Object to form.
3           THE WITNESS:  I'm sure I did but I don't
4   recall.
5   BY MR. CARLSON:
6   ==Q.  Okay.  It seems obvious but the purpose of the==
7   ==trailer is to induce audiences to come see the film;==
8   ==isn't that correct?==
9   ==A.  Yes.==
10  ==Q.  To spark interest in it?==
11  ==A.  Yes.==
12  ==Q.  And that a successful, you know, widely seen==
13  ==trailer would motivate at least some people to come see==
14  ==a movie?==
15          MS. YOUNG:  Objection to the form and calls for
16  speculation.
17  ==        THE WITNESS:  Yes.==
18          MR. CARLSON:  We're jumping back into documents
19  now.
20          (Exhibit 36 marked)
21  BY MR. CARLSON:
22  Q.  Okay.  Mr. Hoberman, you've been handed a
23  one-page document it's Exhibit 36 to your deposition.
24  It bears production numbers Mandeville-Rearden 023, and
25  it looks like it's an email string.  The top email is

Page 56
1   one from you to Mr. Young, and the subject is "Beauty
2   and the Beast:  Furred Beast Test via PIX."
3           Do you see that?
4   A.  Yes.
5   Q.  The first email at the bottom of the page
6   appears to be one from Steve Gaub to you and it begins
7   "Here is the furred Beast test."
8           Do you see that?
9   A.  Yes.
10  Q.  Do you recall what it was that you were looking
11  at here when he refers to the furred Beast test?
12  A.  No.
13  Q.  Mr. Gaub says, "Please let me know once you've
14  had a chance to view so I can forward to Disney."
15          Is that right?
16  A.  Yes.
17  Q.  And then I want to ask you about the next
18  paragraph, second sentence where he says, "Bill saw it
19  and said it was very encouraging and liked that he could
20  sense Dan's performance coming through."
21          Do you see that?
22  A.  Yes.
23  Q.  Was the furred Beast test a test with Mova
24  capture that you were looking at, that's referenced in
25  these emails?

Page 57
1           MS. YOUNG:  Objection.
2           THE WITNESS:  I don't know.
3   BY MR. CARLSON:
4   Q.  The middle of the three emails is from Mr. Gaub
5   to you and I want to ask you just about the third
6   sentence, he says to David -- in the third sentence he
7   says, "Disney is clamoring, and Bill said he's okay
8   sending them if you are, with the below caveats,"
9   talking about the furred Beast test.
10          Do you see that?
11  A.  Yes.
12  Q.  Do you recall what Disney was clamoring about?
13  A.  No.
14  Q.  And you just don't recall the test this is
15  referring to?
16  A.  (No audible response.)
17  Q.  Okay.
18  A.  We saw so many tests, you know, I have no idea.
19  Q.  Okay.  Do you recall a first time that you saw
20  an animated Beast with fur?
21  A.  No.
22          (Exhibit 37 marked)
23  BY MR. CARLSON:
24  Q.  Okay.  Exhibit 37 is Mandeville-Rearden 0827
25  and it's an email from you to Tendo Nagenda of Disney

Page 62

1  Do you see that?
2  A. Yes.
3  Q. Who is Max Jacoby?
4  A. My assistant.
5  Q. And was he assisting you with respect to your
6  work in producing "Beauty and the Beast"?
7  A. No.
8  Q. Do you know why he was forwarding this
9  information to you?
10 A. I would be speculating, but just to say I had
11 an assistant in London, and Max was in the L.A. office.
12 Q. Okay. And since this concerns Bill Condon
13 meetings in L.A., that communication would have come
14 from Mr. Jacoby?
15 A. Yes.
16 Q. Okay. My question is with respect to the
17 Friday, February 5 entries for screening for Alan Horn
18 and then -- that's at 2:00 o'clock, and a 1:30 Beauty
19 and the Beast studio notes meeting at Disney, my only
20 question is whether you attended those?
21 A. Your question is what?
22 Q. Whether you attended those events, either one.
23 A. I don't recall, but I'm sure I did.
24 Q. And do you recall what was being screened for
25 Mr. Horn on February 5?

Page 63

1  A. I do not.
2  Q. And what is a "Beauty and the Beast" studio
3  notes meeting?
4  A. That would be any the executives that saw the
5  movie would then get together and go through their
6  notes.
7  Q. By February 2 of 2016 would the movie have been
8  substantially completed?
9  A. I don't recall. I'm terrible with dates.
10    (Exhibit 42 marked)
11 BY MR. CARLSON:
12 Q. So Exhibit 42 bears production numbers
13 Mandeville-Rearden 0883, and it's an email string, the
14 top one being from Sean Bailey to you and copying Tendo
15 Nagenda and Jessica Virtue of Disney, and the subject is
16 "Evermore."
17    Do you have that in front of you?
18 A. Yes.
19 Q. So the first email in the string is from you
20 and it says, "I spoke to Bill today re the Beast and
21 Evermore. He's happy to keep trying to get more facial
22 emotion and thinks there are a few shots where he can be
23 enhanced and will do so."
24    Do you see that?
25 A. Yes.

Page 64

1  Q. And "Evermore" is one of the songs that were, I
2  think, written for the live-action film; isn't that
3  right, for the Beast?
4  A. Yes.
5     I was waiting for you.
6  Q. She doesn't need any help.
7     MS. YOUNG: I trained you well.
8  BY MR. CARLSON:
9  Q. She's doing just fine objecting.
10    And then your response to him -- or strike
11 that.
12    And then Mr. Bailey's response to you is
13 "Great. Thanks for pushing on this." Is that correct?
14 A. Yes.
15 Q. And so was Mr. Bailey asking you to push on
16 getting more facial emotion for the Beast singing
17 "Evermore"?
18 A. Yes.
19 Q. And he asked you to push Bill on it, Bill
20 Condon?
21 A. I don't recall those circumstances.
22 Q. One of the cc's is Jessica Virtue. Do you know
23 who she is?
24 A. Yes.
25 Q. Who is she?

Page 65

1  A. A junior executive at the time on the film
2  working for Tendo.
3  Q. Okay. At Disney?
4  A. Yes.
5  Q. We're down to three.
6  A. Wow.
7     (Exhibit 43 marked)
8  BY MR. CARLSON:
9  Q. Exhibit 43 is a document with production
10 numbers Mandeville-Rearden 01016 through 1032, and it's
11 an email from William C. Hendley at Disney to Bill
12 Condon and to you and to Dave Solomon.
13    Do you have that in front of you?
14 A. Yes.
15 Q. Okay. So I have some very specific questions
16 about certain pages in this. If you want to take the
17 time to read it we can take a break, or you can just --
18 A. Bring it on.
19 Q. He's saying bring it on. And so we will.
20    Who is William Hendley?
21 A. I don't know.
22 Q. Okay. And his signature on the email indicates
23 that he's Global Publicity for Walt Disney Studios
24 Motion Pictures. Do you know what Global Publicity does
25 for films at Disney?

Page 66

1    A.   Yes.
2    Q.   And what's that?
3    A.   To produce one of these, to get actors and the
4  director and producers to talk to media, do articles,
5  anything that can promote the film.
6    Q.   Okay.  For the purposes of interesting
7  audiences and getting them to come to see the film?
8    A.   Correct.
9    Q.   And when you say "to produce this," that's the
10 attachment you're referring to; right?
11   A.   Yes.
12   Q.   What is the attachment?
13   A.   What do they call it?  I'm blanking.  There is
14 a name for it.  I just can't remember.
15   Q.   When Mr. Hendley refers to it he says, "Please
16 find our draft of the production notes for Beauty and
17 the Beast."
18        Is that what this is called?
19   A.   If he says so.
20   Q.   Or press kit?
21   A.   I think this ultimately goes into the press kit
22 but I think production notes -- when was this?
23 11/10/16.  Yeah, these would be the --
24        MS. YOUNG:  Don't speculate.
25        THE WITNESS:  These would be the production

Page 67

1  notes.
2  BY MR. CARLSON:
3    Q.   Okay.  And so is the purpose of production
4  notes then something to hand out to the press?
5        MS. YOUNG:  Again, calls for speculation.
6        THE WITNESS:  Yeah, I would be speculating.
7  BY MR. CARLSON:
8    Q.   What is done with production notes?
9        MS. YOUNG:  Same objection.
10       THE WITNESS:  All I know is that I read them
11 and approve them.
12 BY MR. CARLSON:
13   Q.   Okay.  So you read the attachment to Exhibit 43
14 and approved it?
15   A.   Yes.
16       MS. YOUNG:  Well, object to the form as vague.
17 BY MR. CARLSON:
18   Q.   So I want to turn to Page 01021 and ask you a
19 question about the top paragraph, which is a quote
20 that's attributed to you.
21       MS. YOUNG:  And I know you didn't want to read
22 this whole document but maybe just take a minute to read
23 this section so you can have it in context.
24 BY MR. CARLSON:
25   Q.   And you're welcome to take as much time -- I

Page 68

1  could take a short break here if you wanted.
2    A.   I think I'm good.
3    Q.   Okay.  So the document states in a quote, "The
4  role is an incredibly challenging one, as Dan" --
5  referring to Dan Stevens -- "has to bring the Beast to
6  life even though he will be represented on screen
7  digitally," closed quote "adds producer David Hoberman."
8        Then it says, quote, "The Beast is a
9  fully-digital character created through performance and
10 facial capture technology, and Dan is able to
11 beautifully convey both the Beast's humanity as well as
12 his beastliness."
13       Do you see that?
14   A.   Yes.
15   Q.   And you approved of that quote for this
16 document?
17   A.   Yes.
18   Q.   Okay.  And then let's turn to Page 1027 and I'm
19 going to ask about the text under the heading "Behind
20 the Magic on the Screen," through the second paragraph
21 on the following page.
22       MS. YOUNG:  And again, just take your time to
23 read through that.  And anything else you need to look
24 at for context.
25       THE WITNESS:  Okay.

Page 69

1  BY MR. CARLSON:
2    Q.   So the first sentence below the heading states,
3  "The key to a successful live-action adaptation of
4  'Beauty and the Beast' lay with the Beast, as the
5  mythical creature needed to be convincing and someone
6  with whom the audience could relate to and care for, but
7  the technology needed to craft such a Beast did not
8  exist until recently."
9        And then the following sentence says, "To
10 create a realistic looking Beast in a real world
11 environment while maintaining Dan Stevens' performance,
12 a combination of physical performance capture and Mova
13 facial capture technology was used."
14       My question is just you did approve that
15 language for this document?
16   A.   I would say I approved it superficially.
17   Q.   You didn't object to it?
18   A.   No.
19   Q.   And then on the following page my question is
20 about the first full paragraph which begins, or which
21 states, "Stevens also participated in separate Mova
22 facial capture sessions which took place in the studio
23 where phosphorescent makeup was applied to his face
24 (which shows up under ultraviolet light as blue) and was
25 surrounded by multiple cameras tracking every pore in

Page 70

1  his face.  The Mova customized hardware and software
2  then converted the performance into data."
3       My question is did you approve that language as
4  well?
5       A.  Same.  I superficially approved it.
6       Q.  And you did not object to it?
7       A.  Correct.
8       (Exhibit 44 marked)
9       (Recess)
10 BY MR. CARLSON:
11      Q.  We've handed you Exhibit 44, Mr. Hoberman.
12 It's a one-page document.  It has production numbers
13 Mandeville-Rearden 0771, and it's entitled "Beauty and
14 the Beast David Hoberman Soundbites V2."
15      Do you have that in front of you?
16      A.  Yes.
17      Q.  What is this?
18      A.  A soundbite for me to talk to the press about.
19      Q.  Okay.  And apparently this was recorded in some
20 manner?
21      A.  Yes.
22      Q.  Was it, like, videotaped or filmed?
23      A.  Videotaped.
24      Q.  Okay.  And was the videotape something that
25 would be handed out then to the press?

Page 71

1       A.  No.
2       Q.  What was done with it?
3       A.  What do we call this?  It's kind of a behind
4  the scenes thing that I do interviews, Bill does
5  interviews, everybody does interviews and then they use
6  whatever they want whenever they need it for whatever
7  type of film they are -- whether it's only for, you
8  know, Entertainment Tonight or whatever it is, that's
9  what the soundbites are integrated into.
10      Q.  Okay.  So the media might use some or all of
11 the soundbites that you provided here for purposes of
12 promoting the "Beauty and the Beast" film to audiences?
13      A.  I'm the least important piece of the puzzle
14 when it comes to the press.
15      Q.  Can you look at clip number 11 and you spoke
16 for, it looks like, 18 seconds about Dan Stevens as the
17 Beast.
18      Do you recall what you said?
19      A.  No, not a chance.
20      Q.  The gist, do you recall the gist of what you
21 said?
22      A.  Huh?
23      Q.  Do you recall the gist of what you said in this
24 clip?
25      A.  No.  I would be speculating.

Page 72

1       Q.  Okay.  And at the end, clip number 17, you
2  spoke for 35 seconds on why audiences should look
3  forward to seeing this film.
4       Do you recall what you said there?
5       A.  I don't.
6       Q.  And do you recall even the gist of it?
7       A.  No.
8       Q.  Who has the videotape?
9       MS. YOUNG:  If you know.
10      THE WITNESS:  I would be speculating.  I could
11 say Disney.
12 BY MR. CARLSON:
13      Q.  Well, and that's where I'm going.  Did, you
14 know, you or Mandeville or anyone working with you, did
15 any of you retain a copy of this videotape?
16      A.  I did not.
17      Q.  And you don't know anyone who works with you
18 who did?
19      A.  No.
20      Q.  Okay.  But Disney would have a copy of the
21 videotape if it exists?
22      MS. YOUNG:  Calls for speculation.
23      THE WITNESS:  Yeah, I mean I'd be speculating
24 but I'd also be surprised if they didn't.
25      MR. CARLSON:  And, you know, we request for

Page 73

1  production a copy of the videotape or film, whatever it
2  is that was created as a result of this.  I made a
3  previous request for these soundbites, and I don't know
4  if it was interpreted too narrowly, but as I understand
5  it there is a section of film or a videotape which has
6  these clips on it and we request its production.
7       (Exhibit 45 marked)
8  BY MR. CARLSON:
9       ==Q.  And Exhibit 45, Mr. Hoberman, bears==
10 ==Mandeville-Rearden production numbers 01406 and it's an==
11 ==email from Max Jacoby to you.  It's dated May 3, 2017,==
12 ==and the subject is "Talking points."==
13      ==Do you have that in front of you?==
14      ==A.  Yes.==
15      ==Q.  What am I looking at here?==
16      ==A.  Talking points.  For what, I don't know.==
17      Q.  Were these talking points for communication to
18 the press about the film?
19      A.  I have no idea.
20      Q.  Do you recall a speaking engagement that you
21 may have had in which you used these talking points?
22      A.  Nothing specifically.
23      Q.  Do you recall speaking with the press or at a
24 speaking engagement about the use of Mova to capture Dan
25 Stevens' performance?

David Hoberman - Confidential
March 04, 2020

|  | Page 74 |
|---|---|
| 1 | A. I honestly don't recall. |
| 2 | Q. Would Mr. Jacoby be someone who would be likely |
| 3 | to recall that? |
| 4 | A. Oh, I doubt it. |
| 5 | Q. Okay. Why is that? |
| 6 | A. He was not a very good assistant. |
| 7 | Q. And is he still employed by you? |
| 8 | A. No, he's not. |
| 9 | Q. Do you know where he lived? I mean is he in |
| 10 | the L.A. area? |
| 11 | A. I have no idea. |
| 12 | Q. Was he at the time? |
| 13 | A. Yes. |
| 14 | ==Q. Mr. Jacoby is providing talking points to you== |
| 15 | ==as his employer for your use in this email; is that== |
| 16 | ==correct?== |
| 17 | ==A. Yes.== |
| 18 | ==Q. And this is a document that was created by him== |
| 19 | ==in relation to your work in producing "Beauty and the== |
| 20 | ==Beast"; is that correct?== |
| 21 | ==A. Yes.== |
| 22 | ==Q. And the purpose of the document is for you to== |
| 23 | ==be able to rely on these talking points; is that== |
| 24 | ==correct?== |
| 25 | ==A. Yes.== |

|  | Page 75 |
|---|---|
| 1 | Q. But just to confirm, do you have a recollection |
| 2 | of ever having used any of these talking points? |
| 3 | MS. YOUNG: It's been asked and answered. |
| 4 | BY MR. CARLSON: |
| 5 | Q. In any event? |
| 6 | A. I don't. |
| 7 | MR. CARLSON: Okay. I think I'm done. Why |
| 8 | don't we take just a short break. |
| 9 | MS. YOUNG: Take a break? |
| 10 | MR. CARLSON: Yeah, and then I will confirm. |
| 11 | But I think we're done. |
| 12 | MS. YOUNG: Okay. |
| 13 | (Recess) |
| 14 | BY MR. CARLSON: |
| 15 | Q. Just a couple more questions on Exhibit 45. |
| 16 | Was it unusual at all for your assistants to |
| 17 | provide you with talking points for interviews that you |
| 18 | were being asked to do? |
| 19 | A. Yes, when it comes to technical things like |
| 20 | this. |
| 21 | Q. And just to clarify, it would be common with a |
| 22 | technical subject like this that an assistant would |
| 23 | provide you with talking notes, is that what you're |
| 24 | saying? |
| 25 | A. Yes, because I wouldn't remember. |

|  | Page 76 |
|---|---|
| 1 | Q. And the notes appear to be in connection with |
| 2 | promotion of "Beauty and the Beast"; is that correct? |
| 3 | MS. YOUNG: Objection. Calls for speculation. |
| 4 | THE WITNESS: I don't know. |
| 5 | BY MR. CARLSON: |
| 6 | Q. The second line from the bottom from Mr. Jacoby |
| 7 | states, "With headcam won't even get 200 dots on the |
| 8 | face, so Beauty and the Beast went up from 200 to |
| 9 | 5,000 points of reference and helped capture the finer |
| 10 | details." |
| 11 | Do you see that? |
| 12 | A. Yes. |
| 13 | Q. So does that refresh your recollection that |
| 14 | this exhibit would have been about the promotion of |
| 15 | "Beauty and the Beast"? |
| 16 | A. No. |
| 17 | MS. YOUNG: Same objection. |
| 18 | BY MR. CARLSON: |
| 19 | Q. Were you using Mova in any of the other films |
| 20 | that you were working on at the time of "Beauty and the |
| 21 | Beast"? |
| 22 | A. No. |
| 23 | Q. Do you believe that Exhibit 45 was provided to |
| 24 | you for purposes of the comments that you made in |
| 25 | Exhibit 44? |

|  | Page 77 |
|---|---|
| 1 | MS. YOUNG: Calls for speculation. |
| 2 | THE WITNESS: No. No, they wouldn't. |
| 3 | BY MR. CARLSON: |
| 4 | ==Q. And why is that?== |
| 5 | ==A. I mean I'd be speculating but I think I was== |
| 6 | ==asked to talk to a technical magazine about the process== |
| 7 | ==and could not remember anything. I believe that's what== |
| 8 | ==this was for.== |
| 9 | ==Q. And when you say "this" you're referring to== |
| 10 | ==Exhibit 45?== |
| 11 | ==A. Yes.== |
| 12 | ==Q. Then my last question on this is looking at the== |
| 13 | ==document do you have any reason to believe that it's not== |
| 14 | ==an authentic document, in other words, that this is some== |
| 15 | ==kind of forgery?== |
| 16 | ==A. No.== |
| 17 | MR. CARLSON: That's all I have. |
| 18 | |
| 19 | EXAMINATION |
| 20 | |
| 21 | BY MS. YOUNG: |
| 22 | Q. A couple of quick follow-up questions. |
| 23 | So can you out of your pile pull out |
| 24 | Exhibit 43, please. |
| 25 | And for the record, Exhibit 43 is a cover email |

Page 78

1  that attaches an attachment called "Beauty and the Beast
2  Production Notes" about which you were asked some
3  questions earlier.  Do you recall that?
4        A.  Yes.
5        Q.  And you were asked some questions about
6  specific language in this document and you were asked
7  whether you approved that language and you said you did
8  so superficially.  So my question is what do you mean by
9  "superficially"?
10       A.  I tend to read my comments and maybe the
11 director's comments and everything else I just sort of
12 scan and look at to make sure it just sort of makes
13 sense.
14       Q.  What was your level of involvement in
15 connection with the "Beauty and the Beast" film with
16 respect to the visual effects technology that was used
17 to create the Beast?
18          MR. CARLSON:  Objection.  Asked and answered.
19          THE WITNESS:  I mean film is a hierarchy the
20 way it works, and I'm up here, and I don't mean that
21 egotistically, but I hire people to do all the technical
22 aspects of the film that I can't, won't, and will never
23 understand.  And fortunately on "Beauty and the Beast"
24 we hired very good people.
25 ///

Page 79

1  BY MS. YOUNG:
2        Q.  And do you have a clear understanding of all of
3  the different technologies that were used to create the
4  Beast?
5        A.  No.
6           MS. YOUNG:  That's all that I have.  Thank you.
7           MR. CARLSON:  Yeah, I have no redirect.
8           MS. YOUNG:  Okay.  I think we're done.
9           And then I'll just put on the record that I'd
10 like to order a rough draft of the transcript as well as
11 a final.  Thank you.
12          THE REPORTER:  Thank you.
13          (Deposition concluded at 12:42 p.m.)

Page 80

1              DECLARATION UNDER PENALTY OF PERJURY

4       I, David Hoberman, hereby certify under penalty of
5  perjury that I have read the foregoing transcript of my
6  deposition taken on March 4, 2020; that I have made such
7  corrections as appear noted on the Deposition Errata
8  Page, attached hereto, signed by me; that my testimony
9  as contained herein, as corrected, is true and correct.

11      Dated this _____ day of _____, 2020, at
12 _____ , California.

16                          _____
17                                David Hoberman

Page 81

1                    DEPOSITION ERRATA SHEET

3  Page No._____ Line No. _____
4  Change:_____
5  Reason for change: _____
   Page No._____ Line No. _____
6
7  Change:_____
   Reason for change: _____
8  Page No._____ Line No. _____
9
10 Change:_____
   Reason for change: _____
11 Page No._____ Line No. _____
12
13 Change:_____
   Reason for change: _____
14 Page No._____ Line No. _____
15
16 Change:_____
   Reason for change: _____
17 Page No._____ Line No. _____
18
19 Change:_____
   Reason for change: _____
20 Page No._____ Line No. _____
21
22 Change:_____
   Reason for change: _____
23
24 _____   _____
25 David Hoberman                    Dated

David Hoberman - Confidential
March 04, 2020

Page 82

```
 1                REPORTER'S CERTIFICATE
 2
 3       I, Jean F. Holliday, CSR No. 4535, Certified
 4   Shorthand Reporter, certify:
 5       That the foregoing proceedings were taken before
 6   me at the time and place therein set forth, at which
 7   time the witness was put under oath by me;
 8       That the testimony of the witness, the questions
 9   propounded, and all objections and statements made at
10   the time of the examination were recorded
11   stenographically by me and were thereafter transcribed;
12       That a review of the transcript by the deponent
13   was not requested;
14       That the foregoing is a true and correct
15   transcript of my shorthand notes so taken.
16       I further certify that I am not a relative or
17   employee of any attorney of the parties, nor financially
18   interested in the action.
19       I declare under penalty of perjury under the laws
20   of California that the foregoing is true and correct.
21       Dated this 15th day of March, 2020.
22
23            Jean Holliday
24       Jean F. Holliday, CSR No. 4535
25
```